## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ANTYANE ROBINSON,** | : | |
| | : | |
| **Petitioner** | : | **Civil Action No. 1:05-CV-1603** |
| | : | |
| **v.** | : | **(Chief Judge Kane)** |
| | : | |
| **JEFFREY BEARD, Commissioner,** | : | |
| **Pennsylvania Department of Corrections, <u>et al.</u>,** | : | **THIS IS A CAPITAL CASE** |
| | : | |
| **Respondents** | : | |

### <u>MEMORANDUM</u>

### I.   <u>INTRODUCTION</u>

Before the Court is a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254,

filed by petitioner Antyane Robinson ("Robinson"), an inmate currently incarcerated at the State

Correctional Institution at Greene ("SCI-Greene"), in Waynesburg, Pennsylvania.  Robinson

challenges his 1997 conviction and sentence in the Court of Common Pleas of Cumberland

County, Pennsylvania.  For the reasons that follow, the petition will be denied.

### II.   <u>BACKGROUND</u>

On March 13, 1997, Robinson was found guilty of first degree murder, attempted

criminal homicide, and related charges following a jury trial in the Court of Common Pleas of

Cumberland County, Pennsylvania ("trial court" or "Cumberland county court").  The

Pennsylvania Supreme Court summarized the relevant facts as follows:

> [Robinson] dated Tara Hodge on and off during the time period
> beginning in early 1993 until February 1995, when Hodge discovered
> that [Robinson] had another girlfriend.  They did not see each other
> for over a year, until March 30, 1996, when [Robinson] re-established
> an intimate relationship with Hodge.  Between March 30, 1996 and
> the night of the incident in question, Hodge was with [Robinson] for
> one night on both March 30 and April 30, four days between May 10

and 13, and one night on June 1, 1996. Hodge met Rashawn Bass on May 26, 1996, after she responded to a personal ad in the local paper. On June 10, 1996, Hodge broke off the relationship with [Robinson] by letter.

On the evening of June 29, 1996 Hodge worked the 2 p.m. to 10 p.m. shift at Wal-Mart. Following her shift, Hodge met Bass at her apartment, located in Carlisle, Pennsylvania, where they had a pizza delivered. After eating the pizza, Bass took a shower. Shortly after midnight, while Bass was in the shower, [Robinson] arrived at the apartment of Tara Hodge. Hodge let him into her apartment. Upon finding that Hodge had a guest at her apartment [Robinson] and Hodge had an argument. [Robinson] requested that Hodge ask Bass to leave. When Hodge refused to ask Bass to leave, [Robinson] pulled a gun out of his "sweats," which he pointed at Hodge and shot her. Hodge heard three shots. [Robinson] ran by Hodge, and she fell to the floor, unconscious.

At about 1 a.m. on the morning of June 30, 1996, Hodge regained consciousness in a pool of her own blood. She then entered the bathroom where she saw that Bass was dead inside the shower stall. She was able to drag herself to her next door neighbor's home. The police arrived at the neighbor's house and saw that Hodge had a head wound. Unable to speak, Hodge wrote a note directing the police to her apartment. The ambulance arrived and took Hodge to the hospital. The officer went to Hodge's apartment and found Bass' body in the shower. After leaving the apartment, the officer went to the hospital to speak with Tara Hodge. At the hospital, Hodge identified [Robinson] as the person who had shot her.

Rashawn Bass had been shot seven times and died almost instantly from multiple gunshot wounds. Bass was shot in the ear, the left side of his head, his upper and lower right chest, the lower left chest, the side of his left arm, and the back of his right hand. Twelve empty 9 millimeter shell casings were found in the apartment. The bullets from the empty shell casings were all fired from the same gun, which was manufactured by one of four possible companies, one of which was Lorcin. In Tara Hodge's apartment, the police found a notebook containing [Robinson's] pager number. Following this, the police obtained an arrest warrant charging [Robinson] with criminal homicide of Rashawn Bass, attempted criminal homicide of Tara Hodge and other related charges. The arrest warrant was forwarded to Prince George's County, Maryland, where [Robinson] was residing

at his parents' home. The following day, July 1, the Prince George's County police paged [Robinson]. Twenty minutes later, [Robinson] returned the call from a local shopping center. The police did not answer the call, but proceeded directly to the shopping center where they observed [Robinson] playing video games. The police then arrested [Robinson] at 4:00 p.m.

At the time of arrest, [Robinson] identified himself as Joseph Smith. The police took [Robinson] to the homicide unit of the Prince George's County police department, where they were met by Detective David Fones and Corporal Hayes of the Carlisle police department at 5:30 p.m. They identified themselves to [Robinson] as police officers from the Borough of Carlisle and told him they wished to question him about an incident that occurred there. [Robinson] was advised of his Miranda rights and signed a written waiver. [Robinson] told police that he had last been in Carlisle at the end of May or beginning of June. In response to whether he knew anyone in Carlisle, [Robinson] stated that he knew Tara Hodge and her family. [Robinson] also told police that he had spent June 29 through the afternoon of June 30 in Washington, D.C., Maryland and Virginia. [Robinson] also told police that he had owned a 9 millimeter handgun, which had been stolen by his niece's boyfriend before June, and 380 handgun, which he had sold. At 6:00 p.m., Detective Fones told [Robinson] he was charged with criminal homicide in Carlisle and read a portion of the arrest warrant to him. [Robinson] then asked whether "Tara is okay." The detective told [Robinson] that she was okay and that she had identified [Robinson] as the shooter. [Robinson] then dropped his head and moved it side to side. He denied any involvement in the shootings.

The police conducted a search of [Robinson's] room in his parents' home in Fort Washington, Maryland. In the bedroom, they found documents in a locked safe relating to a 9 millimeter Lorcin handgun. They did not find the weapon. They also found a picture of [Robinson] holding a 9 millimeter Star handgun, as well as a Federal 44 SPL revolver with ammunition. The police also found the letter from Tara Hodge postmarked June 10, 1996. The police also searched the residence of a woman whom [Robinson] was dating. They found some of [Robinson's] belongings at her house, including 9 millimeter ammunition.

Commonwealth v. Robinson, 721 A.2d 344, 349-50 (Pa. 1998) ("Robinson-I"). As stated above,

the jury found Robinson guilty of all the charges on March 13, 1997.  The penalty phase

commenced on the following day, March 14, 1997.  During the penalty phase, the jury found two

aggravating circumstances: (1) Robinson knowingly created a grave risk of death to another, see

42 Pa. Cons. Stat. § 9711(d)(7); and (2) Robinson committed a killing while in the perpetration

of a felony, see 42 Pa. Cons. Stat. § 9711(d)(6).  The jury also found two mitigating

circumstances: (1) Robinson's youth, see 42 Pa. Cons. Stat. § 9711(e)(4); and (2) Robinson's

future contributions to society, see 42 Pa. Cons. Stat. § 9711(e)(8).  The jury concluded that the

aggravating circumstances outweighed the mitigating circumstances and returned a verdict of

death, see 42 Pa. Cons. Stat. § 9711(c)(1)(iv).  On April 1, 1997, the trial court formally imposed

a sentence of death for first degree murder and a consecutive term of imprisonment of six years,

nine months to twenty years for aggravated assault.

Following the judgment of sentence, the trial court appointed collateral counsel, David J.

Foster, Esquire, pursuant to the Capital Unitary Review Act, 42 Pa. Cons. Stat. §§ 9570 et seq.

However, on August 11, 1997, the Supreme Court of Pennsylvania permanently suspended most

sections of that Act.  Consequently, the trial court vacated the appointment of collateral counsel

and directed Robinson's trial counsel to file a concise statement of matters complained of on

appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925.  By opinion dated November

13, 1997, the trial court denied all issues presented in that appeal.

Represented by trial counsel, Arla M. Waller, Esquire, and Ellen K. Barry, Esquire,

Robinson timely filed a direct appeal to the Pennsylvania Supreme Court, raising six (6) claims

of trial court error.  Specifically, Robinson asserted that the trial court (1) erroneously admitted

several pieces of irrelevant evidence at trial; (2) erred in not allowing Robinson's mother to

4

testify as to why Robinson had guns in the house; (3) erred in refusing to give a jury instruction

on voluntary manslaughter; (4) erred in failing to include any life qualification questions during

voir dire of potential jurors; (5) failed to rehabilitate certain jurors after it was established that

they would not vote to impose the death penalty; and (6) failed to give a jury instruction that a

life sentence in the Commonwealth of Pennsylvania means life without the possibility of parole,

see Simmons v. South Carolina, 512 U.S. 154 (1994).  See Robinson-I.  The Pennsylvania

Supreme Court affirmed the judgment of sentence upon direct appeal in an opinion dated

November 24, 1998, and reargument was denied on January 26, 1999.  Id.

Following disposition of the direct appeal, on March 2, 1999, the trial court again

appointed Attorney Foster for the purpose of filing a petition for collateral relief on behalf of

Robinson under Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat.

§§ 9541 et seq.  Thereafter, then-Governor of Pennsylvania Thomas Ridge signed a warrant,

scheduling Robinson's execution for May 12, 1999.  On April 20, 1999, the Pennsylvania

Supreme Court granted Robinson's emergency request for a stay of execution pending the filing

and consideration of a petition for writ of certiorari before the United States Supreme Court.

On January 10, 2000, the United States Supreme Court denied Robinson's petition for

writ of certiorari.  Robinson v. Pennsylvania, 528 U.S. 1082 (2000).  Thereafter, then-Governor

Ridge signed a second warrant, scheduling Robinson's execution for March 28, 2000.  However,

by order dated March 10, 2000, the trial court granted Robinson's motion for a stay of execution.

On October 16, 2000, Robinson timely filed a PCRA petition.  In that petition, Robinson

raised claims relating to the following areas: (1) pretrial issues; (2) trial issues; (3) jury charge

issues; (4) penalty phase issues; and (5) sentencing issues.  (See Doc. No. 33-5, Ex. 5,

<u>Commonwealth v. Robinson</u>, No. 96-1183 (Cumb. Co. Apr. 22, 2002).)  A full evidentiary

hearing on the PCRA petition was held before the trial court, now acting as PCRA court, on

October 10 and 18, November 29, and December 14, 2001.  (<u>See id.</u>)  On April 22, 2002, the

PCRA court denied the PCRA petition.  (<u>See id.</u>)

     Robinson's timely appeal to the Pennsylvania Supreme Court raised the following issues:

1.    Trial counsel was ineffective for failing to develop and introduce evidence warranting a voluntary manslaughter charge and verdict and for failing to properly argue on direct appeal that [Robinson] was entitled to an instruction on voluntary manslaughter.

2.    His death sentence is based upon an improper application of the perpetration of a felony aggravating circumstance and counsel was ineffective in failing to litigate claims about this aggravator.

3.    Trial counsel's failure to investigate and present at sentencing the readily available evidence of [Robinson's] increasingly paranoid behavior, paranoid schizophrenia, family dysfunction and abuse, diminished capacity and emotional trauma at the time of the offenses deprived him of his constitutional right to effective assistance of counsel.

4.    The sentencing jury, after hearing argument about his future dangerousness, was never instructed that, if sentenced to life, [Robinson] would be ineligible for parole.

5.    Trial counsel was ineffective for failing to object to the Commonwealth's cross-examination of [Robinson's] mother at the penalty phase.

6.    [Robinson] was tried while incompetent and his counsel was ineffective.

7.    The Commonwealth's continuous misconduct throughout [Robinson's] capital trial and sentencing prejudiced [Robinson].

8.      Defense counsel failed to object to irrelevant and improper victim impact testimony and argument.

9.      Trial counsel was ineffective for failing to object to the court's erroneous charge during the guilt phase wherein the court repeatedly stated if [Robinson] had specific intent to kill, the killing was with malice.

10.    There was insufficient evidence to support the jury's finding of the (d)(7) aggravating circumstance, and the trial court failed to include the required limiting instruction rendering the (d)(7) aggravating circumstance vague and overbroad, and counsel was ineffective in failing to litigate these.

11.    Trial counsel was ineffective for failing to effectively argue on direct appeal that the court's refusal to admit testimony of [Robinson's] mother about why he had guns violated [Robinson's] constitutional rights to due process and fair trial, and the refusal to admit this testimony prejudiced [Robinson].

12.    The proportionality review performed by this Court was constitutionally defective.

Commonwealth v. Robinson, 877 A.2d 433, 438 n.1 (Pa. 2005) ("Robinson-II").

On June 22, 2005, the Pennsylvania Supreme Court affirmed the judgment of the PCRA court. Id. The supreme court concluded that five of Robinson's issues constituted attempts to re-litigate claims that the court had dismissed in his direct appeal. Specifically, the court found that Robinson's newly-raised assertion of ineffectiveness of counsel for failing to litigate those claims would not revive the underlying claims. See id. at 438-49. The court found Robinson's remaining issues to be without merit and affirmed the PCRA court's decision.

On August 8, 2005, Robinson timely filed the instant petition for writ of habeas corpus (Doc. No. 1), as amended on January 19, 2006 (Doc. No. 21), in which he alleges eighteen (18) claims for relief. Specifically, those claims are set forth as follows:

1.    Petitioner's trial counsel were ineffective for failing to develop and introduce available evidence supporting a voluntary manslaughter charge and verdict and for failing to properly argue on direct appeal that Petitioner was entitled to an instruction on voluntary manslaughter; the trial court erred when it refused to give a defense requested jury instruction on the charge of voluntary manslaughter;

2.    Because of the Commonwealth's continuous misconduct throughout Petitioner's capital trial and sentencing, Petitioner was prejudiced and a new trial and sentencing proceeding must be granted;

3.    Trial counsel's failure to investigate and present at sentencing the readily available evidence of Mr. Robinson's increasingly paranoid behavior, paranoid schizophrenia, family dysfunction and abuse, diminished capacity and emotional trauma at the time of the offenses deprived him of his constitutional right to the effective assistance of counsel; trial counsel was laboring under an impermissible conflict of interest;

4.    Petitioner's conviction should be vacated because he was tried while incompetent and his counsel were ineffective;

5.    Mr. Robinson is entitled to relief because his death sentence is based upon an improper application of the "perpetration of a felony" aggravating circumstance and counsel were ineffective in failing to litigate claims about this aggravator;

6.    Petitioner is entitled to relief from his death sentence because there was insufficient evidence to support the jury's finding of the (d)(7) aggravating circumstance, and the trial court failed to include the required limiting construction, rendering the (d)(7) aggravating circumstance vague and overbroad, and counsel were ineffective in failing to litigate these claims;

7.    Trial counsel's failure to object to the introduction of irrelevant and otherwise inadmissible evidence of uncharged crimes, failure to ask for a cautionary instruction, and the trial court's failure to give such an instruction, violated Mr. Robinson's constitutional rights;

8

8.      Mr. Robinson's death sentence must be vacated under the Sixth, Eighth, and Fourteenth Amendments because the sentencing jury, after hearing argument about his future dangerousness, was never instructed that, if sentenced to life, Mr. Robinson would be ineligible for parole;

9.      Defense counsel failed to object to irrelevant and improper victim impact testimony and argument;

10.     The court's refusal to admit the testimony of Petitioner's mother about why Petitioner had guns violated Petitioner's constitutional rights to due process and a fair trial and Petitioner was prejudiced as a result;

11.     Mr. Robinson's rights guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated when defense counsel ineffectively failed to object to the Commonwealth's irrelevant, prejudicial and inflammatory cross-examination of Mr. Robinson's mother at the penalty phase;

12.     Defense counsel were ineffective for failing to object to the court's erroneous charge during the guilt/degree-of-guilt/innocence phase of trial wherein the court repeatedly stated that if Mr. Robinson had a specific intent to kill, the killing was with malice;

13.     Petitioner's death sentence must be vacated because the Pennsylvania Supreme Court failed to provide him meaningful proportionality review in violation of his statutory rights and rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution;

14.     The trial court improperly excluded prospective jurors who expressed an opposition to the death penalty, in violation of Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments;

15.     Petitioner was denied important rights during the extradition process from Maryland, including his right to counsel;

16.     Lethal injection in Pennsylvania violates the First, Eighth and Fourteenth Amendments to United States Constitution;

17.   Ineffective assistance and preservation;

18.   Petitioner is entitled to relief because of the cumulative prejudicial effect of the errors in this case.

(Doc. No. 21.)  Respondents responded to the habeas petition on March 20, 2006.  (Doc. No. 22.) Robinson filed his reply brief on April 18, 2006.  (Doc. No. 28.)  This matter is now ripe for disposition.

## III.   STANDARDS OF REVIEW

On April 24, 1996, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214 (1996), went into effect and amended the standards for reviewing state court judgments in federal habeas petitions filed under 28 U.S.C. § 2254.  A habeas corpus petition pursuant to § 2254 is the proper mechanism for a prisoner to challenge the "fact or duration" of his confinement.  Preiser v. Rodriguez, 411 U.S. 475, 498-99 (1973).  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  Rather, federal habeas review is restricted to claims based "on the ground that [petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Estelle, 502 U.S. at 68.

### A.   Exhaustion and Procedural Default

Habeas corpus relief cannot be granted unless all available state remedies have been exhausted, or there is an absence of available state corrective process, or circumstances exist that render such process ineffective to protect the rights of the applicant.  See 28 U.S.C. § 2254(b)(1). The exhaustion requirement is grounded on principles of comity in order to ensure that state

10

courts have the initial opportunity to review federal constitutional challenges to state convictions. See Werts v. Vaughn, 228 F.3d 178, 192 (3d Cir. 2000).

A state prisoner exhausts state remedies by giving the "state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999). Respect for the state court system requires that the petitioner demonstrate that the claims in question have been "fairly presented to the state courts."[1] Castille v. Peoples, 489 U.S. 346, 351 (1989). To "fairly present" a claim, a petitioner must present its "factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." McCandless v. Vaughn, 172 F.3d 255, 261 (3d Cir. 1999); see also Nara v. Frank, 488 F.3d 187, 197-98 (3d Cir. 2007) (recognizing that a claim is fairly presented when a petitioner presents the same factual and legal basis for the claim to the state courts). While the petitioner need not cite "book and verse" of the federal Constitution, Picard v. Connor, 404 U.S. 270, 278 (1971), he must "give the State 'the opportunity to pass upon and correct' alleged violations of its prisoners' federal rights" before presenting those claims here, Duncan v. Henry, 513 U.S. 364, 365 (1995) (quoting Picard, 404 U.S. at 275).

Under this exhaustion rule, a federal court must dismiss without prejudice habeas petitions that contain any unexhausted claims. Slutzker v. Johnson, 393 F.3d 373, 379 (3d Cir.

---

[1] A petitioner bears the burden of demonstrating that he has "fairly presented" his claims to the state's highest court, either on direct appeal or in a state post conviction proceeding. Lambert v. Blackwell, 134 F.3d 506, 513 (3d Cir. 1997). Further, pursuant to Pennsylvania Supreme Court Order 218, effective May 9, 2000, issues presented to the Pennsylvania Superior Court are considered exhausted for the purpose of federal habeas corpus relief under section 2254. See In re: Exhaustion of States Remedies in Criminal and Post-Conviction Relief Cases, No. 218, Judicial Administration Docket No. 1 (May 5, 2000) (per curiam).

2004).  This dismissal requirement does not apply, however, in cases where the state courts would not consider the unexhausted claims because they are procedurally barred by state law. Doctor v. Walters, 96 F.3d 675, 681 (3d Cir. 1996).  However, in that situation the petitioner must still overcome the concomitant doctrine of procedural default.  Id. at 683.

The doctrine of procedural default bars federal habeas relief when a state prisoner has defaulted on his federal claims in state court pursuant to an independent and adequate state procedural rule.  Id.  For example, failure to present federal habeas claims to the state courts in a timely fashion results in procedural default.  See O'Sullivan, 526 U.S at 848 (citing Coleman v. Thompson, 501 U.S. 722, 731-32 (1991)).  Like a state prisoner who has failed to exhaust his state remedies, "a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance."  Coleman, 501 U.S. at 732.  The doctrine of procedural default therefore ensures that a state prisoner cannot evade the exhaustion requirement of § 2254 by defaulting his federal claims in state court.  Id.

However, a federal habeas court can review the merits of procedurally defaulted claims if the petitioner demonstrates either cause for the procedural default and actual prejudice, or that a fundamental miscarriage of justice will result if the court does not review the claims.  See McCandless, 172 F.3d at 260; Coleman, 501 U.S. at 750-51; Caswell v. Ryan, 953 F.2d 853, 861-62 (3d Cir. 1992).  To demonstrate "cause" for a procedural default, the petitioner must show that some objective external factor impeded petitioner's efforts to comply with the state's procedural rule.  Murray v. Carrier, 477 U.S. 478, 488 (1986).  To demonstrate "actual prejudice," the petitioner must show "not merely that the errors . . . created a *possibility* of

12

prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire [proceeding] with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170 (1982) (emphasis in original).

Alternatively, a federal court may excuse a procedural default if the petitioner demonstrates that failure to review the claim will result in a fundamental miscarriage of justice. Edwards v. Carpenter, 529 U.S. 446, 451 (2000); Wenger v. Frank, 266 F.3d 218, 224 (3d Cir. 2001). The miscarriage of justice exception applies only in extraordinary cases where a "constitutional violation has probably resulted in the conviction of one who is actually innocent." Murray, 477 U.S. at 496. "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." Bousley v. United States, 523 U.S. 614, 623 (1998). To establish such a claim, a petitioner must "support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." Schlup v. Delo, 513 U.S. 298, 324 (1995). Further, actual innocence "does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty." Id. at 329.

In the present case, Robinson asserts in Claim 16 that lethal injection in Pennsylvania violates the First, Eighth, and Fourteenth Amendments to the United States Constitution. Upon review of the record, the Court finds that this claim is procedurally defaulted. As discussed above, a claim is procedurally defaulted if the petitioner failed to exhaust his state court remedies and is barred from presenting his claim to the state courts due to an independent and adequate state procedural rule. Coleman, 502 U.S. at 732. Robinson's claim relating to the administration

of lethal injection is unexhausted because he never presented it to the state courts, either on direct

appeal or collateral attack.  However, a new state habeas petition would be deemed time-barred

under Pennsylvania law, see 42 Pa. Cons. Stat. § 9545(b) (requiring the filing of any petition for

post conviction relief, including a second or successive petition, within one year of the date the

judgment becomes final),[2] and thus exhaustion is excused, but the claim is deemed procedurally

defaulted.  In order to have the Court consider the merits of his claim, Robinson must show

"cause and prejudice" or a "fundamental miscarriage of justice" to excuse default.  Here,

Robinson claims that his failure to develop this claim in state court was the result of "the state

court's clear and unequivocal precedent precluding disclosure of the Department of Corrections

protocol for conducting lethal injection."  (Doc. No. 27 at 58.)  While this assertion may provide

an explanation as to why a state court may deny such a claim, the Court fails to understand how it

explains why Robinson failed to even raise it in state court.  Further and without elaboration,

Robinson claims in the alternative that Pennsylvania's refusal to disclose the lethal injection

protocols demonstrates cause and prejudice to excuse procedural default, and that his execution

under the present system constitutes a miscarriage of justice.[3]  (Id.)  The Court rejects these

_____

[2] The time period for filing a second PCRA petition has expired.  See 42 Pa. Cons. Stat. Ann. § 9545(b)(1) (setting a one year limitations period).  Robinson raises no argument, and the record suggests no possibility, that his claim falls within any exception to the limitations period for filing a petition under the PCRA.  See id. (permitting petitions to be filed more than one year after judgment if the failure to raise the claim is attributable to government interference, the facts underlying the claim could not have been ascertained previously, or the claim involves rights newly recognized and retroactively applied by the Supreme Court).

[3] Robinson has not, in the state courts or before this Court, set forth any factual basis in support of a claim of actual innocence which is necessary for the application of a "miscarriage of justice" exception to procedural default.  See Murray, 477 U.S. at 496; Schlup, 513 U.S. at 316 (holding "if a petitioner . . . presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of

contentions and thus will deny habeas relief on this claim.[4]

Nevertheless, the Court is not precluded from addressing the merits of the exhausted claims.  See Wenger, 266 F.3d at 227-28 ("A petition containing unexhausted but procedurally barred claims in addition to exhausted claims, is not a mixed petition requiring dismissal under Rose [v. Lundy, 455 U.S. 509 (1982)].  Although the unexhausted claims may not have been presented to the highest state court, exhaustion is not possible because the state court would find the claims procedurally defaulted.  The district court may not go to the merits of the barred claims, but must decide the merits of the claims that are exhausted and not barred.") (quoting Toulson v. Beyer, 987 F.2d 984, 987 (3d Cir. 1993)).

**B.    Merits**

Section 2254(d) of Title 28 of the United States Code provides, in pertinent part, that an application for a writ of habeas corpus premised on a claim previously adjudicated on the merits in state court shall not be granted unless:

> (1) [the decision] was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) [the decision] was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  To establish that the decision was contrary to federal law, "it is not sufficient for the petitioner to show merely that his interpretation of Supreme Court precedent is

---

nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims.")

[4] The Court notes that the United States Supreme Court has held that an inmate may properly challenge a state's method of execution by filing a suit for injunctive relief under 42 U.S.C. § 1983.  Hill v. McDonough, 547 U.S. 573, 576 (2006).

more plausible than the state court's; rather, the petitioner must demonstrate that Supreme Court precedent *requires* the contrary outcome." Matteo v. Superintendent, 171 F.3d 877, 888 (3d Cir. 1999) (emphasis in original). Similarly, a federal court will only find a state court decision to be an unreasonable application of federal law if the decision, "evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." Id. at 890.

Further, under 28 U.S.C. § 2254(e)(1), a federal court is required to presume that a state court's findings of fact are correct. A petitioner may only rebut this presumption with clear and convincing evidence of the state court's error. § 2254(e)(1); Miller-El v. Cockrell, 537 U.S. 322, 341 (2003) (stating that the clear and convincing standard in § 2254(e)(1) applies to factual issues, whereas the unreasonable application standard of § 2254(d)(2) applies to factual decisions); Matteo, 171 F.3d at 888; Thomas v. Varner, 428 F.3d 491, 497-98 (3d Cir. 2005). This presumption of correctness applies to both explicit and implicit findings of fact. Campbell v. Vaughn, 209 F.3d 280, 285-86 (3d Cir. 2000). Consequently, a habeas petitioner "must clear a high hurdle before a federal court will set aside any of the state court's factual findings." Mastracchio v. Vose, 274 F.3d 590, 598 (1st Cir. 2000).

Like the "unreasonable application" prong of paragraph (1), a factual determination should be adjudged "unreasonable" under paragraph (2) only if the court finds that a rational jurist could not reach the same finding on the basis of the evidence in the record. 28 U.S.C. § 2254(d)(2); Porter v. Horn, 276 F. Supp. 2d 278, 296 (E.D. Pa. 2003); see also Torres v. Prunty, 223 F.3d 1103, 1107-08 (9th Cir. 2000); cf. Jackson v. Virginia, 443 U.S. 307, 317 (1979). "This provision essentially requires the district court to step into the shoes of an appellate

tribunal, examining the record below to ascertain whether sufficient evidence existed to support the findings of fact material to the conviction." Breighner v. Chesney, 301 F. Supp. 2d 354, 364 (M.D. Pa. 2004) (citing 28 U.S.C. § 2254(d)(2) and (f)[5]).  Mere disagreement with an inferential leap or credibility judgment of the state court is insufficient to permit relief.  Porter, 276 F. Supp. 2d at 296; see also Williams v. Taylor, 529 U.S. 362, 410 (2000); Hurtado v. Tucker, 245 F.3d 7, 16 (1st Cir. 2001).  Only when the finding lacks evidentiary support in the state court record or is plainly controverted by evidence therein should the federal habeas court overturn a state court's factual determination.  Porter, 276 F. Supp. 2d at 296; see also Williams, 529 U.S. at 408-10.

Further, the United States Supreme Court has clarified the test a district court must apply before granting relief where the court finds constitutional error:

> [I]n § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the "substantial and injurious effect" standard set forth in Brecht v. Abrahamson, 507 U.S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993), whether or not the state appellate court recognized the error and reviewed it for harmlessness under the "harmless beyond a reasonable doubt" standard set forth in Chapman v. California, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967).

Fry v. Pliler, 551 U.S. 112, 121-22 (2007).  Thus, even if the Court concludes that constitutional error occurred in the state court, the Court may not grant relief unless the error "had a substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 631; see also Bond v. Beard, 539 F.3d 256, 276 (3d Cir. 2008).  See also O'Neal v. McAninch, 513 U.S. 432, 436 (1995) ("When a federal judge in a habeas proceeding is in grave doubt about whether a

---

[5] "If the applicant challenges the sufficiency of the evidence adduced in such State court proceeding to support the state court's determination of a factual issue made therein, the applicant, if able, shall produce that part of the record pertinent to a determination of the sufficiency of the evidence to support such determination."  28 U.S.C. § 2254(f).

trial error of federal law had substantial and injurious effect or influence in determining the jury's

verdict, that error is not harmless.") (quotations omitted).

Of course, AEDPA scrutiny is applicable only if the state court adjudicated the

petitioner's claims "on the merits."  28 U.S.C. § 2254(d); see Appel v. Horn, 250 F.3d 203, 210

(3d Cir. 2001).  " An 'adjudication on the merits' has a well settled meaning: a decision finally

resolving the parties' claims, with res judicata effect, that is based on the substance of the claim

advanced, rather than on a procedural, or other, ground." Rompilla v. Horn, 355 F.3d 233, 247

(3d Cir. 2004), rev'd on other grounds, Rompilla v. Beard, 545 U.S. 374 (2005) (quoting Sellan

v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001)).  Further, an "adjudication on the merits" can

occur at any level of state court.  Thomas v. Horn, 570 F.3d 105, 115 (3d Cir. 2009).  However,

"to qualify as an 'adjudication on the merits,' the state court decision must finally resolve the

claim.  This means that the state court's resolution of the claim must have preclusive effect." Id.[6]

---

[6] In Thomas, the Third Circuit Court of Appeals was presented with a question of whether
a claim has been "adjudicated on the merits" in state court proceedings when a lower state court
decided the claim on the merits, but the appellate state court resolved the claim entirely on
procedural grounds.  Thomas, 570 F.3d at 114.  The Commonwealth argued in that case that the
PCRA court's decision on the merits with respect to two claims presented in the federal habeas
petition was an "adjudication on the merits," rendering § 2254(d) applicable to those two claims.
Id.  However, the petitioner contended that the Pennsylvania Supreme Court's determination that
those claims were waived because they had not been raised in the amended PCRA petition
superceded the PCRA court's decision on the substantive grounds.  (Id.)  The Third Circuit Court
rejected the Commonwealth's argument, holding

> Applying this rule [that to qualify as an "adjudication of the merits,"
> the state court decision's must have preclusive effect] to the state
> court decisions here, we see no "adjudication on the merits."  Here,
> the Pennsylvania Supreme Court decided Thomas' claims on purely
> procedural, not substantive, grounds.  This decision stripped the
> PCRA court's substantive determination of Thomas' claims of
> preclusive effect.  See Restatement (Second) of Judgments § 27 cmt.
> o (1982) ("If the judgment of the court of first instance was based on

18

(citing <u>Rompilla</u>, 355 F.3d at 247 (quoting <u>Sellan</u>, 261 F.3d at 311)).  Where a state court has not

reached the merits of a claim thereafter presented to a federal habeas court, the deferential

AEDPA standards do not apply, and the federal court must exercise <u>de novo</u> review over pure

legal questions and mixed questions of law and fact.  <u>Simmons v. Beard</u>, No. 05-9001, 2009 WL

2902251, at *6 (3d Cir. Sept. 11, 2009) (citing <u>Appel</u>, 250 F.3d at 210) (precedential).  However,

the state court's factual determinations are still presumed to be correct, rebuttable upon a

---

> a determination of two issues, either of which standing independently
> would be sufficient to support the result . . . [and] [i]f the appellate
> court upholds one of these determinations as sufficient and refuses to
> consider whether or not the other is sufficient and accordingly affirms
> the judgment, the judgment is conclusive as to the first
> determination."); 18A Charles Alan Wright, Arthur R. Miller &
> Edward H. Cooper, <u>Federal Practice and Procedure</u> § 4432 (2d ed.
> 2002) ("If the appellate court terminates the case by final rulings as
> to some matters only, preclusion is limited to the matters actually
> resolved by the appellate court . . . ."); <u>see also, e.g.</u>, <u>Sunrise Corp. of
> Myrtle Beach v. City of Myrtle Beach</u>, 420 F.3d 322, 327-28 (4th Cir.
> 2005) (holding that, although the trial court reversed an
> administrative determination on, <u>inter alia</u>, Constitutional grounds,
> res judicata did not apply to the Constitutional claims because the
> appellate court affirmed the trial court's decision without reaching the
> Constitutional issues).   The Pennsylvania Supreme Court's
> procedure-based decision remains as the only resolution of Thomas'
> claims with preclusive effect.   Accordingly, there has been no
> "adjudication on the merits," and AEDPA deference is not due.  <u>See
> also</u> <u>Liegakos v. Cooke</u>, 106 F.3d 1381, 1385 (7th Cir. 1997) (noting
> that Section 2254(d) did not apply to claims decided on the merits in
> state trial court, but disposed of on procedural grounds in the state
> court of appeals because "the disposition of the last state court to
> issue an opinion determines whether the state has invoked a ground
> of forfeiture" (citing <u>Ylst v. Nunnemaker</u>, 501 U.S. 797 (1991))).

<u>Thomas</u>, 570 F.3d at 115-16.

showing of clear and convincing evidence.[7]  Simmons, 2009 WL 2902251, at *6 (citing Appel,

150 F.3d at 210).

IV.   **DISCUSSION**

    Robinson's habeas petition contains eighteen claims for relief and involves each phase of

the state court proceedings: (1) pretrial; (2) trial; (3) penalty; and (4) claims relating to

proceedings generally.[8]  Five of these issues assert ineffective assistance of trial counsel.  For

clarity and for purposes of discussion, the Court will address Robinson's ineffective assistance

claims, as well as his other claims, in chronological order, first setting forth the standard for

ineffective assistance of counsel and then addressing the merits of the claims.  Any other relevant

standards will be presented at the time the particular relevant issue is addressed.

    **A.**    **Ineffective Assistance of Counsel**

    The Sixth Amendment guarantees an accused in a criminal prosecution the right to

assistance of counsel for his defense.  The applicable federal precedent for ineffective assistance

claims is the well-settled two-prong test established by the United States Supreme Court in

Strickland v. Washington, 466 U.S. 668 (1984).  See also Wiggins v. Smith, 539 U.S. at 510, 521

(2003) (setting out the Strickland test); Williams, 529 U.S. at 390-91 (same).  The first prong of

the Strickland test requires a defendant to establish that his attorney's representation fell below

an objective standard of reasonableness by committing errors so serious that he or she was not

---

    [7] In fact, "the § 2254(e)(1) presumption of correctness applies regardless of whether there
has been an 'adjudication on the merits' for purposes of § 2254(d)."  Thomas, 570 F.3d at 116
(quoting Nara, 488 F.3d at 200-01).

    [8] The Court has previously addressed Robinson's Claim Sixteen regarding the
constitutionality of lethal injection.  See supra, at pp. 13-15.

functioning as the "counsel" guaranteed by the Sixth Amendment.  Strickland, 466 U.S. at 688;

Wiggins, 539 U.S. at 521.  It follows that when a petitioner claims that his counsel failed to raise

a claim that the court determines to be meritless, habeas relief under Strickland is not available.

See Strickland, 466 U.S. at 691 (failure to pursue "fruitless" claims "may not be challenged as

unreasonable.")  A court must indulge a "strong presumption that counsel's conduct falls within

the wide range of reasonable professional assistance;" that is, the petitioner must overcome the

presumption that, under the totality of the circumstances, the challenged action "might be

considered sound trial strategy." Id. at 688-89, 690-92.  The question is not whether counsel did

not err, but whether counsel exercised the customary skill and knowledge that normally prevailed

at the time and place of counsel's conduct.  Id.  To that end, a court must conduct an objective

review of counsel's performance measured for reasonableness under prevailing professional

norms, including a context-dependent consideration of the challenged conduct as seen from

counsel's perspective at the time.  Id. at 686; Wiggins, 539 U.S. at 522-27; see also Bobby v. Van

Hook, — U.S. —, 130 S. Ct. 13, 16-20 (2009).

     The second prong of Strickland requires a petitioner to show that "the deficient

performance prejudiced the defense."  Id. at 687.  To prove prejudice, a petitioner "must show

that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different.  A reasonable probability is a probability sufficient to

undermine confidence in the outcome."  Id. at 694.  This standard "is not a stringent one;" it is

less demanding than the preponderance standard.  Baker v. Barbo, 177 F.3d 149, 154 (3d Cir.

1999).  Further, a reviewing court need not determine whether counsel's performance was

deficient before considering whether the petitioner suffered any prejudice as a result of the

alleged deficiency.  Strickland, 466 U.S. at 697.  If it is easier to dispose of an ineffectiveness

claim for lack of requisite prejudice, that course should be followed.  Id.

Further, the reviewing court must evaluate counsel's performance in light of the totality

of the evidence.  Strickland, 466 U.S. at 695-96; see also Jacobs v. Horn, 395 F.3d 92, 106-07

(3d Cir. 2005).  It is the petitioner's burden to establish both deficient performance and resulting

prejudice in order to state an ineffective assistance of counsel claim.  Strickland, 466 U.S. at 697;

see also Jacobs, 395 F.3d at 102.

At the time the state courts reviewed the claims that Robinson's counsel was arguably

ineffective, Strickland's familiar two-pronged test was the "clearly established federal law"

applicable to ineffective assistance of counsel claims.  Under Pennsylvania state jurisprudence, a

three-prong test is applied to ineffective assistance of counsel claims, but is, in substance,

identical to the Strickland test.  See, e.g., Commonwealth v. Pierce, 527 A.2d 973, 975-77 (Pa.

1987).  The Third Circuit Court of Appeals has held that Pennsylvania's test for assessing

ineffective assistance of counsel claims is not contrary to Strickland.  Jacobs, 395 F.3d at 107

n.9; Werts, 228 F.3d at 204.  Thus, under § 2254(d)(1), the relevant inquiry in assessing

ineffectiveness claims that have been adjudicated on the merits is whether the state court's

decision involved an unreasonable application of Strickland.  Jacobs, 395 F.3d at 107 n.9; Werts,

228 F.3d at 204.  Further, under § 2254(d)(2), the relevant inquiry is whether the state court made

unreasonable factual determinations when deciding whether the petitioner received

constitutionally effective counsel.  Bond, 539 F.3d at 279.

Finally, Robinson's claims of ineffective assistance of appellate counsel must be

examined under the same Strickland standards cited above: 1) whether counsel's performance

was unreasonable; and 2) whether counsel's unreasonable performance actually prejudiced the defense.  Strickland, 466 U.S. at 687.  If a court finds no merit in a claim of ineffective assistance by trial counsel, appellate counsel cannot be found ineffective for failing to raise those same meritless issues on appeal.  See United States v. Cook, 45 F.3d 388, 392-93 (10th Cir. 1995) ("When a defendant alleges his appellate counsel rendered ineffective assistance by failing to raise an issue on appeal, we examine the merits of the omitted issue.  If the omitted issue is without merit, counsel's failure to raise it does not constitute constitutionally ineffective assistance of counsel.") (citations and quotations omitted).  Stated otherwise, if there is no ineffective assistance of counsel at the trial level, there can be no ineffective assistance of counsel on appeal for failure to raise the same issue.  See Jones v. Barnes, 463 U.S. 745, 754 (1983) (finding a criminal defendant has no constitutional right to insist that appellate counsel advance every non-frivolous argument the defendant wants raised); Sistrunk v. Vaughn, 96 F.3d 666, 670 (3d Cir. 1996) (holding appellate counsel does not have a duty to raise every possible claim).

**B.      Pretrial Issue - Claim Fifteen - Robinson's Constitutional Rights Were Violated During the Extradition Process from Maryland**

Robinson contends that he is entitled to habeas relief because his constitutional rights were violated when Maryland State officials violated the terms of the Uniform Criminal Extradition Act during Robinson's extradition process from Maryland to Pennsylvania.  Specifically, Robinson asserts that he should have received an extradition hearing with a court-appointed attorney in Maryland prior to being transported to Pennsylvania.  Robinson raised this issue in his PCRA petition.  In the instant petition, he raises this claim in the context of counsel's

ineffectiveness for failing to properly litigate it prior to trial and on direct appeal.

The background of this claim is as follows.  At 8:30 a.m. on June 30, 1996, the day of the shootings, an arrest warrant was issued for Robinson charging him with criminal homicide, attempted criminal homicide, and other charges.[9]  (Doc. No. 33-4, Ex. 4, Op. on Mot. to Suppress Evidence, Feb. 14, 1997, 2.)  Pennsylvania police suspected that Robinson had fled the Commonwealth to his home in Maryland.  (Id.)  As a result, a fugitive warrant was entered into the National Crime Information System at 2:41 p.m. that same day.  (Id.)  Maryland police arrested Robinson on that warrant at 4:00 p.m. the next day, July 1, 1996.  (Id.)

Robinson was taken to the homicide unit of the Prince George's County, Maryland office, and interviewed by two Pennsylvania police officers at 5:30 p.m. that same day.  (Id.)  The officers identified themselves as Carlisle, Pennsylvania police officers and informed him that they were investigating the June 30, 1996 incident.  (Id.)  Robinson was advised of his Miranda rights and signed a written waiver.  (Id.)  The officers then questioned him about his involvement in the June 30, 1996 incident, and at 6:00 p.m., told Robinson that he was charged with criminal homicide in Carlisle, Pennsylvania.  (Id. at 2, 3.)  One of the officers read the arrest warrant to Robinson, who denied any knowledge of the shootings.  (Id. at 3.)

Robinson was then booked and processed by Maryland authorities.  (Doc. No. 21 at 210.)  On July 2, 1996, before a Maryland judge he was formally arraigned on all the charges and the fugitive warrant.  (Id.)  Robinson was not represented by an attorney during this proceeding.  (Id.)  After the arraignment, Robinson was held by Maryland authorities until sometime between July

_____

[9] The trial court, who also sat as PCRA court, set forth these relevant facts in an opinion on a motion to suppress evidence prior to trial.

10 and 12, 1996, at which time Pennsylvania authorities extradited him to the Commonwealth.

(Id.)

As stated above, Robinson raised this claim on collateral review.  The PCRA court

denied the claim, finding that any remedy Robinson may have had as a result of a denial of

constitutional rights by the Maryland court would have been in Maryland, not Pennsylvania.

(Doc. No. 33-5 at 11.)  In support, the court stated,

> The Uniform Extradition Act allows a detainee in the arresting state
> to test the legality of his arrest and transfer to another state.  See
> Commonwealth v. Jacobs, 319 Pa. Super. 531 (1983).  Once
> Pennsylvania received [Robinson] under a Maryland court order of
> extradition, [Robinson] may not challenge the extradition proceedings
> in this state.  This is not a situation where a person was arrested in
> another state on a warrant issued in Pennsylvania, and returned to
> Pennsylvania without the benefit of legal process in the state where
> the arrest was made.

(Id. at 10-11.)

Upon review, the Court finds this claim to be without merit.  The United States Supreme

Court has held that under the Extradition Clause of the United States Constitution, Article IV, §

2, cl. 2, and the Extradition Act of 1793, 18 U.S.C. § 3182, the asylum state (here Maryland)

must deliver a fugitive to the demanding state's agent (here Pennsylvania) if a properly certified

indictment or affidavit charging a crime is lodged against the fugitive.  California v. Superior

Court, 482 U.S. 400, 407 (1987).  At a pre-extradition hearing, the asylum state may do no more

that ascertain whether the requisites of the Extradition Act have been met; the asylum state may

make only four inquiries:

> (a) whether the extradition documents on their face are in order; (b)
> whether the petitioner has been charged with a crime in the
> demanding state; (c) whether the petitioner is a person named in the

25

request for extradition; and (d) whether the petitioner is a fugitive.

Id. at 408 (quoting Michigan v. Doran, 439 U.S. 282, 289 (1978)).  In the context of a later

habeas corpus proceeding, the individual being extradited is only permitted these same inquiries.

Morrison v. Stepanski, 839 F. Supp. 1130, 1142 (M.D. Pa. 1993).

A fugitive may challenge the legality of extradition proceedings by filing a habeas corpus

petition in either a state or federal court located in the asylum state.  U.S. ex rel. Davis v.

Camden County Jail, 413 F. Supp. 1265, 1268 (D. N.J. 1976) (citing U.S. ex rel. Darcy v.

Superintendent of County Prisons of Philadelphia, 111 F.2d 409, 411 (3d Cir. 1940)).  Thus,

while Robinson was detained in Maryland, he could have filed a petition for writ of habeas

corpus with the United States District Court for the District of Maryland in order to test the

validity of the extradition process under Article 4, section 2, clause 2 of the United States

Constitution and the Extradition Act.  Once extradited, however, habeas corpus relief is not

available to a state prisoner from a federal district court in the demanding state on the grounds

that the extradition process in the asylum state was unlawful.  Camden County Jail, 413 F. Supp.

at 1268 (citing Hunt v. Eyman, 405 F.2d 384 (9th Cir. 1968)).

The record demonstrates that Robinson did not challenge his extradition proceedings

prior to being transported to Pennsylvania.  The PCRA court determined that once Robinson was

received in Pennsylvania under a Maryland court order of extradition, he could not challenge

those extradition proceedings in Pennsylvania.  The court stated that, "[a]ny remedy [Robinson]

may have had if there was a violation of his rights by the court in Maryland, would have been in

Maryland."  (Doc. No. 33-5 at 10.)  In light of the relevant case law, the PCRA court's

determination that this claim has no merit is neither contrary to nor an unreasonable application

of the law.  See 28 U.S.C. § 2254(d)(1)-(2).  Further, because this underlying claim has no merit, Robinson's instant claim of ineffectiveness of trial and appellate counsel fails.

### C.    Pretrial Issue - Claim Four - Ineffective Assistance of Counsel for Failure to Litigate Robinson's Competency to Stand Trial and Ability to Participate in His Defense

Robinson contends that trial counsel were ineffective when, prior to trial, they failed to litigate his competency to stand trial and ability to participate in his defense.  As relief, he seeks a new trial.  The Pennsylvania Supreme Court addressed this claim on review of the PCRA court's decision denying relief.  See Robinson-II, 877 A.2d at 439-41.  Thus, the claim is exhausted and not procedurally defaulted, and the Court will apply § 2254(d) to the state court decision.

### 1.    Background

#### a.    Pretrial and Trial

Following Robinson's arrest in Maryland and subsequent return to Cumberland County, Pennsylvania, the trial court appointed the Public Defender to represent Robinson.  (Doc. No. 33-10, Trial Ct. Order, Sept. 24, 1996, 31.)  The Chief Public Defender, Taylor Andrews, Esquire, subsequently assigned Assistant Public Defenders Arla Waller, Esquire, and Ellen Barry, Esquire, to represent Robinson.[10]  While each attorney had at least five years of experience in the Public Defender's office, neither attorney had previously participated in a capital case that went to trial.  (Doc. No. 37, Notes of Testimony, PCRA Hearing, 10/10/2001 ("PCRA NT 10/10/01") 52, 124.)

---

[10] After the court ordered the Public Defender to represent Robinson on September 24, 1996, Attorney Waller was designated as Robinson's counsel.  When the Commonwealth declared its intention to seek the death penalty in this case, Attorney Waller was assigned to represent Robinson during the guilt phase of the trial.  Attorney Barry handled the penalty phase.

At the PCRA hearing, Attorney Andrews testified that he was in contact on a regular basis with Attorneys Waller and Barry about the preparation of Robinson's case. (PCRA NT 10/10/01 9-10.) Attorney Andrews approved the hiring of Stephen Ragusea, Ph.D., a board-certified clinical psychologist, to evaluate Robinson for mental issues. (Id.) Dr. Ragusea met with Robinson at Cumberland County Prison for approximately ten to fifteen minutes in November 1996.[11] (Notes of Testimony, PCRA Hearing, 10/18/2001 (Doc. No. 37, Notes of Testimony, PCRA Hearing 10/18/01 ("PCRA NT 10/18/01") 7-8.) At first, Robinson was open and interactive with Dr. Ragusea, but when he discovered that Dr. Ragusea was a psychologist, he immediately acted "haute, . . . elevated, better, holier than thou, and then asked that he speak with his lawyer and refused to talk with me any further." (Id. at 8.) Dr. Ragusea also observed Robinson acting overly suspicious and overly guarded. (Id. at 9.) Overall, Dr. Ragusea considered this interaction with Robinson evaluative in nature even though it was minimal. (Id. at 13.) However, because of this minimal interaction with, and lack of cooperation from, Robinson, defense counsel relied solely upon a report from the supervising psychiatrist at Norristown State Hospital, where Robinson was involuntarily committed. (PCRA NT 10/10/01 33, 135; PCRA NT 10/18/01 10.)

By November 1996, the relationship between Robinson and Attorneys Waller and Barry had begun to deteriorate to the point where Robinson was "totally uncooperative." (Id. at 53.) At that point, he was either walking out in the middle of meetings with his attorneys, or not coming to scheduled meetings at all. (Id. at 53-54.) To his attorneys, Robinson appeared

---

[11] Prior to meeting with Robinson, defense counsel did not provide Ragusea with any background information on Robinson. (PCRA NT 10/18/01 10.)

paranoid and untrusting of counsel.  (Id. at 54.)  According to Attorney Barry,

> when we were dealing with [Robinson] in 1996 we were viewing his
> contumacy and difficulties with us as being volitional and that his
> choice to deal - - he was choosing not to deal with us and to walk
> away from us and to be obstinate and difficult, and that viewed
> through a different glass, and had we sent the information to a
> psychiatrist, we may have learned that it was not volitional, that he
> did not have a choice, that he was so ill that he would - - that he was
> not able to cooperate with us, which is the second prong of the
> competency issue.
>
> I believe he understood what the charges were against him, and then
> the second prong of that is whether you can cooperate in your
> defense.  We viewed his lack of cooperation as being volitional.
> Now, looking at it differently, it may not have been.

(Id. at 125.)  Additionally, Attorney Barry admitted that because she viewed his behavior as

volitional rather than a type of psychiatric problem, she became frustrated and at times angry

with Robinson.  (Id. at 125-26.)  She also claimed that because she could not persuade him to

talk to her, to sign any releases for information, and to see the psychologist, Dr. Ragusea, "we

had nothing to work with."  (Id. at 126.)  However, the record reflects that Robinson did sign a

general release in October 1996 authorizing the release of any information related to his

background, including psychiatric mental health or psychological reports.  (Id. at 128.)  Attorney

Barry did not recall using the release to obtain any records she believed they were having

difficulty obtaining.  (Id. at 129.)

Attorneys Waller and Barry informed Attorney Andrews of their difficulties in

communicating with Robinson.  As a result, on December 9, 1996, Attorney Andrews went to the

Cumberland County Prison to interview Robinson about his lack of cooperation and

dissatisfaction with the representation by Attorneys Waller and Barry.  (Id. at 12,15.)  When he

29

asked Robinson why he was dissatisfied, Robinson told him that they had "broken their promises" by not delivering certain unnamed documents. (Id.) Further, even though Robinson asked Attorney Andrews to return the next day to discuss the case, this meeting was the only contact Attorney Andrews had with Robinson prior to trial. (Id. at 16, 48.)

Two days after meeting with Attorney Andrews, on December 11, 1996, Robinson stopped eating properly at Cumberland County Prison, claiming that he could only eat food that was sealed or packaged because all other food in the prison was poisoned. (Doc. No. 33-10, Pet. for Involuntary Treatment, Dec. 16, 1996, 58-66.) On December 16, 1996, Mark A. Zengerle, M.S., a psychologist from Cumberland County Prison, petitioned the trial court for the involuntary commitment of Robinson based on his behaviors and physical complaints while incarcerated at the prison. (Id. at 58-62.) Zengerle concluded that there was a "reasonable probability that death, serious bodily injury, or serious physical debilitation would ensue within 30 days unless treatment is afforded." (Id. at 60.) Furthermore, Rocco Manfredi, M.D., a psychiatrist, evaluated Robinson at the prison to determine if he was severely mentally disabled and in need of treatment. (Doc. No. 33-10, Manfredi Examination, Dec. 16, 1996, 63.) After examining Robinson, Dr. Manfredi found him mentally disabled, diagnosed him with paranoid ideation, and suggested that he receive inpatient psychiatric hospitalization to prevent starvation and stabilize his condition. (Id.)

The trial court conducted a civil commitment proceeding on December 16, 1996, based on the petition for involuntary commitment. (See Doc. No. 33-10 at 64-65.) After reviewing the petition, the trial court ordered Robinson involuntarily committed to the Norristown State

Hospital.[12]  (Id.)

Thereafter, on December 17, 1996, the Commonwealth filed a motion for determination

of Robinson's competency to stand trial and assist in his defense pursuant to sections 402 and

403 of the Pennsylvania's Mental Health Procedures Act, 50 Pa. Cons. Stat. Ann. §§ 402, 403.

(Doc. No. 33-10, Application for Ct. Determination of Def's Competency, 67-68.)  In response,

the trial court issued an order on January 3, 1997, directing Norristown State Hospital to evaluate

Robinson in order to provide the court with (1) a diagnosis of Robinson's mental condition, and

(2) an opinion as to the capacity of Robinson to understand the nature and object of the criminal

proceedings against him and to assist in his defense.  (Doc. No. 33-10, Trial Ct. Order, Jan. 3,

1997, 71-72.)

Robinson refused to participate in any evaluations at Norristown State Hospital.  (Doc.

No. 38, PCRA Pet., Attach. 23, Norristown Hospital Records.)  However, staff at the hospital did

record their observations of Robinson.  (Id.)  In a January 3, 1997, progress note, Murray Caplan,

M.D., the supervising psychiatrist, noted "Robinson is aloof and feels superior to staff and peers

and refuses to disclose information of a personal nature instead preferring to argue every question

in a condescending manner."  (Id.)  In another entry dated February 4, 1997, it was noted that

"[p]atient needs further, active, inpatient care."  (Id.)  However, in a February 7, 1997 letter to the

trial court, Dr. Caplan concluded that it was possible that Robinson was malingering.  (Id.)  He

---

[12] Further, in a memorandum for the case file, Attorney Andrews indicated that he had considered whether to file a motion challenging Robinson's competency, but decided against it. (PCRA NT 10/18/01 17, 21.)  Even though that decision at the time was not final, shortly after his meeting with Robinson, Robinson was involuntarily committed to Norristown State Hospital and evaluated there.  (Id. at 21-22; see infra.)  Once there and under observation by Norristown officials, Attorney Andrews decided to take a "wait and see" approach to his competency determination rather than seeking out an independent medical evaluation.  (Id. at 28.)

stated that Robinson "did demonstrate a haughty, disdainful attitude," "remains arrogant and condescending," and "was guarded and evasive, especially when discussing his charges."[13] (Id.) With respect to his opinion on Robinson's capacity to understand the criminal proceedings and the ability to assist in his defense, Dr. Caplan cited no specific findings, but stated the following:

> Concerning competency, Mr. Robinson will not talk about his charges without a lawyer present.  His behavior on the ward and his lack of psychiatric symptomatology give us no indication that he is incompetent due to a psychiatric illness.  His refusal to talk is a willing and deliberate attempt to delay his going to trial.  Team members feel that Mr. Robinson can return to court for trial and no longer requires in-patient care.

(Id.)

The trial court considered Dr. Caplan's letter and the report from Norristown State Hospital at a pre-trial suppression hearing not specifically related to Robinson's competency held on February 11, 1997.  (Doc. No. 33-10, Notes of Testimony, Suppression Hearing, 2/11/1997 ("Suppression NT 2/11/97").)  At that time, defense counsel stated, "We're not in a position to stipulate to the findings of Dr. Caplan which are stated in the report."  (Suppression NT 2/11/97 5.)  The trial court responded by admitting into evidence the report and later issued an order deeming Robinson competent to stand trial, based solely on the Norristown State Hospital records and report.  (Id. at 5-6.)  Defense counsel did not request a competency hearing in order to challenge those findings.

---

[13] Dr. Caplan also stated that Robinson denied that he ever believed the food at the Cumberland County Prison was poisoned.  (Doc. No. 38, PCRA Pet., Attach. 23, Norristown Hospital Records.)  Robinson did not refuse food while at Norristown State Hospital.  (Id.)  At the PCRA hearing, Dr. Larry Rotenberg, a psychiatrist, explained that it was Robinson's delusion that the food was poisoned only at the Cumberland County Prison, and that once he was in a different place such as the Norristown State Hospital, his delusion about poisoned food would be altered.  (PCRA NT 10/18/2001 101-02.)

Robinson was discharged from Norristown State Hospital on February 11, 1997, and returned to Cumberland County Prison. A pre-trial conference was held on February 18, 1997. (See Doc. No. 33-11, Trial Ct. Order, Feb. 18, 1997.) At that conference, Robinson made an oral motion to represent himself at trial. (See id.) On February 20, 1997, the trial court conducted a colloquy of Robinson on his waiver of representation by the Public Defender's office. (Doc. No. 33-11, Notes of Testimony, Proceedings re. Waiver of Counsel Representation, 2/20/97 ("Waiver NT")). When asked why he wanted to represent himself, Robinson replied that he was not getting adequate representation from his public defenders. (Waiver NT 3.) After advising Robinson of his right to waive representation, explaining the repercussions of doing so, and explaining the role of standby counsel, the trial court granted Robinson's motion, vacated the appointment of the Public Defender, and appointed the Public Defender's office (again, Attorneys Waller and Barry) to act as stand-by counsel. (Id. at 12.)

Robinson's trial began on March 10, 1997. At the beginning of the proceedings, the trial court confirmed with Robinson that he in fact did want to proceed pro se. (Doc. No. 33-12, Notes of Testimony, Trial, 3/10/97 ("Trial NT 3/10/97") 3-4.) On March 12, 1997, Robinson, proceeding pro se, made an opening statement.[14] However, after the Commonwealth's second

_____

[14] In his opening statement, Robinson stated, in part,

> Now, all of my life I've been discriminated against in one form or another, and it was mostly from white people. And I have a jury of all whites and a white prosecutor and a white judge, and this is society today. This is how it is, and this is how it's always going to be. And for me being a black man, I'll never get a fair chance.

> When I was picked up and put in jail, communications was difficult. I was locked up 23 hours a day. I had been locked up for 23 hours a day since I had been locked up.

witness testified on direct examination, Robinson requested that an attorney other than Attorneys Waller and Barry take over his representation.  (Trial NT 3/12/97 53-54.)  The trial court denied Robinson's request, but allowed standby counsel (Attorneys Waller and Barry) to take over for both the guilt and penalty phases of trial.  (Id. at 54.)  The trial proceeded with Attorney Waller conducting the guilt phase and Attorney Barry conducting the penalty phase.

### b.    Post-Conviction Proceedings

At the PCRA hearing, Robinson presented the testimony of Dr. Ragusea, the clinical psychologist who had attempted to interview him in October 1996.  In preparation for the hearing, Dr. Ragusea examined a number of records, including the Norristown State Hospital report, correspondence from Hodge, police reports, parts of the trial transcript, and affidavits of family members.  (PCRA NT 10/18/01 11-12.)  Dr. Ragusea did not attempt to interview Robinson again before his PCRA testimony.  (Id. at 52.)  Based on his review of the documentation, Dr. Ragusea concluded that Robinson was not competent to stand trial in 1997

---

I've also been sent to a mental hospital because of a heart problem which they will deny.  Everyone who will come up here and testify will deny everything that happened to me.  So that in itself is a lie.  So to give me a fair trial and a true verdict and honesty that true justice shine, you have to hear both sides of the story.

And right now because my Public Defenders are turned against me from the beginning and used everything I told them against me and worked with the prosecution, also the jail and maybe the Judge and the press to print one side of the story, you'll never understand my side of the story.

(Doc. No. 36, Notes of Testimony, Trial, 3/12/97 ("Trial NT 3/12/97") 13-14.)

because he was most likely suffering from paranoid schizophrenia.[15]  (Id. at 14.)  Further, Dr.

Ragusea was "appalled" by the Norristown State Hospital report which labeled Robinson as a

malingerer.  (Id. at 21.)  From his review, Dr. Ragusea believed that the doctors at Norristown

State Hospital did not have enough information available to them to support a diagnosis of

malingering, and that the most they should have said about Robinson was that no opinion could

be made as to his mental condition because he had refused to be evaluated.  (Id. at 22, 24.)

Robinson also presented the testimony of Larry Rotenberg, M.D., a board certified

psychiatrist.  Robinson's PCRA counsel asked Dr. Rotenberg to interview and evaluate Robinson

at SCI-Greene in September 2000.  (PCRA NT 10/18/01 56.)  However, Robinson refused to see

---

[15]  Dr. Ragusea explained paranoid schizophrenia as follows:

> It involves a constellation of symptoms that include most typically
> delusions and hallucinations.  Individuals tend not to function very
> well.

> Schizophrenia takes a variety of forms.  In paranoid schizophrenia,
> the dominant manifestation is a overly high level of suspiciousness.
> Such individuals sometimes have delusions about people hurting
> them.  For example, they might fear that the FBI is poisoning their
> food or that their telephones are bugged or that aliens are reading
> their mind from spaceships circling earth.

> Unlike other forms of schizophrenia, one of the important
> characteristics of paranoid schizophrenia is that paranoid
> schizophrenics most commonly appear intact when you talk with
> them.  They don't talk to themselves.  They don't appear to be
> running from visual hallucinations. They appear to be more or less
> normal.

> They can present in a somewhat superior manner, almost as if they
> think they are better than you, and therefore it's unnecessary for them
> to interact with you.

(PCRA NT 10/18/01 14-15.)

him at that time.  (Id. at 56-57.)  Dr. Rotenberg did, however, review the record from Norristown

State Hospital, parts of the trial transcript, correspondence between Robinson and his attorneys,

correspondence between his attorneys and the psychiatrists at Norristown State Hospital, internal

memoranda between Robinson's attorneys, correspondence from Hodge, affidavits of family

members, and documents relating to his commitment from Cumberland County Prison to

Norristown State Hospital.  (Id. at 57-58.)

After reviewing the documentation, Dr. Rotenberg was able to make a differential

diagnosis[16] that at the time of the killing of Bass and shooting of Hodge, Robinson "fit[] some of

the criteria of paranoid schizophrenia, he fit[] many of the criteria of a delusional disorder and

many of the criteria of a so-called psychosis NOS ["not otherwise specified"]."[17]  (Id. at 59.)  He

further concluded that Robinson's mental disorder distorted his reality and distorted his ability to

make appropriate decisions to the extent that he was not competent to stand trial in 1997.  (Id. at

65.)  He also described the evaluation of Robinson performed at Norristown State Hospital as

"appallingly bad."  (Id. at 68.)  In the six weeks that Robinson spent at the hospital, he did not

have an actual sit-down evaluation with a psychiatrist, rather "what we have are the superficial

observations of a whole bunch of professionals without anyone really ever having done an

evaluation."  (Id. at 69.)  He admitted that it was Robinson who refused to speak with doctors,

but explained that, due to his mental illness, in order to properly evaluate him "[y]ou had to meet

---

[16] Dr. Rotenberg described a differential diagnosis as one where "we look at the data, the best data that we have available, and we come up with what appears to be the likely diagnosis." (PCRA NT 10/18/01 59.)

[17] Dr. Rotenberg stated that these disorders do not necessarily immediately manifest themselves in a person as a child; rather, typically these disorders occur in late adolescence or early adulthood.  (PCRA NT 10/18/01 71.)

him every day on his level.  You have to attempt to access him.  You have to get him."  (Id.)

According to Dr. Rotenberg's review of the records, doctors at Norristown State Hospital made

no such efforts to access Robinson.  (Id.)

The Commonwealth presented the testimony of John O'Brien, M.D., a forensic

psychiatrist.  Dr. O'Brien did not examine or interview Robinson in preparation for his

testimony, nor did he review the trial transcript, including Robinson's opening statement, or

testimony or affidavits from Robinson's family members.[18]  (Doc. No. 37, Notes of Testimony,

PCRA Hearing, 12/14/2001 ("PCRA NT 12/14/01") 44, 57, 70.)  He did, however, review

background materials such as the reports from Cumberland County Prison, Norristown State

Hospital, Drs. Ragusea and Rotenberg, and various correspondence between the individuals

involved in the case.  (PCRA NT 12/14/01 11-12.)  After reviewing that documentation, Dr.

O'Brien opined that the determination by Norristown State Hospital that Robinson was

competent to stand trial was reasonable and supported by the record.  (Id. at 55.)  In support, Dr.

O'Brien noted that while incarcerated at the Cumberland County Prison Robinson initially

---

[18] In his direct testimony, Dr. O'Brien emphasized the face-to-face interaction and
observations of the doctors and staff at Norristown State Hospital, intimating that these
observations were wholly more reliable than a review of Robinson's history through reports.
(PCRA NT 12/14/01 29-31.)  However, on cross-examination, when asked why he did not
believe it would have been to *his* advantage in his testimony to have the opportunity to examine
Robinson, Dr. O'Brien stated, "Well, there's a proverb that I always ask patients when I evaluate
them and they actually talk to me to interpret, and the proverb is, you can't judge a book by its
cover.  So an actual face-to-face meeting of an individual really would not give me enough
information to reliably provide additional information about them."  (Id. at 58.)  While this
inconsistent testimony is somewhat baffling, the Court concludes that a thorough review of
Robinson's history and correspondence between the individuals involved in his case, as
performed by all experts here, serves as a sufficient backdrop in order to make a determination of
whether Robinson's counsel were ineffective for failing to investigate Robinson's competency
and to request a competency hearing.

cooperated with the Public Defender's office, providing his attorneys with some background information and information related to the crimes.  (Id. at 13.)  However, after Robinson requested copies of all documents filed to date in his case, his attorneys questioned whether he was planning to file a lawsuit against them.  (Id. at 17.)  Dr. O'Brien noted that after this exchange, Robinson became "progressively less and less cooperative."  (Id.)  Dr. O'Brien also believed that Robinson's refusal to shower or come out of his cell, and his concern that his food was poisoned, were reality-based concerns because he was told that friends of Hodge's brother were also incarcerated at Cumberland County Prison.  (Id. at 19-20.)  What confirms that belief for Dr. O'Brien was that Robinson began eating again when he arrived at Norristown State Hospital.  (Id. at 20.)

According to Dr. O'Brien, when Robinson arrived at Norristown State Hospital, he was initially standoffish, but eventually developed relationships and friendships with certain other patients.  (Id. at 31-32.)  Further, Dr. O'Brien stated that Robinson engaged in those activities he wished to engage in, such as playing cards, chess, billiards, basketball, and lifting weights.  (Id. at 32.)  Further, he was cooperative with the ward routine.  (Id.)  Staff members observed Robinson for nearly six weeks, yet were unable to persuade Robinson to participate in a psychiatric evaluation.  (Id. at 29.)  Staff members noted that he displayed no bizarre behavior or peculiar verbalizations.  (Id. at 36.)  He did not display any indicia of psychotic delusions, auditory hallucinations or other psychiatrically treatable behaviors.  (Id. at 51.)  As a result, Robinson was not treated with medication for psychotic symptoms at any time.  (Id. at 51.)

Dr. O'Brien also opined that although one of Robinson's sisters suffers from paranoid schizophrenia and another sister died of a possible suicide, Robinson's family history was not

significant if he himself was not displaying symptoms of mental illness.  (Id. at 52-53.)  Only if there are symptoms in an individual can the family history aid in diagnosing that individual.  (Id.)  In addition, some individuals diagnosed as paranoid schizophrenics may be competent to stand trial to the extent that they understand the circumstances and cooperate with counsel.  (Id. at 42-43.)  Dr. O'Brien concluded by stating that he does not believe he is in a position to state of his own opinion that Robinson was competent to stand trial in 1997, rather he simply agrees with the conclusions of the Norristown State Hospital officials and the materials provided to him by the Public Defender's office.  (Id. at 88.)

Further, Robinson's PCRA counsel presented the testimony of Lori James Monroe, the mitigation specialist hired by defense counsel prior to trial.  Monroe met with Robinson on two occasions in 1996 prior to trial.  (Doc. No. 37, Notes of Testimony, PCRA Hearing, 11/29/2001 ("PCRA NT 11/29/01") 8.)  On the first occasion, Monroe recalled that Robinson was not very cooperative, and that his primary concern was not having someone looking into his history or talking to family members.  (Id.)  Robinson, however, did provide her with some preliminary background information.  (Id.)  When she met with him again prior to the civil commitment hearing, "[Robinson's] behavior appeared more hostile, not towards me but just in general, some paranoid thoughts.  His thoughts were sort of flighty ideas, all over the place, really not making much sense at all at that time."  (Id.)

Robinson's family members informed Monroe of the family's history of schizophrenia in late 1996.[19]  (Id. at 10.)  Monroe, in turn, told counsel about this history, but counsel decided not to pursue mental health issues because the court had already determined, based on the

---

[19] For additional information regarding the family history, see infra.

39

Norristown State Hospital report, that Robinson was competent to stand trial.  (<u>Id</u>. at 11.)

With the exception of Dr. O'Brien, the above-referenced mental health experts relied on background information on Robinson supplied by various family members.  These family members not only provided sworn affidavits, but also testified at the PCRA hearing.  Robinson's mother testified that Robinson had a seizure when he was five which required several days of hospitalization.  (PCRA NT 10/10/01 212.)  The cause of the seizure was never determined, but Robinson was prescribed phenobarbital for a year and had several follow-up appointments with doctors.  (<u>Id</u>.)  Lorenzo Robinson, Sr., Robinson's father, testified that Robinson's sister, Eulana, had been diagnosed as a paranoid schizophrenic at the age of twenty, and eventually required placement in a group home for mentally ill individuals.  (<u>Id</u>. at 166.)  Prior to her placement in a group home, Eulana engaged in violent or threatening behavior at times, and in one instance wielded a knife against her siblings.  (<u>Id</u>. at 164-65.)  Robinson's cousin, Rhonda Brewington, noticed signs of schizophrenia in Eulana, such as severe mood swings: at one moment Eulana would be calm, but would suddenly enter into rage if she believed people were talking about her. (PCRA NT 10/18/01 129.)  Robinson's other sister, Diondalo, died when Robinson was a teenager.  (PCRA NT 10/10/01 167.)  Some family members believed she had been murdered, but there was also evidence that she committed suicide.  (<u>Id</u>.)  Robinson's brother, Lorenzo Robinson, Jr., testified that Diondalo had suffered a nervous breakdown prior to leaving the family home.  (<u>Id</u>. at 197.)

Robinson observed many arguments between his parents, mainly over the infidelity of Lorenzo Robinson, Sr.  (<u>Id</u>. at 172-73.)  As Robinson reached young adulthood, Lorenzo Robinson, Sr. noticed that Robinson was becoming more belligerent and refused to take orders.

40

(Id. at 170-71.)  In fact, Robinson had two fist fights with his father, and at one point pulled a gun during an argument.  (Id. at 183-85.)

When Lorenzo Robinson, Sr. visited Robinson at the Cumberland County Prison after his arrest, Robinson was sensitive about verbally communicating with his family members because he believed others were listening to their conversations.  (Id. at 177.)  Lorenzo Robinson, Jr. recalled Robinson expressing dissatisfaction with his counsel's representation.  (Id. at 201.)  When Robinson's uncle, Dudley Williams, visited Robinson at the Cumberland County Prison after his arrest, Robinson told him the phones were bugged.  (PCRA NT 10/18/01 137.)  None of this testimony was provided to the trial court prior to its decision on Robinson's competency to stand trial.

The prosecuting officer, Detective Ronald Egolf, also testified about Robinson's behavior while incarcerated at the Cumberland County Prison.  (PCRA NT 11/29/01 72-88.)  In December 1996, both Attorney Barry and Robinson himself asked that Detective Egolf come to the prison to speak with Robinson.  (Id. at 74.)  Attorney Barry wanted Detective Egolf to persuade Robinson to cooperate with his attorneys.  (Id. at 72-73.)  However, when Robinson spoke with Detective Egolf at the prison, he spoke only of his fears that his food was being poisoned by Hodge's associates also incarcerated at the Cumberland County Prison.  (Id. at 73-74.)  He also wanted to see a doctor outside the prison because he believed he was ill.  (Id. at 75.)  After Detective Egolf met with Robinson, he told Attorney Waller that Robinson was getting very paranoid, "like he is getting ready to crack or something."  (Id. at 85.)

## 2.    State Court Decisions

The PCRA court denied the ineffective assistance claim, finding instead that trial counsel

could reasonably rely on the findings of the Norristown State Hospital evaluation which concluded that Robinson was competent to stand trial, that he was not mentally ill, and that his lack of cooperation with his attorneys was a result of malingering.  (Doc. No. 33-5 at 18.)  The Pennsylvania Supreme Court affirmed the denial of the ineffectiveness claim.  Robinson-II, 877 A.2d at 439-441.  It agreed with the PCRA court that trial counsel reasonably relied on the mental health evaluation performed at the Norristown State Hospital.  Id. at 440.  It further stated that "[a]lthough [Robinson] offered testimony of two different psychiatrists in support of his claim, this testimony was negated by the evaluation done less than a year after the murder, which concluded [Robinson] was competent."  Id.  As a result, the state supreme court found that Robinson had failed to establish the ineffectiveness of counsel by showing counsel's performance was unreasonable.  Id. at 440-41.

### 3.     Analysis of Ineffective Assistance of Counsel

In considering whether the deficient performance of Robinson's counsel was prejudicial with respect to litigating Robinson's competency to stand trial, the Court must first briefly outline the relevant law regarding competency to stand trial.  However, the Court stresses that it is not determining whether Robinson was competent to stand trial.  Rather, the issue here is whether there is a reasonable probability that he would have been found incompetent to stand trial if not for the ineffective assistance of trial counsel.

A defendant has a due process right not to be tried while incompetent.  Drope v. Missouri, 420 U.S. 162, 171-72 (1975); Pate v. Robinson, 383 U.S. 375, 385 (1966).  To be competent to stand trial, a defendant must have a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and must possess "a rational as well

as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402,

402 (1960). Accord Drope, 420 U.S. at 171 ("[A] person whose mental condition is such that he

lacks the capacity to understand the nature and object of the proceedings against him, to consult

with counsel, and to assist in preparing his defense may not be subjected to a trial").

In assessing whether there were sufficient indicia of Robinson's incompetency to warrant

a competency hearing, "we must consider the nature and quality of the facts known to the court."

Jermyn v. Horn, 266 F.3d 257, 292 (3d Cir. 2001). "[E]vidence of a defendant's irrational

behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all

relevant in determining whether further inquiry is required, but . . . even one of these factors

standing alone may, in some circumstances, be sufficient." Drope, 420 U.S. at 180.

Further, as stated above, Strickland imposes a two-part test for ineffective assistance of

counsel claims. First, it asks whether counsel performed deficiently. Strickland, 466 U.S. at

687. This measures deficiency against the standard of "reasonably effective assistance," as

defined by "prevailing professional norms." Id. at 687-88. Second, a petitioner must show that

"the deficient performance prejudiced the defense." Id. at 687. To prove prejudice, a petitioner

"must show that there is a reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different." Id. at 694.

It is well established that an attorney would render ineffective assistance of counsel if he

failed to inquire into a defendant's competency and failed to request a competency hearing,

despite indicia of incompetence that would provide reasonable counsel "reason to doubt" the

defendant's ability to understand the proceedings, communicate with counsel, and assist in his

own defense. See Hull v. Kyler, 190 F.3d 88, 106 (3d Cir. 1999) (noting that defendant could

43

establish an ineffectiveness claim if there were sufficient indicia of incompetence and counsel failed to request a competency hearing); Hull v. Freeman, 932 F.2d 159, 169 (3d Cir. 1991) (stating that counsel has independent professional responsibility to "put government to its proof" at a competency hearing when there exists serious doubt as to the defendant's competence), overruled on other grounds as stated in Caswell v. Ryan, 953 F.2d 853, 859 (3d Cir. 1992).

The issue of whether there was such indicia of incompetency that, in failing to request a competency hearing or evaluation on behalf of Robinson, defense counsel's representation "fell below an objective standard of reasonableness" can only be assessed by examining what counsel did, and what facts counsel knew at the time that would bear on the issue of Robinson's competency to stand trial.  See Porter, 276 F. Supp. 2d at 331 (citing Jermyn, 266 F.3d at 300). See also Strickland, 466 U.S. at 690 ("[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.").  Thus, the testimony of Attorneys Waller and Barry, as well as that of Attorney Andrews, about what they did and what facts they knew regarding Robinson's understanding of the proceedings is crucial.

The record reflects that Robinson was able to communicate initially in order to provide basic background information and even sign a general release for collecting more information. However, all communication with his attorneys broke down in the fall of 1996 while he was still at Cumberland County Prison.  Trial counsel hired Dr. Ragusea to evaluate Robinson at that time, but Robinson refused to be evaluated by a mental health professional.  As a result, defense counsel released Dr. Ragusea and did not seek further evaluation from him or any other mental health expert at that time.  Instead, after Robinson was committed to Norristown State Hospital,

his counsel made a judgment call to "wait and see" what resulted from the Norristown State Hospital evaluation, an evaluation to be performed by a team of mental health professionals observing Robinson over a six-week period of time.  The staff at the hospital, like Dr. Ragusea before them, were unable to persuade Robinson to actively participate in a face-to-face evaluation.  As a result, the only method by which to evaluate Robinson was through observation.  There is nothing in the record to suggest that he could have been evaluated in any other way at that time or any other time in the future.  Further, there is nothing in the record to suggest that defense counsel had reason to second-guess the evaluation of the Norristown State Hospital staff.  As a result, the Court fails to understand what would have triggered defense counsel to *further* investigate Robinson's competency at the time he was committed to Norristown State Hospital.

Dr. Caplan's report, presented to the trial court for a determination on competency, suggested that malingering may have been the cause of Robinson's behavior. Viewing the entire record compiled by the Norristown State Hospital with the evidence from other witnesses at the PCRA hearing which could have been available prior to trial, the Court agrees with the Pennsylvania Supreme Court's decision that counsel could reasonably rely on the Norristown State Hospital evaluation that Robinson's uncooperative, manipulative behavior did not amount to incompetence to stand trial.  Thus, the Court finds that the Pennsylvania Supreme Court properly applied Strickland in concluding that counsel performed reasonably.  See 28 U.S.C. § 2254(d)(1).  Further, the Court concludes that the state court's holding rest in part on the appropriate factual determination that trial counsel reasonably relied solely on the mental health evaluation from Norristown State Hospital rather than gathering their own evidence as to

45

Robinson's competency.  See 28 U.S.C. § 2254(d)(2).

Having found no deficient performance on the part of counsel, the Court need not address

the prejudice prong of Strickland.  Further, as Robinson has failed to establish ineffectiveness of

trial counsel with respect to this claim, it follows that defense counsel were not ineffective for

failing to raise this meritless claim on direct appeal.

**D.    Guilt Phase Issue - Claim One - Ineffective Assistance of Counsel for Failure
to Develop and Present Evidence in Support of a Voluntary Manslaughter
Charge**

Robinson contends that he is entitled to a new trial because trial counsel was ineffective

for failing to develop and introduce available evidence in support of a voluntary manslaughter

charge to the jury, specifically a charge that he was acting under a heat of passion.[20]  Before

---

[20] Under this claim, in addition to arguing defense counsel's ineffectiveness, Robinson
also contends that the trial court violated his right to due process when it refused to give a jury
instruction on a voluntary manslaughter charge.  Further, Robinson now claims that counsel on
direct appeal were ineffective for failing to raise this claim.  The Court rejects this claim of
ineffectiveness of counsel on direct appeal because the record demonstrates that this claim was in
fact raised on direct appeal, as it was addressed by the Pennsylvania Supreme Court.  See
Robinson-I, 721 A.2d 353-54.  In addressing this claim, the state supreme court reviewed the
evidence presented at trial and found no basis for Robinson's contention that the killing occurred
under the heat of passion as a result of provocation from the victim, Bass.  Id.  Upon review, the
Court agrees with the state court's conclusion on direct appeal that, *based on the evidence that
was presented at trial*, Robinson's right to due process was not harmed by the trial court's refusal
to charge on voluntary manslaughter.  The jury was instructed on third degree murder, not
voluntary manslaughter, a lesser included offense.  However, the jury rejected the third degree
murder option in favor of the first degree murder conviction.  As stated by the Third Circuit
Court of Appeals, "in cases involving offenses on a ladder, if the trial court wrongfully refuses to
charge the offense at the bottom rung, that error is harmless provided the jury returns a guilty
verdict for an offense higher up rather than for an intermediate offense which was also charged."
Geschwendt v. Ryan, 967 F.2d 877, 884 (3d Cir.), cert. denied, 506 U.S. 977 (1992).  Of course,
this conclusion does not preclude the Court from considering the instant claim with respect to
trial counsel's role, because the essence of the instant ineffectiveness claim lies in what evidence
in support of a voluntary manslaughter instruction was *not* developed and presented at trial.
Thus, the Third Circuit Court's holding in Geschwendt is not applicable to the ineffectiveness
claim.

turning to an analysis of this claim, the Court will first recount the relevant background as it relates to a voluntary manslaughter charge.

## 1.    Background

In support of this claim, Robinson contends that the following evidence could have been presented to show the cumulative impact of a series of related events supporting the heat of passion charge: (1) testimony and correspondence of Hodge, along with certain other evidence, detailing how the depth and emotional intensity of the relationship between Robinson and Hodge led Robinson to act in the heat of passion; (2) expert testimony detailing Robinson's mental health issues; and (3) evidence relating to Robinson's frequent habit of carrying of a gun and the ballistics evidence relating to the gun used to commit the offenses.  Robinson contends that had his counsel properly used and developed this evidence at the guilt phase, there is a reasonable probability that at least one juror would have found him guilty of third degree murder.  The evidence of record in support of Robinson's position is as follows.

### a.    Tara Hodge

At trial, the Commonwealth presented the testimony of Hodge.  On direct examination, Hodge stated that she and Robinson began their relationship in the middle of 1993, after her former boyfriend, Anthony Locke, introduced them.  (Trial NT 3/12/1997 60, 90.)  Hodge was living in Carlisle, Pennsylvania at that time, while Robinson was located in Maryland.  (Id. at 60.)  During their relationship, Robinson visited Hodge regularly in Carlisle.  (Id. at 63.)

In February 1995, Hodge received a telephone call from another woman who claimed to be Robinson's girlfriend.  (Id. at 62.)  Hodge did not see Robinson again until the spring of 1996, when he began visiting her again in Carlisle.  (Id. at 66.)  Hodge, however, did not consider them

47

to be in a romantic relationship at that point; rather, she characterized their interaction as

"intimate friends."  (Id. at 69.)

In May 1996, Hodge began a relationship with Bass.  (Id. at 69-71.)  As a result, she sent

a letter to Robinson on June 10, 1996, terminating their relationship.  (Id. at 73-75.)  She read the

letter aloud at trial:

> Hi. How's life treating you?  I would hope well.  I'm pretty much the
> same.  I'm not sure if you will like what you are about to read but it's
> things I must say.
>
> After your last visit, I was upset for a few days.  I've come to realize
> that you and I will never be.  I could never have the type of
> relationship I want with you.  I will not allow myself to feel I must
> answer to you for everything, someone speaking to me or a facial
> expression.  I've had enough of feeling as if I'm being controlled.  I
> think you don't want me unless everything is your way and that will
> not be.  Sex may have been great, but I need someone I can get along
> with outside of bed.
>
> I must allow myself to let you go.  I'm ready to do so now.  I must
> move on.  You and I have gotten nowhere.  I will always care about
> you.  You are special to me.  I'll call once in awhile to see how you
> are.  I hope you'll do the same.  Love, Tara.

(Id. at 74-75.)  Of the many letters Hodge wrote to Robinson, this letter was the only one entered

into evidence at trial.  The prosecutor described this letter as follows: "[T]he one thing that's

plainly clear, that young lady told him, and this letter was found in his house, it's over.  You'll

read this.  It's perfectly clear.  We're at an end.  I've had enough of it."  (Doc. No. 36, Notes of

Testimony, Trial, 3/13/97 ("Trial NT 3/13/97") 272.)

Hodge also testified at trial about Robinson's jealous behavior prior to the shootings on

June 30, 1996.  She testified that in December 1994, Robinson unexpectedly entered a restaurant

in Carlisle where she was eating with a male friend, got visibly upset, and forced Hodge to leave

with him.  (Trial NT 3/12/97 65-66.)  She also testified that Robinson found her in the shower

with his friend and her former boyfriend, Anthony Locke.  (Id. at 95.)

Hodge testified that on the evening of the shootings, when Robinson entered her

apartment and heard the shower running, he got upset: "We argued.  He wanted to know who

was in the shower.  I told him a friend.  He said we must have just gotten done having sex."  (Id.

at 80.)  Robinson continued to argue with Hodge, demanding that she ask Bass to leave, until the

moment he pulled the gun out of his waistband and shot her three times, in quick succession.  (Id.

at 80-81.)

Hodge also testified at the PCRA hearing.  At the hearing, rather than state that she ended

her relationship with Robinson prior to the shootings, Hodge confirmed that the relationship

"continued [from 1993] with highs and lows, offs and ons, until the night of the shooting."

(PCRA NT 10/18/2001 109.)  She also was asked again about Robinson's jealousy during their

relationship.  (Id. at 110-12.)  Further, she also described Robinson's behavior prior to the

shootings upon hearing the shower running in Hodge's apartment.  (Id. at 119-120.)

In addition, at the PCRA hearing, the numerous letters written by Hodge to Robinson

were introduced for the first time.  These letters demonstrate the albeit on-again off-again nature

of an intense emotional and physical connection between Hodge and Robinson.  The

correspondence Hodge wrote to Robinson includes the following:

In July 1993, when Hodge was dating Robinson, she wrote a letter to him, which stated,

in part, "If you only knew what just thinking about you does to me."  (Doc. No. 38, PCRA Brief,

Attach. 13.)  On the envelope containing this letter, Hodge wrote her name on the return address

as "Tara Hodge Robinson."  (Id.) (emphasis in original).

49

On July 28, 1993, Hodge wrote to Robinson, stating:

> My letters may be short but that means nothing.  No one else is
> occupying my mind or time.  I have no room in my mind for anyone
> but you.  Physically, mentally and emotionally.  I'm with you.  No
> one can change that but you.  Not seeing you makes me want you
> even more in every way.

(Id. at Attach. 14.)  Hodge wrote her name on the envelope containing this letter as "Tara

Robinson (maybe someday)."  (Id.)  On April 20, 1994, after Hodge and Robinson had a break-

up, Hodge wrote to him:

> I made myself a promise a long time ago and I intend on keeping it.
> I'll never be with anyone else after you.  I promised myself the next
> time I loved someone and got hurt that would be it.  You'd think I'm
> here having sex with someone but I'm not.  I don't want anyone else
> touching me.  I made the mistakes I did before because I was afraid.
> I guess I'm just a fuck up all together.  The things I want the most I
> can't have so nothing else matters to me.
>
> Well I don't know what's going to happen to me.  Just don't hate me.
> I've meant well.  I'm a good person, just a little fucked up right now.
> I do love you Antyane, I hope you believe that.  If you need me I'm
> here for you always.  Please be careful just because we're not together
> doesn't change the fact that if something happens to you I'd be
> messed up.  Please don't forget me.  I enjoyed our time together.  I'm
> still going to miss you.  Take care of yourself.
>
> I love you
> Tara
>
> I hope to hear from you soon.
> Thanks for coming to see me.

(Id. at Attach. 18.)  On May 13, 1994, Hodge wrote to Robinson, stating:

> All I've wanted with you I can't have.  I'll always love you but I must
> face reality.  I still hate the thought of you being with someone else,
> but I know you will if you're not already.  But as long as your [sic]
> happy.

> Anyway, I hope you'll come visit again.  I miss you.

(Id. at Attach. 19.)  On March 15, 1996, three months before the shootings, Hodge wrote again,

stating:

> I just wanted to let you know I enjoyed having you here.  I hope you
> won't be a stranger.
>
> I had realized a lot after you had left, actually before you left but I
> won't get into it.  I'm just going to have to find a way to deal with
> things.
>
> Things have to get better sometime.  Change is very hard.  I guess
> with time things will be the way they were meant to be.  If you ever
> need or want me I'll always be there for you no matter what.
>
> I still care and feel a great deal for you.  I doubt that will ever change.
>
> Love Always
> Tara

(Id. at Attach. 20.)  And finally, on April 3, 1996, Hodge wrote the following correspondence to

Robinson:

> Once again I enjoyed your visit.  I'm glad you wanted to come again.
> I'm surprised it was so soon.
>
> * * *
>
> I need to accept the fact that we will never be a couple. . . .  I really
> thought I would have been over you by now.  They say time heals all
> wounds, but the fact still remains my feelings haven't changed.  I
> shouldn't admit to you but maybe it's time to start and try to let go.
> The thought of you being with another female, hurts.  I don't like it
> but it's bound to happen and someone else having your children.
>
> Well my thoughts go much more deeper and serious than what I've
> already written. I won't say anymore it doesn't matter. I should just
> keep my feelings to myself.  Nothing's going to change.  I need to
> find a way to move on.  I have to stop wanting things I can't have.
> You said I wouldn't see you in a few months so for the next few

months I must work on getting over you.

As for sex, I can't climax with another man.  Maybe someday that
will change when or if I find someone I can get into and develop
feelings for.  The thought of having to find a way to get over you
hurts.

* * *

[I]f you should need me just page or you know where I live if it's
important.  I will be in touch but not for awhile.

Love,
Tara

(Id. at Attach. 21.)  None of this correspondence was entered into the record or introduced at

trial.

### b.      Mental Health Evidence

Robinson also claims that his trial counsel failed to develop and present relevant mental

health evidence in support of a voluntary manslaughter charge.  At trial, defense counsel did not

present any expert mental health evidence as to Robinson's state of mind at the time of the

killing.

At the PCRA hearing, Robinson presented the testimony of Dr. Ragusea.  As stated

above, Dr. Ragusea had been hired by defense counsel prior to trial to evaluate Robinson for

mental health issues.  (See supra, p. 28.)  However, Dr. Ragusea was unable to evaluate

Robinson due to Robinson's lack of cooperation, and defense counsel did not seek further input

from Dr. Ragusea without that evaluation.  (PCRA NT 10/10/01 19-20.)  After reviewing

background materials such as Robinson's medical and family records, Dr. Ragusea opined at the

PCRA hearing that Robinson was most likely suffering from paranoid schizophrenia at the time

of the killing, and that diagnosis would be a relevant consideration in determining whether

Robinson may have acted under the heat of passion.  (PCRA NT 10/18/01 14, 24-25.)  However,

as Attorney Waller testified at the PCRA hearing, defense counsel chose not to seek input from

Dr. Ragusea on this matter in the absence of cooperation from Robinson.  (Id. at 60.)

     Robinson also presented the testimony of Dr. Rotenberg, who had been hired to interview

and evaluate Robinson prior to the PCRA hearing.  (See supra, pp. 35-37.)  After reviewing the

relevant background material, Dr. Rotenberg made the following conclusion with respect to

Robinson's mental health status at the time of the incident:

> On the night when the tragedy occurred, Mr. Robinson felt a sense of
> betrayal heightened by his irrational and overwhelming jealousy and
> paranoia for which he suffered.  His actions were not that of a
> gunman out to protect his image as a big city guy, rather they were
> actions of a mentally ill, insecure, jealous, and paranoid individual.
> Indeed, as Miss Hodge testified, Mr. Robinson could not tolerate her
> sharing a meal with another man in his presence.

(PCRA NT 10/18/01 73.)

### c.    Other Evidence

     Robinson also claims that defense counsel failed to develop and present other evidence to

the jury in support of a voluntary manslaughter charge.  Specifically, in addition to the letter

evidence relevant to Robinson's relationship with Hodge, Robinson argues that defense counsel

failed to develop evidence relating to Robinson's frequent habit of carrying of a gun and the

ballistics evidence relating to the gun used to commit the offenses.  Had this evidence been

developed at trial, Robinson contends, a voluntary manslaughter charge to the jury would have

been appropriate.

     At trial, the Commonwealth presented a ballistics and firearms examination expert who

testified that the gun purportedly used in the incident only has to be chambered once with a magazine holding ten cartridges (bullets) prior to firing.  (Trial NT 3/13/97 221-22.)  On cross-examination, defense counsel did not ask any follow up questions with respect to how the loading of the weapon would affect the timing of the shooting itself.  However, at closing defense counsel argued the following:

> We've heard testimony from the ballistics people . . . that the semiautomatic weapon that they believe these bullets came out of could be fired in less than a second.  Each shot can be fired in less than a second.  Twelve shell casings found, twelve shots fired that can be fired in - - reasonably between ten and twelve seconds this entire event is over.  I submit to you that this shortness of time, the quickness with which this weapon can fire, negates any specific intent that the Commonwealth is going to allege that Mr. Robinson had to kill Mr. Bass.  There was not time to form specific intent.  There was not time to have premeditation, any hardness of heart.

(Id. at 265.)  Further, at the PCRA hearing, defense counsel testified that she had hired a defense ballistics expert prior to trial, but did not present his testimony to the jury because she determined it to be duplicative of the Commonwealth's expert testimony with respect to the gun.  (PCRA NT 10/10/01 99-102.)

Robinson claims that at trial the Commonwealth seemed to suggest that he traveled to Carlisle on the night of the shootings with a gun for the specific purpose of confronting Hodge with it rather than simply having it on his person at the time.  In particular, the prosecutor argued during his closing,

> Consider the motive.  I told you that the motive in this case and the whole theme of it was, I'm a big city guy, you disrespected me, I'm going to have to hurt you.  Because what's the whole story here?  This guy would come up, he would want to have sex with her whenever he wanted it. . . . And this time, because she had found another boy, she said, no you leave now, I'm not taking that, I'm not

> going to settle for that.  Why, I came up here to make love with you.
> Why in the world you would have to carry an automatic pistol
> concealed under your clothes to do that, I have no idea whatsoever,
> because that's the kind of image this man projects.

(Trial NT 3/13/97 271-72.)  However, at the PCRA hearing, Robinson's father testified that

Robinson routinely carried a gun for personal safety after he was jumped by two men previously.

(PCRA NT 10/10/01 175-76.)  Robinson's mother also testified at the PCRA hearing that he

often carried a gun for personal safety after his niece's boyfriend had broken into his room and

stolen property.  (Id. at 217.)  She also testified that Robinson once brandished the gun during an

argument he had with his father in which he believed his father had assaulted his mother.  (Id. at

216-17.)  This testimony was not presented at trial.

### d.    Defense Counsel

On the third day of the trial, March 12, 1997, the trial court asked defense counsel at

sidebar if Robinson was going to seek a charge on voluntary manslaughter.  (Trial NT 3/12/97

161.)  In response, Attorney Waller stated,

> At this point I can't say for sure, Your Honor.  I need to speak with
> my client further.  I can't say for sure.  I think [ Hodge] testified that
> their relationship was over in the spring of '96.  She didn't indicate
> anything that she thought he was faithful to her or anything.  I don't
> see how that's still relevant.  If he was cheating, how is that relevant?

(Id.)

Further, after each side had presented its evidence, but prior to closings, a discussion was

held in chambers, where the possibility of a voluntary manslaughter charge was raised again.

Specifically, the trial court and Attorney Waller had this exchange:

> [Trial court]:          [S]tate    your    reasons    for voluntary
>                         manslaughter.

[Attorney Waller]:   I believe that there are facts in the record that point to a series of events that could lead to provocation to show that my client acted in the heat of passion, and that's going to come from the testimony of Miss Hodge, things that she said on direct and cross.

* * *

That when he came to the house at night that that was not anything unusual.  When she saw that it was him at the door, she didn't tell him to go away.  She let him in.  There is no testimony that he forced his way in, that he, you know, pushed the door in.  She opened the door, walked away, let him in.

When he came in the kitchen door, which she testified to, you can't hear the shower running so he didn't know anybody else was there, that when he entered the kitchen he went through the walkway - - through the doorway . . . into the bedroom.  She went ahead of him and she sat down on the bed.

She didn't indicate up until that point any desire to have him leave at all, to have him leave, that she didn't want to talk to him, speak to him or anything.  I feel that that can show that he may have thought that this was again a part of their ongoing on and off relationship, that potentially maybe it could be on again, maybe they could work things out.  That's a reason or inference because even despite her letters her actions this night were to the contrary.

[Trial court]:   When he finds a person there, that is adequate provocation?

[Attorney Waller]:   There is a person in the shower.  Even though he may think they are trying to - - that there is a potential they could have an on again

56

> relationship again, previously - - and this is
> the only fact that's outside of the sequence
> here - - that there had been infidelity
> previously on both sides, and that previously
> her infidelity involved being caught with her
> ex-boyfriend, his best friend, in the shower
> and that there whole series of events give rise
> to the provocation.

(Trial NT 3/13/97 246-48.)  The trial court denied Robinson's request, and a voluntary

manslaughter charge was not given to the jury for consideration.  (Id. at 248.)  However, at the

conclusion of the charge, Attorney Waller expressly stated her objection to the court's denial of

Robinson's proposed voluntary manslaughter instruction.  (Id. at 300-301.)

At the PCRA hearing, defense counsel testified about the testimony and evidence in

support of a voluntary manslaughter charge.  Initially, Attorney Andrews characterized the

shootings as "a situation where there seemingly was a killing that had not been preplanned.

There was the possibility of supportive testimony on a manslaughter charge."  (PCRA NT

10/10/01 11-12.)

During Attorney Waller's PCRA testimony, she agreed with PCRA counsel that the

relationship between Hodge and Robinson was a crucial element of the defense, and that it would

have been important to show "the depth of their relationship, [Robinson]'s jealousy, the status of

the relationship at the time, [and] the history of the relationship."  (Id. at 64.)  She also

acknowledged that "a cumulative effect of past events can be considered by the jury in

determining whether at the point of the incident the particular defendant was operating under the

heat of passion."  (Id.)  PCRA counsel then asked Attorney Waller a series of questions about

why she did not use any of the nearly one hundred letters written to Robinson by Hodge to

demonstrate the cumulative effect of past events at trial.  (Id. at 65-86.)  She testified that she did

not think it was "the most important thing" that the jury know the two had discussed getting

married through these letters.  (Id. at 65.)  She continued, stating, "They had had a number of

breakups and reconciliations.  So although they had discussed marriage apparent from her letters,

I didn't think that was vital.  If the jury found that out, I didn't think it was vital that they had to

know that."  (Id. at 67.)  Attorney Waller could not recall why she did not confront Hodge with

one of her letters at trial when Hodge testified that she could not remember informing Robinson

that she had been unfaithful and had slept with someone else.  (Id. at 67-68.)  Further, on cross

examination Attorney Waller stated that it was only necessary to introduce the single letter from

June 10, 1996 to show the extent of the communication between Hodge and Robinson prior to

the shootings.  (Id. at 107.)

## 2.    State Court Decisions

In its decision on direct appeal, the Pennsylvania Supreme Court addressed the issue of

whether the trial court erred in refusing to give a jury instruction on voluntary manslaughter.

Robinson-I, 721 A.2d at 353-54.  Affirming that under Pennsylvania law a voluntary

manslaughter charge "is not proper where the person who was killed is not the person who

provoked the defendant, absent evidence of negligence or accident, see id. at 353 (citing

Commonwealth v. Jones, 683 A.2d 1181 (1996)), the state supreme court found the following:

> In his brief to this court, [Robinson]'s evidence of provocation relates
> to past incidents with Tara Hodge and [Robinson]'s interaction with
> Tara Hodge on the night of the murder.  Accordingly, it appears that
> [Robinson] is arguing that Tara Hodge was responsible for the
> provocation that warranted the voluntary manslaughter charge.
> However, Tara Hodge was not the individual killed.  Moreover,
> [Robinson] does not assert that he was endeavoring to kill Tara

58

> Hodge at the time he shot Rashawn Bass, or that he negligently or
> accidentally shot Bass. [Robinson] seems to imply that a voluntary
> manslaughter charge is warranted even where he was provoked by
> someone other than the person who was murdered. There is no legal
> support for such argument. Accordingly, [Robinson]'s claim lacks
> arguable merit.

Id. at 353-54.[21]

After conducting a PCRA hearing, the trial court, now sitting as PCRA court, again

denied this claim, which was presented to the PCRA court as ineffective assistance of counsel for

failing to develop and present evidence in support of a voluntary manslaughter charge. (Doc. No.

33-5.) The PCRA court was not persuaded by Robinson's additional evidence, namely Hodge's

letters. (Id.) The court found the evidence to be cumulative to the evidence that had been

admitted at trial, stating that this evidence showed,

> that [Robinson] and Tara Hodge had an off-again on-again
> relationship from when they first started seeing each other in 1993.
> [Robinson] was jealous of Tara, even holding against her a
> relationship that she had with his friend, Anthony Lock[e], before he
> became involved with her. Over the years, Hodge wrote [Robinson]

---

[21] The Pennsylvania Supreme Court affirmed the trial court's opinion in support of the
judgment of sentence, which stated, in part (as quoted in the PCRA court opinion):

> [Robinson] came to Tara's home after midnight on June 30, uninvited
> and armed. [Robinson], who had never lived with Tara, intentionally
> intruded upon her over a half month after she had civilly told him that
> their relationship was over. [Robinson] would not leave Tara's home
> when she told him to leave. Rashawn Bass was in Tara's home at her
> invitation. Bass did nothing whereby a jury could have concluded
> that he seriously provoked [Robinson] into killing him unless we
> were to conclude that [Robinson] owned Tara as a result of their
> sporadic relationship, and that Rashawn Bass, therefore, should not
> have been with her thereby seriously provoking defendant. Such a
> proposition is absurd.

(Doc. No. 33-5 at 30.)

> numerous letters indicating that she was considering breaking off their relationship, but she never followed through. [Robinson] suggests that his trial/appellate counsel was ineffective in failing to introduce this evidence which he maintains would have shown a course of conduct sufficient to raise an issue of adequate provocation to warrant a charge of voluntary manslaughter.

(Doc. No. 33-5 at 33-34.)  The court rejected Robinson's argument, reasoning that the evidence presented at the PCRA hearing "would not sufficiently add to the facts on which the Supreme Court has already concluded that the request to charge on voluntary manslaughter was properly denied."  (Id. at 34.)

On review of the PCRA court's decision, the Pennsylvania Supreme Court declined to reach the merits of the claim, concluding that it was previously litigated on direct appeal. Robinson-II, 877 A.2d at 438.  The state court's denial of the ineffectiveness claim on the basis that the underlying claim was previously litigated does not bar this Court's review.  See Cone v. Bell, — U.S. — , 129 S. Ct. 1769, 1781 (2009) ("When a state court refuses to re-adjudicate a claim on the ground that it has been previously determined, the court's decision does not indicate that the claim has been procedurally defaulted.  To the contrary, it provides strong evidence that the claim has already been given full consideration by the state courts and thus is *ripe* for federal adjudication." (footnote omitted)).  Accordingly, the ineffectiveness claim is exhausted and not procedurally defaulted.  Further, as found by the Supreme Court in Cone, where a state court rejects a claim as "previously determined," this Court's "review is not subject to the deferential standard that applies under AEDPA . . . .  Instead, the claim is reviewed de novo."  Cone, 129 S. Ct. at 1784.  See also Thomas, 570 F.3d at 115 (holding that a Pennsylvania Supreme Court decision on purely procedural grounds stripped the PCRA court's substantive determination of

petitioner's claim of preclusive effect, and thus AEDPA deference is not due).  Thus, the Court will review this ineffectiveness claim de novo, rather than applying AEDPA's deferential standard of review.

### 3.    Analysis of Ineffectiveness of Counsel

In order to determine whether the deficient performance of Robinson's counsel was prejudicial with respect to developing and presenting evidence in support of a voluntary manslaughter charge, the Court first will briefly outline the relevant law regarding voluntary manslaughter.

Under Pennsylvania law, a person is guilty of voluntary manslaughter if he acted under a sudden and intense passion resulting from a serious provocation by the individual killed.  See 18 Pa. Cons. Stat. Ann. § 2503(a)(1).[22]  "'Heat of passion' includes emotions such as anger, rage, sudden resentment or terror, which renders the mind incapable of reason."  Commonwealth v. Ragan, 743 A.2d 390, 396-97 (Pa. 1999) (quoting Commonwealth v. Speight, 677 A.2d 317, 324-25 (Pa. 1996)).  The test to determine whether there was adequate provocation to reduce homicide to voluntary manslaughter is whether a reasonable man, confronted with the same series of events, would become impassioned to the extent that his mind was incapable of cool reflection.  Commonwealth v. Eddowes, 580 A.2d 769, 772 (Pa. Super. Ct. 1990) (citing Commonwealth v. McCusker, 292 A.2d 286, 290 (Pa. 1972)).  "In making the objective determination as to what constitutes sufficient provocation reliance may be placed upon the

---

[22] In Pennsylvania, a second form of voluntary manslaughter exists when a defendant kills a victim with the unreasonable belief that, under the circumstances, he was entitled to use deadly force in self-defense.  See 18 Pa. Cons. Stat. Ann. § 2503(b); Commonwealth v. Washington, 692 A.2d 1024, 1029 (Pa. 1997).

cumulative impact of a series of related events." <u>McCusker</u>, 292 A.2d at 290.[23]  Further, in cases where a defendant asserts that he acted in the heat of passion, "evidence - lay or psychiatric - pertinent to that defense should be admissible" in order to establish the defendant's state of mind at the time of the crime.  <u>Id</u>. at 290-91.  Specifically, as to mental health evidence, "psychiatric evidence is admissible as an aid in determining whether an accused acted in the heat of passion at the time of his offense." <u>Id</u>. at 293.

Turning to the ineffectiveness claim, the Court notes that the issue of whether counsel's failure to develop and present a voluntary manslaughter defense was unreasonable need not be addressed here.  <u>Strickland</u> provides that a court may determine an ineffectiveness claim by looking to the prejudice prong first.  <u>Strickland</u>, 466 U.S. at 697.  Under the prejudice prong of the <u>Strickland</u> test, Robinson must show that, but for counsel's alleged unprofessional errors, there is a reasonable probability that the result of his trial would have been different.  <u>Id</u>. at 694.

Upon review of the totality of the evidence in this case, the Court finds that the evidence in support of the first degree murder conviction was overwhelming, and that Robinson has failed

---

[23] The Pennsylvania Supreme Court further explained in <u>McCusker</u>,

> Having found in a given situation that an accused was confronted with sufficient provocation, the focus then shifts to defendant's response to that provocation.  The relevant inquiry is threefold: did the defendant actually act in the heat of passion when he committed the homicide; did the provocation directly lead to the slaying of the person responsible for the provocation; and was there insufficient 'cooling time' thus preventing a reasonable man from using his 'reasoning faculties' and 'capacity to reflect.'  Absent any of these elements an accused's defense of provocation must fail and he is not entitled to a verdict of voluntary manslaughter.

<u>McCusker</u>, 292 A.2d at 290 (footnotes omitted).

to show that there was a reasonable probability that, but for counsel's failure to present additional evidence in support of a voluntary manslaughter charge, the outcome of the trial would have been different. The evidence in support of voluntary manslaughter relied upon by Robinson in the instant petition does not convince the court that a jury would have found that Bass's presence in the shower seriously provoked Robinson. More specifically, while the letters from Hodge to Robinson may show the on-again, off-again nature of their relationship, introducing all the letters would not have been sufficient to demonstrate how Bass, not Hodge, provoked Robinson. Further, Hodge's PCRA testimony speaks to the nature of her relationship with Robinson, not to how Bass provoked Robinson on the night of the shootings. In addition, the mental health evidence may have been effective for determining Robinson's state of mind at the time of the offense, but there simply is not enough history to demonstrate how a man taking a shower provoked Robinson to kill him. The totality of the evidence simply does not support Robinson's contention that the killing was made under the heat of passion. Accordingly, the Court's confidence in the conviction on the charge of first degree murder has not been undermined by defense counsel's representation. Thus, Robinson has not shown that there exists a reasonable probability that, if trial counsel had developed and presented all the proposed evidence, the result of the proceeding would have been different. See Strickland, 466 U.S. at 694. Further, because trial counsel was not ineffective, appellate counsel cannot be found ineffective for failing to properly litigate this claim.

### E.     Guilt Phase Issue - Claim Two - Commonwealth Misconduct Throughout Trial and Sentencing Hearing

Robinson contends that he is entitled to a new trial and sentencing proceeding because the

prosecutor in the case violated his constitutional rights by making repeated, improper and

prejudicial comments throughout the trial and sentencing hearing.  Specifically, Robinson argues

that the prosecutor's comments at trial (1) improperly attributed motive and intent to Robinson's

upbringing and race, (2) improperly put a barrier between the jury and Robinson, (3) put before

the jury facts not in evidence, and (4) maligned his constitutional rights by denigrating his right

to the presumption of innocence.  Further, Robinson claims that at sentencing the prosecutor was

permitted to incorporate irrelevant non-statutory evidence for consideration of the aggravation of

sentence and improperly commented on Robinson's future dangerousness and lack of remorse.

Robinson also asserts ineffective assistance of counsel claims in connection with these claims.[24]

Improper statements by a prosecutor do not in and of themselves require reversal, but

must be analyzed on a case-by-case basis pursuant to the harmless error doctrine.  United States

v. Zehrbach, 47 F.3d 1252, 1267 (3d Cir. 1995).  "The harmless error doctrine requires that the

court consider an error in light of the record as a whole, but the standard of review depends on

whether the error was constitutional or non-constitutional."  United States v. Gambone, 314 F.3d

163, 177 (3d Cir. 2003) (quoting Zehrbach, 47 F.3d at 1265).  Non-constitutional error is

---

[24] The Pennsylvania Supreme Court addressed the merits of the substantive claims of prosecutorial misconduct, as well as the related ineffectiveness claims, on post-conviction review.  See Robinson-II, 877 A.2d 433.  In addressing Robinson's claims, the Pennsylvania Supreme Court applied Pennsylvania's standard for evaluating prosecutorial misconduct claims.  Id., 877 A.2d at 441.  As it has been held that the standard for prosecutorial misconduct applied by the Pennsylvania courts is consistent with established federal law, the Court will apply the AEDPA inquiry of whether the state court decision was contrary to or involved an unreasonable application of clearly established federal law.  See Henry v. Horn, 218 F. Supp. 2d 671, 704-05 (E.D. Pa. 2002) (finding Pennsylvania standards addressing prosecutorial misconduct are not contrary to the comparable federal standards); Martinez v. Shannon, Civ. No. 06-2657, 2007 WL 2702644, at *15 (E.D. Pa. June 28, 2007); Fahy v. Horn, No. Civ.A. 99-5086, 2003 WL 22017231, at *50 (E.D. Pa. Aug. 26, 2003), overruled on other grounds by, 516 F.3d 169 (3d Cir. 2008).

harmless when it is highly probable that the error did not contribute to the judgment.  Id. (quoting

Zehrbach, 47 F.3d at 1265).  High probability, on the other hand, requires that the court possess a

sure conviction that the error did not prejudice the defendant.  Id. (quoting Zehrbach, 47 F.3d at

1265).  If the error was unconstitutional, the court may affirm only if the error was harmless

beyond a reasonable doubt.  Id. (citing United States v. Molina-Guevara, 96 F.3d 698, 703 (3d

Cir. 1996).

　　　　The relevant question is whether the prosecutor's comments "so infected the trial with

unfairness as to make the resulting conviction a denial of due process."  Darden v. Wainwright,

477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)).  In

making this determination, a court must examine the prosecutor's statements in context to

determine their probable effect on the jury's ability to judge the evidence fairly.  United States v.

Young, 470 U.S. 1, 11-14 (1985).  Stated otherwise, the arguments of counsel must be judged in

the context in which they were made, bearing in mind that arguments of counsel carry less weight

with a jury than do instructions from the court.  Boyde v. California, 494 U.S. 370, 384 (1990).

For example, a conviction will not be overturned on the grounds of prosecutorial statements

where the prosecutor's comments were "invited" by defense counsel's improper statements, and

went no further than necessary to "right the scale" of justice or to "neutralize" the defense's

remarks.  Young, 470 U.S. at 12-13.  Further, habeas relief is not available simply because the

prosecutor's comments were undesirable or even universally condemned.  Darden, 477 U.S. at

180-81; Donnelly, 416 U.S. at 643; Lam v. Kelchner, 304 F.3d 256, 271 (3d Cir. 2002).

### 1.　　　Prosecutor's Comments at Trial

　　　　In his petition, Robinson takes issue with several statements made by the prosecutor

during the trial.  Initially, in his opening statement, the prosecutor made the following statement,

as set forth by the Pennsylvania Supreme Court:

> This is going to be a case of images, ladies and gentlemen.  Every case like this has a theme, I suppose, and in this one you are going to see how a young man and a young woman paid the big city price for a perceived disrespect.  You've all heard that word, and you've seen it in television shows.
>
> He disrespected me.
>
> You are going to hear evidence about this perceived disrespect, a disrespect to that man and how he responded to it.  Because I'm from the big city, you disrespected me, I'm going to have to hurt you.
>
>                 * * *
>
> You'll say, sir, you got the benefit of every one of those rights, but you don't come up here into this county and shoot a boy and a hard working young lady . . . .

Robinson-II, 877 A.2d at 441.  Further, in his closing statement, the prosecutor continued:

> Now there was an image projected here, and it's that big city image.  You'll get to look at this.  Man, I got to carry a gun wherever I go.  He's not the person in here that all my life I've been treated so badly.  This is the image of a kind of person capable of forming the specific intent to kill.  This is a lifestyle.  You look at that and you judge these acts carefully.
>
>                 * * *
>
> I would say an ordinary person doesn't want to do that, but the person that wants to project this kind of image, the kind of guy that has to drive into Cumberland County and have guns in his waistband and his home has to have a bullet proof vest, those are the kind of guys I submit to you that say I ain't going to be disrespected, disrespect me and you're going to have to pay.

Id. at 441-42.

Robinson argues that these statements had implicit, but unmistakable and highly

improper, racial overtones.  He also contends that trial counsel was ineffective for failing to

object when the prosecutor injected race into the argument.  At the PCRA hearing, Attorney

Waller testified that she did not think the prosecutor's opening statement provided a fair

representation of the evidence that was going to be presented, but as the trial progressed, she

determined that the evidence did in fact support the statements.  (PCRA NT 10/10/01 89.)  As to

the prosecutor's closing statements, Attorney Waller testified as follows:

> to be honest, I think they were borderline.  I chose not to object to
> them because I didn't want to draw unnecessary attention to them by
> the jury and just try to make attempts to neutralize it in my own
> closing, which is sort of the thought process you go through whenever
> you think there is an objection.

(Id. at 92.)

In its decision affirming the denial of post-conviction relief, the Pennsylvania Supreme

Court initially found that "the prosecutor's remarks were not a deliberate attempt to destroy the

objectivity of the jury, but merely summarized the evidence presented at trial with oratorical flair

permitted during argument."  Robinson-II, 877 A.2d at 442.  The court also reasoned,

> The theme of the prosecution throughout the trial was that [Robinson]
> had a reputation to protect, and when he found out his girlfriend was
> seeing another man, he felt disrespected.  The prosecution did not
> mention the fact [Robinson] is an African-American, nor do the
> comment suggest, as [Robinson] argues, that because of his race he
> was more likely to kill to protect his reputation.

Id.

The court denied the underlying prosecutorial misconduct claim, concluding that "[i]t is

difficult to ascertain what prejudice allegedly resulted from the prosecutor's comments, and

[Robinson] has not demonstrated but for these comments, the outcome of his trial would have

differed." Id. In doing so, the court also found Robinson's claim of trial counsel's

ineffectiveness at the time of closing meritless.[25] Id.

    Robinson also argues that the prosecutor maligned his constitutional rights by denigrating

his right to the presumption of innocence. During his opening statement, the prosecutor stated:

> During this part, understand fully this man came in here presumed innocent. He has a lot of rights. That's our system of government. I'm sure every one of you thinks back to your elementary school days and took great pride in our system.
>
>     * * *
>
> We've come to this stage and when you put those rights out there, the thing you're here to decide now is what happened on a particular day, and you have just as much of an obligation to be fair to the people of Pennsylvania and Cumberland County as you do to that man right there.
>
>     * * *
>
> When you hear the evidence, it's no longer a question of presumed innocent . . . . You'll say, sir, you got the benefit of every one of those rights, but you don't come up here into this county and shoot a boy and a hard working young lady . . . .
>
>     * * *
>
> I have to prove each and every element of these crimes and you'll hear long renditions of what these offenses are and the elements. It's not particularly important now because you are fact finders.

Robinson-II, 877 A.2d at 443.

    The trial court also instructed the jury on Robinson's rights and the presumption of

_____

[25] The court rejected Robinson's ineffectiveness claims related to the opening statements because at that time Robinson was representing himself, and thus could not now claim he was ineffective or that standby counsel was ineffective because he did not seek her guidance. Id. (citing Commonwealth v. Tilley, 780 A.2d 649, 653 n.9 (Pa. 2001)).

innocence.  At the beginning of the trial, the court stated,

> The Commonwealth has the burden of proof beyond a reasonable doubt.

> * * *

> You should keep an open mind.  You should discuss this case with no one during the course of the trial.   That even means among yourselves.   The first time that you should discuss this case among yourselves or may discuss this case among yourselves under Pennsylvania law is when you are deliberating.

> There is a good reason for that rule.  At that point you will know all of the evidence.  You will have heard the arguments in support of the evidence in this case, and you will have heard the charge on the law that I will give you.  So that is the first time you know everything that you need to know under the law to render a fair and a just verdict in this case.  That is the reason for the rule not to discuss the case with anyone nor among yourselves until you are in the jury room deliberating.

(Trial NT 3/12/97 6-8.)  In the charge to the jury, the trial court further stated,

> [M]erely because a person is charged with a crime is not evidence. An accused comes to court presumed to be innocent, or as we say, cloaked with the presumption of innocence.  A defendant has no burden of proof.  The burden of proof is on the Commonwealth to prove defendant's guilt beyond a reasonable doubt.

> Thus, in order to convict this defendant beyond a reasonable doubt of any crime, you must be satisfied that each and every element of that offense has been proven beyond a reasonable doubt and that this defendant is the person who committed the offense beyond a reasonable doubt.

> * * *

> If you have such a doubt, then it is your duty to find defendant not guilty.  If you have no such doubt, then the presumption of innocence dissipates, and you would find defendant guilty.

(Trial NT 3/13/97 279-80.)

In its opinion affirming the denial of post-conviction relief, the Pennsylvania Supreme Court found that the prosecutor's comments, "viewed in the context along with the proper instructions given by the [trial] court, do not undermine the truth-determining process and do not require another trial." Robinson-II, 877 A.2d at 443. On this basis, the court also rejected Robinson's claims of ineffective assistance of counsel. Id.

On review of both these claims of prosecutorial misconduct during the trial,[26] this Court must presume under § 2254(e)(1) that the state court's factual determinations are correct because Robinson has failed to "rebut[ ] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see Campbell, 209 F.3d at 285-86. Taken in context and viewed as a whole, and being mindful that counsel's comments are given less weight than a trial court's instructions and the overwhelming evidence of Robinson's guilt presented at trial, the Court finds the prosecutor's statements did not likely impede the jury's ability to judge the evidence fairly. See Darden, 477 U.S. at 181; Boyd, 494 U.S. at 384. Further, the Court finds that these statements did not "infect[ ] the trial with unfairness" to such an extent that Robinson was denied due process of law. See id.

---

[26] In his amended habeas petition, Robinson makes the following additional arguments with respect to prosecutorial misconduct during the trial: (1) the prosecutor engaged in conduct intended to mislead and confuse the jury into believing that it had connected a weapon in Robinson's possession with the murder, by presenting a number of witnesses who testified about a Lorcin 9 millimeter weapon, and (2) the prosecutor capitalized on counsel's failure to request sequestration of the Commonwealth's witnesses by repeatedly referencing other witness testimony during his examinations and essentially eliciting from the witness on the stand an adoption of another witness' testimony. (Doc. No. 21 at 39-43.) These claims, however, are procedurally defaulted because Robinson never presented them to the state courts, either on direct appeal or collateral attack, and has not shown any "cause and prejudice" or a "fundamental miscarriage of justice" to excuse default. See Coleman, 501 U.S. at 732; 750-51. Furthermore, counsel's instant attempt to couch these issues in a claim of ineffective assistance of counsel for failure to raise them is cursory at best, thus the Court will not consider them.

The record below clearly demonstrates that the state court findings were not erroneous.

Thus, under § 2254(d)(1), the adjudication of the state court was not "contrary to" and did not

"involve[ ] an unreasonable application of, clearly established Federal law."  28 U.S.C. §

2254(d)(1); see Williams, 529 U.S. at 406.  Nor has Robinson demonstrated that the state court's

decision resulted in a decision that was based on "unreasonable determination of the facts in light

of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see Matteo,

171 F.3d at 888.

## 2.      Prosecutor's Comments at Sentencing Hearing

Robinson also takes issue with several statements made by the prosecutor at the

sentencing hearing.  First, he argues that he is entitled to habeas relief because the

Commonwealth was permitted to incorporate into the sentencing hearing irrelevant non-statutory

evidence for consideration of the aggravation of sentence.[27]  In connection with this evidence, the

---

[27] This evidence, as set forth by Robinson in his petition, includes the following:

> • Evidence in 1991 or 1992, years before the offense, Mr. Robinson
> applied for a license to purchase a Davis Caliber .380 gun; N.T.
> 3/12/97 at 124;
> • Evidence that in 1991 or 1992, four to five years before the offense,
> Mr. Robinson applied for a license to purchase a Star caliber .9
> millimeter gun; [1] Id.;
> • Evidence that Mr. Robinson had a bullet proof vest found in a
> drawer in his bedroom at his parents house after the offense; Id. at
> 151;
> • Evidence that the police found and confiscated "various army
> fatigue clothing and other type military gear" from his bedroom room;
> Id. at 151;
> • Evidence that an ammo pouch with a large extended magazine
> containing .9 millimeter ammunition was found in a room he
> allegedly used at a friend's house; Id. at 148;
> • Evidence that a full box of .44 caliber bullets was found in a safe
> located in Mr. Robinson's bedroom; Id. at 154;

prosecutor stated the following during his closing:

> What you heard today is supposed to outweigh everything you heard
> the other day about this act and the aggravating circumstances that I
> moved into evidence.  You have to keep that in mind, that those
> things that you heard on Wednesday during the trial are all part of his
> process.

(Doc. No. 36-5, Notes of Testimony, Sentencing Hearing, 3/14/1997 ("Sentencing NT 3/14/97"

352).  Further, the trial court instructed the jury to incorporate

> [a]ll of the evidence from the Commonwealth and defendant,
> including the evidence you heard during the first culpability phase of
> the trial and the evidence you heard during the second penalty phase
> of the trial, is for your consideration in assessing the credibility of the
> witnesses in determining whether there is an aggravating
> circumstance or any mitigating circumstance or circumstances.

---

> • Evidence that a .44 magnum handgun with rubber bands wrapped
> around the handle "[s]o you can stick it in your waist band without
> using a holster so it won't fall out"; Id. at 154;[1]
> • Evidence that police found in Mr. Robinson's possessions a limited
> warranty for an interarms firearm; Id. at 156;[1]
> • Evidence that police found in Mr. Robinson's safe a small envelope
> containing a picture of a Lorcin .9 millimeter semiautomatic handgun;
> Id. at 156;
> • A photograph recovered from a scrapbook or photo album showing
> Mr. Robinson holding a .9 millimeter gun; Id. at 162;
> • A different photograph of Mr. Robinson holding a Davis .380
> weapon; Id.;
> • A different photograph of Mr. Robinson with a pager and a wad of
> money; Id.;
> • A different photograph of Mr. Robinson with the .9 millimeter gun
> tucked in his waistband in the front of his pants; Id.;
> • Additional photographs of the above mentioned guns along with
> numerous twenty dollar bills with the guns, and a digital pager; Id.;
> • A photograph of Mr. Robinson holding a handgun, wearing a large
> gold chain and sunglasses; Id.

(Doc. No. 21 at 44-46.)  On direct appeal, the Pennsylvania Supreme Court found that the
erroneous admission of this evidence was harmless.  See Robinson-I, 721 A.2d at 350-53.

(Sentencing NT 3/14/97 372.)

In its opinion affirming the denial of post-conviction relief, the Pennsylvania Supreme Court rejected Robinson's claim, finding that "[t]he prosecutor did not specifically refer to non-statutory aggravating factors.  In his closing, the prosecutor reminded the jury it was to weigh the various aggravating and mitigating circumstances and 'that those things that you heard . . . during the trial are all part of this process.'" Robinson-II, 877 A.2d at 447.  The court also cited to the trial court's instruction with respect to the evidence to be considered, and found that trial counsel was not ineffective for failing to object to the instruction because, on direct appeal, the court had already determined that the erroneously admitted evidence was harmless.  Id.; see Robinson-I, 721 A.2d at 350-53.  Further, the court asserted that this same evidence remained harmless at the sentencing hearing because Robinson's guilt had already been determined and the incorporation of the evidence into the sentencing hearing "was purely a procedural matter carried out pursuant to 42 Pa. C.S. § 9711(a)(2). Id. ('evidence may be presented as to any other matter that the court deems relevant and admissible on the question of sentence to be imposed.')." Robinson-II, 877 A.2d at 447.

Robinson also contends that the prosecutor improperly argued Robinson's future dangerousness for consideration at the sentencing hearing.  Specifically, Robinson takes issue with the following statement made by the prosecutor: "And then while he is killing Rashawn another person gets almost killed.  That's a serious thing that we have to stop . . . ." (Sentencing NT 3/14/97 358.)  Due to that statement, Robinson argues that the trial court should have given a jury instruction that a life sentence means life without the possibility of parole. See Simmons v. South Carolina, 512 U.S. 154 (1994) (holding jury must only be informed that defendant is

73

ineligible for parole when the prosecution puts the future dangerousness of defendant at issue and state law prohibits release on parole for a capital defendant).

In its decision affirming the denial of post-conviction relief, the Pennsylvania Supreme Court found that it had previously addressed this issue on direct appeal. Robinson-II, 877 A.2d at 447 n.11. To that end, on direct appeal the court specifically rejected Robinson's contention that the Commonwealth "spent 'a good deal of time in both their case-in-chief and the penalty phase' implicating the future dangerousness of [Robinson] by references to the fact that [Robinson] was dangerous before the murder." Robinson-I, 721 A.2d at 355. Further, the court reasoned that a Simmons instruction was only necessary where the future dangerousness of the defendant is *expressly* implicated. Id.

Finally, Robinson argues that the prosecutor improperly commented on Robinson's purported lack of remorse and his exercise of the right to remain silent. Specifically, the prosecutor made the following comment:

> Of all the things that I think you would have maybe said was, you know, given the argument yesterday, yeah, I did it, I was wrong, you know, where is one sound of I'm sorry, one sound to say something about the memory of this man? None. Well, he tossed it away just like that picture.

(Sentencing NT 3/14/97 358.)

In its opinion affirming the denial of post-conviction relief, the Pennsylvania Supreme Court rejected Robinson's claim, concluding,

> Reviewed in context, the prosecutor's comments were in response to [Robinson]'s opening statement. Here, in his opening statement, [Robinson], representing himself, pled to the jury that everything he did was wrong, he never had a fair chance in life, and he would not receive a fair trial until the jury saw the whole picture. See N.T.

> Trial, 3/12/97, at 12.   Contrary to what [Robinson] argues, the
> prosecutor's comments do not warrant relief, as they were a fair
> response to [Robinson]'s opening.   'A remark by a prosecutor,
> otherwise improper, may be appropriate if it is in fair response to the
> argument and comment of defense counsel.'   Commonwealth v.
> Trivigno, 561 Pa. 232, 750 A.2d 243, 249 (2000).

Robinson-II, 877 A.2d at 447.  Further, finding this claim meritless, the court also denied

Robinson's claim that appellate counsel was ineffective for failure to raise it on appeal.  Id. at

447-48.

On review of these claims of prosecutorial misconduct during the sentencing hearing, the

Court again must presume under § 2254(e)(1) that the state court's factual determinations are

correct because Robinson has failed to "rebut[ ] the presumption of correctness by clear and

convincing evidence."  28 U.S.C. § 2254(e)(1); see Campbell, 209 F.3d at 285-86.  Taken in

context and viewed as a whole, and being mindful that counsel's comments are given less weight

than a trial court's instructions and the overwhelming evidence of Robinson's guilt presented at

trial, the prosecutor's statements did not likely impede the jury's ability to judge the evidence

fairly.  See Darden, 477 U.S. at 181.  Further, the Court finds that these statements did not

"infect[ ] the trial with unfairness" to such an extent that Robinson was denied due process of

law.  See id.

Thus, under § 2254(d)(1), the adjudication of the state court was not "contrary to" and did

not "involve[ ] an unreasonable application of, clearly established Federal law."  28 U.S.C. §

2254(d)(1); see Williams, 529 U.S. at 406.  Nor has Robinson demonstrated that the state court's

decision resulted in a decision that was based on "unreasonable determination of the facts in light

of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see Matteo,

171 F.3d at 888.

F.   **Guilt Phase Issue - Claim Seven - Defense Counsel's Failure to Object to Introduction of Inadmissible Evidence**

Robinson argues that he is entitled to a new trial and sentencing hearing because defense counsel failed to object to the introduction of irrelevant and otherwise inadmissible evidence or, in the alternative, seek a cautionary instruction.  He further asserts trial court error for failing to give such an instruction.

In support of this claim, Robinson asserts that the Commonwealth improperly introduced, and the trial court admitted, several irrelevant and prejudicial items of evidence, including the following, as set forth by Robinson:

- Mr. Robinson's attempts to purchase firearms years before the offense (NT 3/12/97 at 124);

- Mr. Robinson's possession of a bulletproof vest and other items of fatigue clothing and military gear found in his bedroom (NT 3/12/97 at 151);

- an ammo pouch and magazine containing .9 millimeter ammunition found in a room Mr. Robinson used at a friend's home (NT 3/12/97 at 148);

- evidence that a Bulldog Pug 44 SPL revolver with rubber bands around it and a full box of .44 caliber bullets was found in a safe located in Mr. Robinson's room (NT 3/12/97 at 154);

- evidence that Mr. Robinson carried a .44 magnum handgun with rubber bands wrapped around the handle "[s]o you can stick it in your waist band without using a holster so it won't fall out" (NT 3/12/97 at 154);

- evidence that police found in Mr. Robinson's possessions a limited warranty for an interarms firearm (NT 3/12/97 at 156) (This also was admittedly not related to the offense);

- photographs found in Mr. Robinson's safe of a <u>picture</u> of a Lorcin .9 millimeter semiautomatic handgun (NT 3/12/97 at 156);

- photographs of Mr. Robinson holding various makes of handguns, and other photos showing Mr. Robinson with wads of money, a pager, large gold jewelry and sunglasses (NT 3/12/97 at 162).

(Doc. No. 21 at 41-42.)

In his direct appeal, Robinson, represented by trial counsel, presented this claim as one of trial court error for erroneously admitting the irrelevant and prejudicial evidence. <u>See</u> <u>Robinson-I</u>, 721 A.2d at 351-53. The Pennsylvania Supreme Court addressed the merits of this claim and concluded that even though the evidence was in fact erroneously admitted into evidence by the trial court,[28] that the erroneously admitted evidence was harmless because it did not contribute to the verdict. <u>Robinson-I</u>, 721 A.2d at 351-53. In his collateral appeal, Robinson included his objection to the admission of the evidence and trial counsel's associated ineffectiveness in his claim that the prosecutor had presented irrelevant non-statutory aggravating evidence which was incorporated from the guilt phase into the penalty phase. <u>See</u> <u>Robinson-II</u>, 877 A.2d at 446-47. Upon review, the Pennsylvania Supreme Court affirmed the earlier decision that the erroneously admitted evidence was harmless. <u>Robinson-II</u>, 877 A.2d at 447. In doing so, the court did not address on the merits Robinson's claim of counsel's ineffectiveness. Thus, here the Court will

---

[28] Only the admissibility of the photographs of Robinson holding guns that were not the murder weapon, the bullet-proof vest, and cartridges from the revolver were addressed by the Pennsylvania Supreme Court on direct appeal. <u>Robinson-I</u>, 721 A.2d at 351-53. An ineffectiveness claim relating to the admissibility of the remaining evidence presented in the instant petition was never raised in state court. Thus, the subclaims related to this evidence are unexhausted, and deemed procedurally defaulted. As Robinson has not demonstrated either "cause and prejudice" or "miscarriage of justice" to excuse the default, the Court will not address these subclaims herein.

review the ineffectiveness claim <u>de novo</u>.  However, for purposes of analysis, the Court will not disturb the finding that the relevant evidence was erroneously admitted into evidence by the trial court.  <u>See</u> <u>Robinson-I</u>, 721 A.2d at 351-53; 28 U.S.C. § 2254(e)(1).

Turning to Robinson's claim for ineffectiveness of trial and direct appeal counsel for failing to object to the evidence or seek a cautionary instruction, the Court notes that the issue of whether counsel's failure was unreasonable need not be addressed here.  <u>Strickland</u> provides that a court may determine an ineffectiveness claim by looking to the prejudice prong first.  <u>Id.</u>, 466 U.S. at 697.  Under the prejudice prong of the <u>Strickland</u> test, Robinson must show that, but for counsel's alleged unprofessional errors, there is a reasonable probability that the result of his trial would have been different.  <u>Id</u>. at 694.

Upon review of the totality of the evidence in this case, the Court finds that the properly admitted evidence against Robinson was overwhelming, and that Robinson has failed to show that there was a reasonable probability that, but for the lack of the inadmissible evidence, the outcome of his trial would have been different.  Although Robinson has set forth several pieces of evidence that were inadmissible at trial, he has failed to establish that counsel's failure to object to this evidence or seek a cautionary instruction would have changed the outcome of his trial.  Furthermore, because trial counsel was not ineffective, direct appeal counsel cannot be found ineffective for failing to properly litigate such a claim.  Thus, this claim of trial counsel's ineffectiveness will be denied.

Moreover, the Court will also deny Robinson's claim of trial court error for failing to provide a cautionary instruction with respect to the inadmissible evidence.  Typically, all evidence which tends to make the existence or non-existence of a material fact more or less

probable is admissible, subject to the prejudice/probative value weighing which attends all decisions upon admissibility.  See Pa. R. Evid. 401; Pa. R. Evid. 402.  See also Commonwealth v. Malloy, 856 A.2d 767, 775 (Pa. 2004).  A federal habeas court cannot decide whether the evidence in question was properly allowed under the state rules of evidence.  Keller v. Larkins, 251 F.3d 408, 416 n.2 (3d Cir. 2001).  The appropriate inquiry on federal habeas review is whether the admission of the evidence rose to the level of a due process violation.  Id.  A state court evidentiary ruling will rise to the level of a due process violation only if the habeas petitioner can establish that the alleged error was of such magnitude that it undermined the fundamental fairness of the entire trial.  Id. at 413.  Here, due to the overwhelming amount of properly admitted evidence against Robinson, the Court finds that Robinson has not established that the trial court's failure to provide a cautionary instruction was of such magnitude that it undermined the fairness of the entire trial.  Thus, this claim will also be denied.

### G.    Guilt Phase Issue - Claim Nine - Counsel's Failure to Object to Irrelevant and Improper Victim Impact Testimony and Argument

Robinson contends that trial counsel was ineffective for failing to object to irrelevant and improper victim impact testimony[29] and for failing to raise this issue on direct appeal.  As relief, he seeks a new trial.

In support of this claim, Robinson asserts that the prosecutor introduced religion into the

---

[29] In Payne v. Tennessee, 501 U.S. 808 (1991), the United States Supreme Court held that prosecutors should be permitted to present evidence "offering a quick glimpse of the life which [the] defendant chose to extinguish and "demonstrating the loss to the victim's family and to society . . . result[ing] from the defendant's homicide."  Id., 501 U.S. at 822.  While the Court did not expressly set forth a category of admissible victim impact evidence, it noted, "[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief."  Id. at 825.

case in such a way as to evoke impassioned sympathy from the jury in order to secure a first degree murder conviction.  Specifically, during his opening, the prosecutor stated that Hodge had responded to Bass's personal advertisement in the newspaper that he was "a single black Christian male in search of a single Christian female, loves church."  (Doc. No. 21 at 161.)  The prosecutor continued, stating that Bass's "father's a deacon in a church in Harrisburg, had a good job at EDS, again working there."  (Id.)  Further, during his direct examination of Hodge, the prosecutor asked her to read directly from Bass's personal advertisement, thus repeating the information about Bass's religion.  (Trial NT 3/12/97 70.)  The prosecutor and Hodge also had the following exchange:

| [District Attorney]: | Now, after meeting Shawn in May and a few weeks had followed that, getting to know him and liking him, did you know where his family came from? |
|---|---|
| [Hodge]: | New York. |
| [District Attorney]: | And did they eventually move to Harrisburg? |
| [Hodge]: | Yes. |
| [District Attorney]: | What was his father doing at that time? |
| [Hodge]: | His father is a deacon at a church. |
| [District Attorney]: | Do you know what church it is, do you remember? |
| [Hodge]: | No. |
| [District Attorney]: | Did Rashawn attend all the time? |
| [Hodge]: | Yes. |

(Id. at 73.)  During his closing, the prosecutor made the following statements to the jury:

80

When you are talking about being fair, you got to remember being fair
to a girl that got shot in the head and to a young man who came to
Carlisle in search of a single Christian female and ended up ending
his young life in the bottom of that shower.

\* \* \*

[T]his young man, this boy, comes into Carlisle, a single black
Christian male, a mellow fellow, new to the burbs in search of a
single Christian female, loves church, and he did find a nice girl who
is working, who did want to be with him, and what did he get?

(Trial NT 3/13/97 268, 277-78.)

As stated above, Robinson contends that trial counsel was ineffective for failing to object

to these comments by the prosecutor.  The Pennsylvania Supreme Court reviewed this claim and

found that since Robinson could not establish prejudice the claim was meritless.  Robinson-II,

877 A.2d at 443-44.  Specifically, the supreme court agreed with the PCRA court's determination

that the admission of the evidence of religion was "very limited" to the background of the

victims and how they met.  Robinson-II, 877 A.2d at 444.  The court further concluded that the

"record does not indicate the prosecution was attempting to inject religion into the trial.  Even

assuming this background information was victim impact testimony, it was so brief it did not

affect the jury's decision. . . . As [Robinson] fails to prove prejudice, his claim of trial counsel's

ineffectiveness fails, . . . as does the claim appellate counsel was ineffective."  Id.

Upon review, the Court agrees with the Pennsylvania Supreme Court that this claim is

without merit and that, as a result, counsel was not ineffective.  Pursuant to the second prong of

Strickland, Robinson must show that, but for counsel's alleged unprofessional error, there is a

reasonable probability that the result of his trial would have been different.  After a review of all

the evidence with respect to the background of the victims, how they met, and why Bass was in

81

Hodge's shower that evening, the Court finds that Robinson has failed to prove prejudice due to the lack of an objection to the introduction of Bass's religion.  Robinson cannot prove that the outcome of the trial would have been different had trial counsel objected to this evidence. Strickland, 466 U.S. at 694.  As a result, the Court cannot find that trial counsel was ineffective as to this claim.  Further, the Court cannot find direct appeal counsel ineffective for failing to pursue this claim.  Thus, this claim will be denied.

**H.    Guilt Phase Issue - Claim Ten - Trial Court's Refusal to Admit Certain Testimony of Robinson's Mother and Ineffective Assistance of Counsel**

Robinson argues that the trial court erred in not allowing his mother to testify concerning his gun possession and that counsel was ineffective for failing to properly raise and litigate this claim during the post-conviction proceedings.  As relief, he seeks a new trial.

The background of this claim is as follows.  At trial, defense counsel offered the testimony of Robinson's mother, Juanita Robinson, to explain why he had guns in his bedroom and why the bedroom was locked.  (See Trial NT 3/13/97 230-33.)  The trial court refused to admit this testimony, stating, "[T]he issue is whether or not he used the gun on the two people, not why he had the gun in the first place."  (Id. at 230.)  The court further stated:

> No, I do not think the Commonwealth can raise a reasonable inference that he purchased and had a gun for the sole purpose of coming up here and killing these people.  All the Commonwealth has done here is present evidence that he had a gun available that could have been used here.  So why he had a gun and what reasons he owned guns is not relevant.  It is not relevant to attack any portion of the Commonwealth's case.  Your offer is rejected.

(Id. at 233.)  However, during his closing, the prosecutor implied that Robinson's possession of guns demonstrated that he had the capability to form the specific intent to kill.  (Id. at 273.)

82

Defense counsel objected to neither the trial court's refusal to allow the testimony nor the

prosecutor's argument.

In its decision on direct appeal, the Pennsylvania Supreme Court addressed the issue of

whether the trial court had erred in not allowing Robinson's mother to testify at the guilt phase.

Robinson-I, 721 A.2d at 353.  The supreme court found that the trial court had committed

harmless error, stating specifically,

> The trial court held that the reason why [Robinson] had the guns in
> the house was not relevant to the inquiry of whether he used a gun on
> Bass and Hodge.  Although normally we would agree with the trial
> court's assessment, we are troubled by the fact that the
> Commonwealth implied that the reason [Robinson] possessed guns
> was so he would feel like a "big city man." (N.T. 273.)  Moreover,
> the Commonwealth stated in its closing arguments that [Robinson]'s
> possession of guns showed that he had the capability to form the
> specific intent to kill. (N.T. 273.)  The testimony of Mrs. Robinson
> was relevant to refute the Commonwealth's contention that
> [Robinson] possessed guns merely to be a "big city man."  Mrs.
> Robinson's testimony would have offered a different explanation of
> why [Robinson] had guns in the home - to protect the household,
> which included two nieces under the age of fifteen.
>
> Although we believe that the trial court erred in refusing to allow
> Mrs. Robinson to testify, based on the above harmless error analysis,
> the instant case presents the situation where there the properly
> admitted evidence of guilt was so overwhelming.  Accordingly, this
> error was harmless.

Robinson-I, 721 A.2d at 353.

In its decision on collateral review, the Pennsylvania Supreme Court again denied the

claim, which had been presented as ineffective assistance of counsel for failing to effectively

argue it on direct appeal.  Robinson-II, 877 A.2d at 439.  However, the court declined to reach

the merits of the claim, concluding that it was previously litigated on direct appeal.  Id.  The state

court's denial of the ineffectiveness claim on this basis does not bar this Court's review.  See
Cone v. Bell, 129 S. Ct. at 1781; supra pp. 60-61.  The Court will review the ineffectiveness
claim de novo.  Id.

Initially, the Court will not disturb the Pennsylvania Supreme Court's finding that the
trial court did err in refusing to allow Mrs. Robinson to testify about Robinson's gun possession.
See 28 U.S.C. § 2254(d)(2), (e)(1).  The Commonwealth presented such overwhelming evidence
of Robinson's guilt that the error was not of such magnitude that it undermined the fundamental
fairness of the entire trial.  Keller, 251 F.3d at 413.  Specifically, although Mrs. Robinson's
testimony was admissible in order to refute the Commonwealth's contention that Robinson
owned several guns in order to be a "big city man," the properly admitted evidence of guilt
outweighed such testimony.  The evidence showed that Hodge saw Robinson pull a gun out of
his sweatpants and point it at her.  She also heard three shots.  The evidence also shows that
Robinson then traveled to the bathroom where he shot Bass seven times at close range.  When
police apprehended Robinson and informed him that he was charged with criminal homicide in
Carlisle, in response Robinson asked whether "Tara is okay."  When a detective told Robinson
that she was okay, he dropped his head and shook it from side to side.  Due to this overwhelming
evidence of guilt, the Court concludes that the trial court's error in refusing to allow Mrs.
Robinson to testify about Robinson's gun possession was not of such magnitude that it
undermined the fundamental fairness of the trial.  Keller, 251 F.3d at 413.

Turning to the ineffectiveness claim, as set forth above, Strickland provides that a court
may determine an ineffectiveness claim by looking to the prejudice prong first.  Strickland, 466
U.S. at 697.  Pursuant to this second prong, a petitioner must show that, but for counsel's alleged

unprofessional error, there is a reasonable probability that the result of the petitioner's trial would have been different. Id. at 694. In the instant case, Robinson has failed to meet this prong. Again, the evidence of Robinson's guilt was overwhelming. Mrs. Robinson's testimony about Robinson's gun possession would not have outweighed this evidence and thus would not have altered the outcome of the trial. Robinson has failed to establish that counsel's failure to object to the trial court's refusal to allow Mrs. Robinson's testimony or object to the prosecutor's closing remarks related to Robinson's gun possession would have changed the outcome of his trial. Furthermore, because trial counsel was not ineffective, appellate counsel cannot be found ineffective for failing to properly raise and litigate this claim in post-conviction proceedings.

I.      **Guilt Phase Issue - Claim Twelve - Counsel's Failure to Object to Trial Court's Charge to Jury Related to Elements of First Degree Murder**

Robinson claims that trial counsel was ineffective for failing to object to the trial court's charge concerning the elements of first degree murder. As a result, he asserts that the language in the court's charge had the effect of removing the Commonwealth's burden of proving the elements of murder. He also claims direct appeal counsel was ineffective for failing to properly raise and litigate this claim. As relief, he seeks a new trial.

The record relevant to this issue is as follows. At the outset of the homicide charges, the trial court detailed the elements of first degree murder and third degree murder with respect to the death of Bass. (Trial NT 3/13/97 285-89.) In doing so, the court stated, in relevant part,

> First degree murder. . . . One, that Rashawn Bass is dead. Two, that defendant killed him. . . . Three, that the killing was with a specific intent to kill. Four, that the killing was with malice. A killing is with specific intent to kill if it is willful, deliberate, premeditated; that is, if it is committed by a person who has a fully formed intent to kill and who is conscious of his own intent.

85

* * *

A killing is with malice if it is done with a specific intent to kill. . . .
If the defendant had a specific intent to kill, the killing was malicious.

* * *

Third degree murder. . . .   One, Rashawn Bass is dead.  Two, that
defendant killed him . . . .   Three, that the killing was with malice.

The specific element of first degree murder that is not present in third
degree murder is a specific intent to kill.   In the context of third
degree murder, malice is one of the following states of mind:

A wickedness of disposition, hardness of heart, cruelty, recklessness
of consequences, and a mind regardless of social duty indicating an
unjustified regard for the probability of death or great bodily harm
and an extreme indifference to the value of human life.

It may also include an intent to kill or an intent to inflict serious
bodily harm.  Although if you find a specific intent to kill, that would
raise third degree murder to murder in the first degree.

Malice may be either expressed by the defendant or inferred from his
conduct or words in light of the attending circumstances.  Malice may
be inferred from the intentional use without legal excuse or
justification of a deadly weapon on the vital part of the body of the
person killed.

Again, the difference between first degree murder and third degree
murder is a specific intent to kill.  If a person has a specific intent to
kill, as I have defined it, that constitutes malice, and it is the specific
intent to kill with malice that raises third degree murder to first degree
murder.

In contrast, a killing without a specific intent to kill which is still
malicious, as I have defined the term malice, is third degree murder
because the difference between third degree murder and first degree
murder is the lack of a specific intent to kill.

Again, a killing is with a specific intent to kill if it is willful,
deliberate, or premeditated; that is, if it is committed by a person who
has a fully formed intent to kill and who is conscious of his own

intent.

\* \* \*

A killing is with malice if it is done with a specific intent to kill. A killing without the specific intent to kill with malice is third degree murder rather than first degree murder.

(Id. at 285-88.)

After approximately one and one-half hours of deliberation, the jury returned a question to the court, asking for the difference between first and third degree murder. (Id. at 302.) The court answered first by again defining first degree murder. (Id. at 302-303.) The court included the following language in that definition:

Three, that the killing was with a specific intent to kill, and that is the difference between first and third degree murder. Three, that the killing was with a specific intent to kill. Four, that the killing was with malice. A specific intent to kill is malicious. But you can have a killing without a specific intent to kill that is malicious alone, and that is what third degree murder is. . . . [A] killing is with malice if it is done with the specific intent to kill.

(Id.) Turning to third degree murder, the court stated:

[T]hat the defendant killed him and that the killing was with malice. The additional element of first degree murder that is not present in third degree murder is that the killing was with a specific intent to kill.

(Id. at 303.) The court then provided a further definition of malice:

Now, this is the definition of malice, the separate definition of malice. Malice is one of the following states of mind: A wickedness of disposition, a hardness of heart, cruelty, recklessness of consequence, and a mind regardless of social duty.

I will repeat. Malice is one of the following states of mind: A wickedness of disposition, a hardness of heart, cruelty, recklessness of consequence, and a mind regardless of social duty indicating an

unjustified regard of the probability of death or great bodily harm and an extreme indifference to the value of human life.

It may also include an intent to kill or an intent to inflict serious bodily harm. Although if you find a specific intent to fill, as I have defined it, that would raise a malicious killing to first degree murder. Malice may be either expressed by the defendant or inferred from his conduct or words in light of attending circumstances. Malice may be inferred from the intentional use without legal excuse or justification of a deadly weapon on the vital part of a body of a person.

Also, if you believe that defendant intentionally used a deadly weapon on a vital part of Rashawn Bass's body, you may regard that as an item of circumstantial evidence from which you may infer that the defendant had a specific intent to kill which was malicious.

If the defendant had a specific intent to kill, it is malicious. If the defendant did not have a specific intent to kill but acted with malice, then a malicious killing without the specific intent to kill is third degree murder.

Again, to correlate that back, if the defendant has a specific intent to kill, that is a malicious killing. So that is both the specific intent to kill and malice and that would constitute the murder. The element that is not present in third degree murder that is present in first is that specific intent to kill, as I have defined it for you again, and that is the difference between the different grades, those two different grades of criminal homicide.

* * *

Did he have a specific intent to kill Rashawn Bass as I have defined it? If he did and all of the other elements are present that I gave you, then that would be murder in the first degree. If he did not and if it was a malicious killing but not with specific intent, then he would be guilty of murder in the third degree.

(Id. at 303-06.)

Robinson raised this claim related to the jury charge on first degree murder on collateral review. See Robinson-II, 877 A.2d at 444-45. After reviewing the charge as a whole, the

Pennsylvania Supreme Court found that the trial court had accurately and adequately explained the law to the jury.  Id.  As a result, the court held that Robinson had failed to prove that trial counsel was ineffective for failing to object to the charge and that appellate counsel was ineffective for failing to raise the issue on direct appeal.  Id. at 445.

Before turning to analysis of the ineffectiveness claim, the Court will set forth the applicable underlying law.  The due process clause of the Fourteenth Amendment requires the government to prove beyond a reasonable doubt every element of the crime with which a defendant is charged.  In re Winship, 397 U.S. 358, 364 (1970); United States v. Gaudin, 515 U.S. 506, 510 (1995).  Accordingly, a criminal conviction violates due process when the trial court fails to instruct the jury on an element that the prosecution must prove beyond a reasonable doubt.  Id. at 522-23.  In determining whether a jury instruction runs afoul of due process, a district court "must focus initially on the specific language challenged."  Francis v. Franklin, 471 U.S. 307, 315 (1985); Smith v. Horn, 120 F.3d 400, 411 (3d Cir. 1997).  The court must then consider the challenged language in the context of the jury charge as a whole.  Francis, 471 U.S. at 309, 318-19.  The ultimate question is "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution."  Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Boyde v. California, 494 U.S. 370, 380 (1990)); Smith, 120 F.3d at 411.  Nonetheless, even if a jury instruction is found to violate due process, a district court should grant a new trial only if the error is not harmless.  Neder v. United States, 527 U.S. 1, 9-10 (1999) (holding that harmless error analysis applies to jury instructions that violate the principle of Gaudin); Smith, 120 F.3d at 417-18 (applying the harmless error standard from Brecht to habeas petitioner's claim that trial court improperly instructed the jury that it

89

could convict without finding that petitioner had specific intent to kill).

Upon review, the Court agrees with the Pennsylvania Supreme Court that this claim is without merit and that, as a result, counsel was not ineffective.  Pursuant to the second prong of Strickland, Robinson must show that, but for counsel's alleged unprofessional error, there is a reasonable probability that the result of his trial would have been different.  Strickland, 466 U.S. at 694.  A review of the challenged language relating to malice and specific intent to kill in the context of the jury charge as a whole, see Francis, 471 U.S. at 309, 318-19, reveals that Robinson has failed to prove prejudice due to the lack of an objection to the jury charge.  Rather, the trial court accurately apprised the jury of the elements of first and third degree murder.  The trial court included in the charge the proper definition of malice and noted that malice is a necessary element of first degree murder.  The court repeatedly distinguished first and third degree murder. It cannot be found that the trial court erred in the jury instruction, and any objection by trial counsel to the jury instruction would have been denied.  Thus, Robinson cannot prove that the outcome of the trial would have been different had trial counsel objected to charge.  Strickland, 466 U.S. at 694.  As a result, the Court cannot find that trial counsel was ineffective as to this claim.  Further, the Court cannot find direct appeal counsel ineffective for failing to pursue this claim.  This claim will be denied.

**J.     Sentencing Phase Issue - Claim 3 - Failure to Investigate and Present Mental Health Evidence**

Robinson contends that he is entitled to a new sentencing hearing because trial counsel was ineffective for failing to investigate and present mitigating evidence relating to Robinson's mental health and family history.  For the reasons that follow, the Court will deny this claim.

90

As set forth herein, in <u>Strickland</u>, the United States Supreme Court set forth the standard

by which courts must evaluate claims alleging unconstitutional ineffectiveness of counsel:

> First, the defendant must show that counsel's performance was
> deficient.  This requires showing that counsel made errors so serious
> that counsel was not functioning as the "counsel" guaranteed the
> defendant by the Sixth Amendment.  Second, the defendant must
> show that the deficient performance prejudiced the defense.  This
> requires showing that counsel's errors were so serious as to deprive
> the defendant of a fair trial, a trial whose result is reliable.

<u>Strickland</u>, 466 U.S. at 687.

Robinson contends that trial counsel was deficient in that they failed to seek or obtain

records indicating his "significant and compelling mental and emotional impairments," (Doc. No.

17-3 at 3); failed to obtain or present testimony of a mental health expert; and, failed to

adequately investigate Robinson's background.  He claims he was prejudiced by counsel's

ineffectiveness with respect mental health mitigating evidence because, had counsel conducted

an adequate investigation, counsel would have learned, <u>inter alia</u>, that Robinson began exhibiting

bizarre, paranoid behaviors long before the murder in this case; he was at a minimum, acting

under a diminished capacity at the time of the murder; and, Robinson suffered from paranoid

schizophrenia at the time of the offense.  Robinson also claims he was prejudiced by counsel's

ineffectiveness with respect to his background because, had counsel conducted an adequate

investigation, counsel would have learned, among other things, that Robinson's family history of

serious mental illness, including depression and schizophrenia, made it more likely that he

suffered from a serious mental illness; Robinson's home was rife with domestic violence when

he was a child and on many occasions he witnessed his father brutally beat his mother; Robinson

was also beaten and one time, choked by his father while growing up; and, Robinson's father was

a womanizer, who had many blatant affairs while Robinson was growing up that severely

impacted his view of women and relationships.

For purposes of discussion, the Court will first provide relevant standard of review on

counsel's duty to investigate.  The Court will then address Robinson's claim relating to

investigation and presentation of mental health mitigating evidence, followed by the claim

relating to investigation and presentation of family background mitigating evidence.

### 1.     Deficiency of Counsel's Performance

The Supreme Court has long recognized defense counsel's duty to investigate:

> [S]trategic choices made after thorough investigation of law and facts
> relevant to plausible options are virtually unchallengeable; and
> strategic choices made after less than complete investigation are
> reasonable precisely to the extent that reasonable professional
> judgments support the limitations on investigation.  In other words,
> counsel has a duty to make reasonable investigations or to make a
> reasonable decision that makes particular investigations unnecessary.
> In any ineffectiveness case, a particular decision not to investigate
> must be directly assessed for reasonableness in all the circumstances,
> applying a heavy measure of deference to counsel's judgments.

Strickland, 466 U.S. at 690-91 (emphasis added).  Under Strickland, where counsel has no

strategic or other reason for failing to investigate, the failure is objectively unreasonable.

Further, as explained by the Third Circuit Court of Appeals, "counsel can hardly be said to have

made a strategic choice . . . when s/he has not yet obtained the facts on which such a decision

could be made."  United States v. Gray, 878 F.2d 702, 711 (3d Cir. 1989).  Under such

circumstances, counsel's conduct is "not colorably based on tactical considerations but merely

upon a lack of diligence."  Id. at 712.  Finally, in applying the duty to investigate set forth in

Strickland to mitigating evidence, where a jury in a capital case has been precluded from hearing

mitigating evidence concerning the defendant's character or background because counsel has made an objectively unreasonable decision not to look for it, counsel's performance violates the dictates of Strickland.  See Rompilla v. Beard, 545 U.S. 374, 383-389 (2005).

In Robinson-II, the Pennsylvania Supreme Court denied the instant claim because it determined that Robinson failed to establish that counsel's performance was deficient. Robinson-II, 877 A.2d at 448.  Rather, the court held that counsel's performance was objectively reasonable in light of pursuing a strategy "reasonably designed to serve [Robinson's] best interest."  Id.  Because the state court adjudicated the deficient performance prong of Strickland on the merits, the Court will apply AEDPA's standard of review to determine whether the state court's adjudication was an "unreasonable application of" Strickland or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."[30]  28 U.S.C. § 2254(d)(1)-(2).

## 2.    Mental Health Mitigating Evidence

As discussed in Part IV(C)(1) herein,[31] defense counsel relied upon the report of the supervising psychiatrist at Norristown State Hospital, where Robinson was involuntarily committed after his arrest and prior to trial, for a diagnosis of Robinson's mental condition.  (See supra, pp. 30-32.)  While the report was court-ordered in order to determine whether Robinson

───────────────

[30] The Court has already determined that the Pennsylvania Supreme Court applied the correct legal standard when it evaluated all of Robinson's ineffective assistance claims.  (See supra, p. 22.)  Therefore, the state court's adjudication satisfies review under the "contrary to" clause of 28 U.S.C. § 2254(d)(1).

[31] The relevant factual background related to this claim can be found in Section IV(C)(1) herein, and need not be repeated here.  However, for purposes of discussion, the Court will nevertheless recount some background.

was competent to stand trial, it was specifically to include an evaluation of Robinson's mental condition.  (See supra, p. 31.)

At the PCRA hearing, Attorney Andrews testified that after Robinson was involuntarily committed, the defense chose to rely on the expected report from Norristown to "get more information regarding [Robinson's] mental status as a result of his stay at the Norristown State Hospital."  (PCRA NT 10/10/01 27.)  Thus, rather than seek further mental health expert reports,[32] the defense took a "wait and see approach."  (Id. at 28.)  Further, Attorney Waller testified that Robinson's refusal to speak with Dr. Ragusea, who was hired prior to Robinson's commitment to Norristown State Hospital, led to their decision to not call Dr. Ragusea back for another attempt at evaluation.  (Id. at 113.)  She affirmed that counsel's strategy was to rely on the Norristown report for mental health evaluations: "[W]e had no reason to doubt the ability of the doctors at Norristown to judge his competency, so we were relying on their evaluation and results."  (Id. at 115.)  Finally, Attorney Barry testified that counsel had to rely on the Norristown report because they were unable to get Robinson's past mental health records, and the family would not provide counsel with relevant information.  (Id. at 151.)

Robinson contends here that counsel was ineffective because they did not perform an investigation into Robinson's mental health relating to mitigating circumstances beyond the Norristown State Hospital evaluation.  The Pennsylvania Supreme Court, as well as the PCRA

---

[32] It is noted here, and in prior discussion herein, that defense counsel did in fact hire Dr. Stephen Ragusea to evaluate Robinson prior to trial, but Robinson refused the interview and evaluation.  (See PCRA NT 10/10/01 12.)  Attorney Andrews stated that rather than seek further assistance from Dr. Ragusea, whom Robinson had already refused to see, once Robinson was committed to Norristown State Hospital, "we instead relied upon the mental health reports that came out of Norristown and acted based upon those reports rather than seeking independent mental health expert guidance."  (Id. at 33-34.)

court, rejected this contention that counsel was ineffective for relying on the state hospital's

reports. Robinson-II, 877 A.2d at 448. Instead, the state court found that counsel was faced with

the same mental health evaluations at the sentencing phase and reasonably relied upon them

rather than pursuing further investigation for purposes of finding mitigating circumstance

evidence related to mental health. Id. Specifically, the state court stated, "Counsel's stewardship

will not be deemed ineffective in pursuing a particular strategy, as long as the course chosen was

reasonable." Id. (citing Commonwealth v. Rivers, 786 A.2d 923, 930 (Pa. 2001).

Similar to the state court's conclusion with respect to Robinson's competency claim, the

Court agrees with the state court's decision that counsel did not have to further investigate

Robinson's mental health issues as they related to mitigating circumstances. The Norristown

report indicated that Robinson was competent and that he was possibly malingering. Nothing in

the evaluation necessarily would trigger counsel to conduct further investigation into potential

mental health issues. Moreover, the Court agrees that it was reasonable for defense counsel to

rely on this report. As the Supreme Court stated in Bobby v. Van Hook, — U.S. —, 130 S. Ct.

13 (2009):

> This is not a case in which the defendant's attorneys failed to act
> while potentially powerful mitigating evidence stared them in the
> face, cf. Wiggins, 539 U.S. at 525, 123 S. Ct. 2527, or would have
> been apparent from documents any reasonable attorney would have
> obtained, cf. Rompilla v. Beard, 545 U.S. 374, 389-393, 125 S. Ct.
> 2456, 162 L. Ed. 2d. 360 (2005). It is instead a case, like Strickland
> itself, in which defense counsel's "decision not to seek more"
> mitigating evidence from the defendant's background "than was
> already in hand" fell "well within the range of professionally
> reasonable judgments."

Van Hook, 130 S. Ct. at 19 (parallel citations omitted). See also Strickland, 466 U.S. at 699

("[Counsel's] decision not to seek more character or psychological evidence than was already in hand was . . . reasonable.").  Moreover, regardless of the evidence Robinson now requests the Court consider relating to his claim, there is nothing in the record to establish that counsel acted unreasonably in relying on the Norristown report for the sentencing phase of the trial.  Therefore, the Court concludes that the state court's decision that counsel's conduct here was objectively reasonable was not an unreasonable application of Strickland or resulted in an unreasonable determination of the facts in light of the evidence presented.[33]  See 28 U.S.C. § 2254(d)(1)-(2).

### 3.    Family Background Mitigating Evidence

At the sentencing phase, defense counsel called three witnesses who testified as to Robinson's family history and background.  Juanita Robinson, Robinson's mother, testified about the family history.  She informed the jury that Robinson's oldest sister was diagnosed as a paranoid schizophrenic, and his other sister was found dead in a hotel room from an apparent suicide.  (Sentencing NT 3/14/97 317-318.)  She testified that Robinson did not have problems in school, graduated from high school, and received a certificate of excellence in piano.  (Id. at 320-21.)  She noted that Robinson enlisted in the United States Army Reserves after high school, and was honorably discharged years later.  (Id. at 321-22.)  She also testified that Robinson was a good uncle to his nieces.  (Id. at 322-23.)  Finally, she stated that Robinson and his father did not have a good relationship.  (Id. at 329-330.)  Robinson's aunt, Pearlie Mae Williams, testified about the effect his sister's death had on Robinson.  (Id. at 338.)  Pamela Hodge, Tara Hodge's mother, testified that Robinson was a "nice boy."  (Id. at 339.)

---

[33] Because Robinson has failed to establish the first prong of the Strickland analysis, the Court need not evaluate whether he was prejudiced.

Further, prior to trial, defense counsel hired Lori James-Monroe, a licensed clinical social worker/mitigation specialist, to investigate Robinson's background.  At the PCRA hearing, Monroe testified that she first met with the defense attorneys, then interviewed some of Robinson's family members, including his mother, father, brother, aunt, uncle, and two cousins. (PCRA NT 11/29/01 7.)  She also interviewed two high school counselors, his captain from the Reserves, and a family friend.  (Id.)  She also testified that she attempted interviews of Robinson on two occasions, but he was uncooperative and concerned that someone would be digging through his history.  (Id. at 8.)  Further, she believed Robinson's family "hid a lot of information and was not as forthcoming as they could have been."  (Id. at 17.)  Through the interviews, Monroe learned of Robinson's family history of mental illness in his sister and the death of his other sister.  (Id. at 10.)  She also learned of the abusive relationship between Robinson's parents, and Robinson's bad relationship with his father.  (Id. at 26-27.)  She stated, however, that when the state deemed him competent, the defense team decided to "drop" the theory that Robinson had mental health issues for purposes of mitigation.  (Id. at 12.)

Robinson contends that counsel was ineffective for failing to investigate and present further family history as mitigating circumstances evidence.  The Pennsylvania Supreme Court, as well as the PCRA court, rejected this argument on the basis that the defense team developed a reasonable strategy with the information that Robinson and his family were willing to provide. Robinson-II, 877 A.2d at 448.  The court noted that counsel presented direct testimony from family members, and used that testimony to paint Robinson "in the most positive light possible." Id.  As a result, the court concluded that counsel was not ineffective because counsel had pursued a strategy reasonably designed to serve Robinson's best interest.  Id.

The Court agrees with the Pennsylvania Supreme Court's determination that counsel was not ineffective because they had pursued a reasonable trial strategy.  As set forth above, and relied upon by the state court, when counsel received the Norristown State Hospital report concluding that Robinson was competent and even possibly malingering, counsel reasonably decided to drop any theory relating to mental health issues.  This applies to sentencing as well. Even though counsel did not present their own mental health expert, counsel did present direct testimony from family members on Robinson's background.[34]  Given the conclusions drawn by the Norristown State Hospital staff, the decision to present such direct testimony that did not expressly raise the question of Robinson's mental health, was reasonable.  Further, the Court notes that the jury was afforded the opportunity to consider any of this evidence as a mitigating circumstance under the "catch-all" mitigating circumstance charged prior to deliberations.[35]

---

[34] Even if Robinson contends that counsel should have presented *further* testimony from other family members, the Supreme Court has recently stated, "there comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties."  Van Hook, — U.S. —, 130 S. Ct. at 18.

[35] The trial court instructed the jury on the "catch-all" mitigating circumstance as follows:

> That mitigating circumstance is any other evidence of mitigation concerning the character and the record of the defendant and the circumstances of his offense.
>
> You should examine all of the testimony both in the culpability phase of the trial and in this penalty phase of the trial to determine whether or not the defendant has proven by a preponderance of the evidence the mitigating circumstance or any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense.
>
> * * *
>
> That does not require unanimity.

98

Therefore, the Court concludes that the state court's decision that counsel's conduct here was objectively reasonable was not an unreasonable application of <u>Strickland</u> or resulted in a determination of the facts in light of the evidence presented.[36]  <u>See</u> 28 U.S.C. § 2254(d)(1)-(2). Further, because the Court has concluded that trial counsel was not ineffective, Robinson's claim that appellate counsel was ineffective also fails.  <u>See</u> <u>Cook</u>, 45 F.3d at 392-93.

### K.   Sentencing Phase Issue - Claim 5 - Constitutionality and Application of the "Perpetration of a Felony" Aggravating Circumstance

Robinson argues that he is entitled to a new sentencing hearing because Pennsylvania's aggravating circumstance "a killing committed while in the perpetration of a felony," 42 Pa. Cons. Stat. § 9711(d)(6), is arbitrary and capricious, and should not have been applied in his case, as it fails to "genuinely narrow the class of persons eligible for the death penalty," or "reasonably justify the imposition of a more severe sentence."  <u>See</u> <u>Zant v. Stephens</u>, 462 U.S. 862, 877 (1983).  He further contends that counsel was ineffective for failing to properly litigate this claim.  For the reasons that follow, the Court will not disturb the jury's sentence on this ground.

Under Pennsylvania law, the sentencing procedures for first degree murder require that:

> Before the jury retires to consider the sentencing verdict, the court shall instruct the jury . . . [that] the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance . . . and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstance which outweigh any mitigating circumstances.  The verdict must be a sentence of life imprisonment in all other cases.

(Sentencing NT 3/14/97 376-77.)

[36] Because Robinson has failed to establish the first prong of the <u>Strickland</u> analysis, the Court need not evaluate whether he was prejudiced.

42 Pa. Cons. Stat. § 9711(c)(1)(iv).  "Aggravating circumstances must be proved by the Commonwealth beyond a reasonable doubt; mitigating circumstances must be proved by the defendant by a preponderance of the evidence."  Id. § 9711(c)(1)(iii).

At sentencing, the Commonwealth presented the jury with two aggravating circumstances: (1) the defendant committed a killing while in the perpetration of a felony, id. § 9711(d)(6); and (2) in the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense, id. § 9711(d)(7).  Defense counsel did not set forth any specific mitigating circumstances; rather, she instructed the jury to construct its own mitigating circumstances pursuant to 42 Pa. Cons. Stat. § 9711(e)(8).[37]

At the conclusion of the jury's deliberations, the jury indicated that at least one juror found two mitigating circumstances applied in this matter, namely: (1) Robinson's youth, see 42 Pa. Conn. Stat. § 9711(e)(4); and (2) his future contributions to society, see id. § 9711(e)(8).  (Sentencing NT 3/14/97 387.)  However, the jurors unanimously concluded that both aggravating circumstances put forth by the Commonwealth applied, and further found that those aggravating circumstances outweighed the mitigating circumstances.  (Id. at 386-87.)  Therefore, the jury returned a verdict of death consistent with 42 Pa. Cons. Stat. § 9711(c)(1)(iv).

---

[37] Defense counsel stated in her closing,

> You can decide to give him life.  You can construct your own mitigating circumstances, and I will concede I don't have the mitigating circumstances laid out by Mr. Ebert.  You heard them.  I don't have them.  But that doesn't make the mitigating circumstances I have any less legitimate, and remember that it is not a numbers game.

(Sentencing NT 3/14/97 367-68.)

Counsel did not raise an objection to the "in perpetration of a felony" aggravating circumstance on direct appeal.  However, in his PCRA petition with the Pennsylvania Supreme Court, Robinson raised the same claim regarding the "in perpetration of a felony" aggravating circumstance that he raises here.  Robinson-II, 877 A.2d at 438 n.1.  The Pennsylvania Supreme Court addressed this claim on the merits, finding that the claim lacked merit, and that counsel cannot be deemed ineffective for failing to litigate a meritless claim.  Id. at 446.  Thus, the Court will address this claim using the deferential AEDPA standards.

### 1.     Constitutionality and Application of "In Perpetration of a Felony"

As stated above, Pennsylvania's death penalty statute provides as an aggravating circumstance, "[t]he defendant committed a killing while in the perpetration of a felony."  42 Pa. Cons. Stat. § 9711(d)(6).  In a separate statute, "perpetration of a felony" is defined as "[t]he act of the defendant in engaging in or being an accomplice in the commission of, or an attempt to commit, of flight after committing, or attempting to commit robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping."  18 Pa. Cons. Stat. § 2502(d).  Before the Pennsylvania Supreme Court and this Court, Robinson contends that the "in perpetration of a felony" aggravating circumstance should be limited to the six felonies found in § 2502(d)'s definition of "perpetration of a felony."  He claims that because he was not found guilty of any of those felonies enumerated in § 2502(d), the jury's finding of the "in perpetration of a felony" aggravating circumstance cannot stand, and counsel was ineffective for failing to properly litigate this claim.

In support of his position, Robinson argued before the Pennsylvania Supreme Court that the legislative history of Pennsylvania's death penalty statute suggests that prior to the United

States Supreme Court's decision in Furman v. Georgia, 408 U.S. 238 (1972),[38] 18 Pa. Cons. Stat. § 2502 and 42 Pa. Cons. Stat. § 9711 were part of the same statute. See Robinson-II, 877 A.2d at 445-46. He further asserted that following Furman, when the state legislature severed the statute into present day sections 2502 and 9711, it overlooked the necessity to import the definitional subsection of § 2502 into § 9711. See Robinson-II, 877 A.2d at 446. As a result, to expand the felonies for purposes of § 9711(d)(6) to any felonies beyond those enumerated in § 2502 creates a constitutionally impermissible interpretation of § 9711.

In deciding this issue, the Pennsylvania Supreme Court noted that it had previously addressed and rejected a nearly identical claim in Commonwealth v. Walker, 656 A.2d 90 (Pa. 1995). In that case, the petitioner asserted that the trial court erred in permitting the jury to consider the felony of criminal trespass, 18 Pa. Cons. Stat. § 3503(a)(2), as an aggravating circumstance under § 9711(d)(6). Walker, 656 A.2d at 102. The petitioner made the same argument as Robinson, but without providing the extensive legislative history to support his claim. In Walker, the Pennsylvania Supreme Court held, as stated in Robinson-II,

> a jury may find an "in perpetration of a felony" aggravating circumstance and that felonies expressly defined in the Crimes Code at 18 Pa. Cons. Stat. § 101 et seq. Id. Additionally, we held Walker's claim had no merit "[b]ecause 42 Pa. Cons. Stat. § 9711(d) expressly permits the use of 'felonies' as an aggravating circumstance . . . ." Id. We, therefore, found a jury may consider criminal trespass as a felony for purposes of the (d)(6) aggravating circumstance. Id. Importantly, we did not limit felonies for purposes of (d)(6) to those enumerated in § 2502(d).

Robinson-II, 877 A.2d at 445. In rejecting Robinson's argument, the supreme court stated,

---

[38] In Furman, the United States Supreme Court held that the death penalty may not be imposed under sentencing procedures that create a substantial risk that punishment will be inflicted in an arbitrary and capricious manner. Id., 408 U.S. 238.

We decided <u>Walker</u> on March 23, 1995.  Since that time, the General Assembly has amended 42 Pa. Cons. Stat. § 9711 on no less than five occasions, including October 11, 1995, November 17, 1995, April 25, 1997, June 25, 1997, and October 12, 1999.  42 Pa. Cons. Stat. § 9711.  In these amendments, the Legislature did not alter the law as interpreted by this Court.  "The failure of the General Assembly to change the law which has been interpreted by the courts creates a presumption that the interpretation was in accordance with the legislative intent; otherwise the General Assembly would have changed the law in a subsequent amendment."  <u>Fonner v. Shandon, Inc.</u>, 555 Pa. 370, 724 A.2d 903, 906 (1999) (citation omitted); <u>see</u> 1 Pa. Cons. Stat. § 1922(4) ("In ascertaining the intention of the General Assembly . . . the following presumptions . . . may be used: That when a court of last resort has construed the language used in a statute, the General Assembly in subsequent statutes on the same subject matter intends the same construction to be placed upon such language.").  Accordingly, consistent with our decision in <u>Walker</u>, we find that 42 Pa. Cons. Stat. § 9711(d)(6) expressly allows a jury to find as an aggravating circumstance that a killing was committed while in perpetration of a "felony."  What constitutes a "felony" in this Commonwealth is defined in the Crimes Code at 18 Pa. Cons. Stat. § 101 <u>et seq.</u>

<u>Robinson-II</u>, 877 A.2d at 446.  The court also noted that the jury properly considered Robinson's felony convictions of attempted criminal homicide, <u>see</u> 18 Pa. Cons. Stat. §§ 901, 2501, 2502, aggravated assault, <u>see</u> 18 Pa. Cons. Stat. § 2702(a)(1), and concealing a firearm on his person or in his vehicle without a license, <u>see</u> 18 Pa. Cons. Stat. § 6106, in determining that Robinson had committed a killing while in perpetration of a felony.  <u>Robinson-II</u>, 877 A.2d at 446.

Before this Court, Robinson again raises <u>Furman</u>, arguing that Pennsylvania's capital sentencing scheme is arbitrary and capricious.  In support, he cites <u>Godfrey v. Georgia</u>, 446 U.S. 420 (1980), which, in reaffirming <u>Furman</u>, held:

A capital sentencing scheme must, in short, provide a meaningful basis for distinguishing the few cases in which the death penalty is imposed from the many cases in which it is not.  This means that if a state wishes to authorize capital punishment it has a constitutional

> responsibility to tailor and apply its law in a manner that avoids the
> arbitrary and capricious infliction of the death penalty.  Part of a
> State's responsibility in this regard is to define the crimes for which
> death may be the sentence in a way that obviates "standardless
> [sentencing] discretion."

Godfrey, 446 U.S. at 427-28 (citations and internal quotation marks omitted).  See also Gregg v.

Georgia, 428 U.S. 153, 189 (1976) ("where discretion is afforded a sentencing body on a matter

so grave as the determination of whether a human life should be taken or spared, that discretion

must be suitably limited so as to minimize the risk of wholly arbitrary and capricious action").

Initially, the Court understands Robinson's argument to be based, in part, on the United

States Supreme Court's requirement under the Eighth Amendment that the class of first-degree

murderers eligible for the death penalty be narrowed by the use of aggravating factors.  See

Tuilaepa v. California, 512 U.S. 967, 971-72 (1994).  A state's sentencing procedures with

respect to aggravating circumstances will not comply with the rule set down in Furman and

Gregg,  if: (1) the state defines its aggravating circumstances too broadly, either in a statute or in

an instruction given to the jury, such that these circumstances could apply to every possible

defendant convicted of murder, see Tuilaepa, 512 U.S. at 972; see also Godfrey, 446 U.S. at 428;

or (2) the state defines its aggravating circumstances in a way that is too vague, such that they fail

to "channel the [jury's] discretion by 'clear and objective standards' that provide 'specific and

detailed guidance.'" Godfrey, 446 U.S. at 428.  The Supreme Court also has stated that the

process must be "neutral and principled so as to guard against the bias or caprice in the

sentencing decision." Tuilaepa, 512 U.S. at 973.

In this case, Robinson is challenging the constitutionality of the "in perpetration of a

felony" aggravating circumstance, not the sufficiency of evidence used to apply it.  The

Pennsylvania Supreme Court addressed Robinson's claim by looking to the legislative history of 42 Pa. Cons. Stat. § 9711.  It concluded that, based on the state legislature's repeated failure to alter the law after the court had interpreted it to include all felonies found in the Crimes Code, 42 Pa. Cons. Stat. § 9711(d)(6) expressly permits a jury to find as an aggravating circumstance that a killing was committed while in perpetration of a "felony."  Robinson-II, 877 A.2d at 446. Further, the court found that because Robinson had been convicted of the separate felonies of attempted criminal homicide, aggravated assault, and concealing a firearm without a license, the jury properly could consider these offenses when determining whether to apply the "in perpetration of a felony" aggravating circumstance.  Id.

Upon review, the Court concludes that an aggravating circumstance which directs a jury to consider any felonies committed at the time of a murder does not run afoul of the Eighth Amendment's prohibition on instructions that permit open-ended discretion as to the sentence that may be imposed.  The act of committing a separate felony in the course of committing a murder does not apply to every possible defendant convicted of murder.  Further, the very fact that a jury is permitted to consider any felony as applicable to this aggravating circumstance does not per se constitute a broad interpretation of the aggravator itself.  Robinson cites no Supreme Court cases requiring the opposite outcome.  In addition, he fails to establish that the state court was objectively unreasonable in choosing to follow its own precedent.  Thus, the Court finds that the Pennsylvania Supreme Court's denial of Robinson's claim is neither contrary to, or an unreasonable application of, clearly established federal law.[39]  28 U.S.C. § 2254(d).

_____

[39] Since the Court agrees that 42 Pa. Cons. Stat. § 9711(d)(6) is not unconstitutionally overbroad, it need not address Robinson's alternate argument that the statute violates the Constitution's prohibition against ex post facto laws.

### 2.    Ineffective Assistance of Counsel

In addition to the substantive claims, Robinson claims counsel were ineffective for failing to properly litigate the claims.  As discussed in the preceding subsection, the substantive claim put forth by Robinson is meritless, and counsel's performance cannot be deficient based on a failure to advance a meritless claim.  Strickland, 466 U.S. at 691.  Therefore, Robinson's claims of ineffective assistance of counsel must fail.

### L.    Sentencing Phase Issue - Claim Six - The Trial Court's Instruction on "Grave Risk" Aggravating Circumstance and the Sufficiency of the Evidence Establishing That Aggravating Circumstance

Robinson claims he is entitled to a new sentencing hearing "because there was insufficient evidence to support the jury's finding of the [grave risk] aggravating circumstance, and the trial court failed to include the required limiting instruction rendering the [grave risk] aggravating circumstance vague and overbroad, and counsel were ineffective in failing to litigate these claims."  (Doc. No. 21 at 126.)  For the reasons that follow, the Court will not disturb the jury's sentence on these grounds.

As stated in the previous section, at sentencing, the Commonwealth presented the jury with two aggravating circumstances: (1) the defendant committed a killing while in the perpetration of a felony, id. § 9711(d)(6); and (2) in the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense, id. § 9711(d)(7).  Defense counsel did not set forth any specific mitigating circumstances; rather, she instructed the jury to construct its own mitigating circumstances pursuant to 42 Pa. Cons. Stat. § 9711(e)(8).[40]  During closing, the prosecutor stated the following with respect to

---

[40] See supra, note 37, at 100.

aggravating circumstances:

> Here we're trying to say, gees, if the guy's not licensed to carry a gun, which is a felony, that the mere fact that he had it with him and shouldn't, say, don't be carrying a gun illegally and then go kill somebody. Stop. We'll just deal with the gun thing, or if you're going to kill somebody, don't create a risk of killing someone else.

> Because in the course of this killing, and by your very verdicts you said, yeah, he killed Rashawn Bass and he had the specific intent to do that, and while he's doing that, in the course of that killing, he also created grave risk of death to Tara Hodge, and you heard that testimony.

> The doctor said had that angle changed just a bit, that girl would be dead. You all heard about what a vital organ the head is, and that's just a common sense thing. So if you're going to create a grave risk of death, that puts you in that seat that we're sitting in today, or if you do other felony crimes while you're killing Rashawn Bass, like attempted murder on Tara Hodge or aggravated assault on Tara Hodge, or even the fact that you're carrying a gun, which is a felony, that you shouldn't be doing, and you go and kill someone, now you have got some extra problems.

> *  *  *

> And then while he is killing Rashawn another person gets almost killed. That's a serious thing that we have to stop, and then in that course of creating a grave risk of death to Tara.

(Sentencing NT 3/14/97 353-54, 58.) Defense counsel then stated the following in response to the prosecution's arguments in favor of the aggravating circumstances:

> Mr. Ebert's aggravating circumstances are defendant knowingly created a grave risk of death to another person in addition to the victim. He's talking about Tara Hodge. Yes, he did, and you convicted him of that yesterday. You convicted him of attempted murder and aggravated assault. This is redundant. This is a trick question.

> The defendant committed a killing while in the perpetration of a

107

> felony.  Yes, he did, and you convicted him of that yesterday.  You
> convicted him of the killing of Rashawn Bass.  You convicted him of
> the carrying of the weapon, and you convicted him of the perpetration
> of a felony, which was assaulting Tara Hodge.  These are repackaging
> of what you did yesterday.

(Id. at 365.)  Following closing arguments, the trial court gave its charge to the jury.  During the

charge, the trial court explained the "grave risk" aggravating circumstance in the following

manner:

> In this case, the aggravating circumstances that are being submitted
> to you for your consideration to determine whether the
> Commonwealth has proven them beyond a reasonable doubt are two
> in number.  They are right out of the Pennsylvania statute, as will be
> the mitigating circumstance I am about to tell you.  One, in the
> commission of the criminal homicide defendant knowingly created a
> grave risk of death to Tara Hodge and in addition to Rashawn Bass
> who was the victim of the offense.

(Id. at 375-76.)  The trial court provided no further language with respect to the "grave risk"

aggravating circumstance.

At the conclusion of its deliberations, the jury indicated that at least one juror found two

mitigating circumstances applied in this matter, namely: (1) Robinson's youth, 42 Pa. Conn. Stat.

§ 9711(e)(4); and (2) his future contributions to society, id. § 9711(e)(8).  (Id. at 387.)  However,

the jurors unanimously concluded that both aggravating circumstances put forth by the

Commonwealth applied, and further found that those aggravating circumstances outweighed the

mitigating circumstances.  (Id. at 386-87.)  Therefore, the jury returned a verdict of death

consistent with 42 Pa. Conn. Stat. § 9711(c)(1)(iv).

Counsel did not raise an objection to the "grave risk" aggravating circumstance on direct

appeal.  However, in its opinion on direct appeal the Pennsylvania Supreme Court reviewed

Robinson's death sentence in accordance with its statutory duty set forth in § 9711(h).[41]  In so

doing, the court found that "the evidence was sufficient to establish the aggravating factors found

by the jury."  Robinson-I, 721 A.2d at 355.  In his PCRA petition with the Pennsylvania Supreme

Court, Robinson raised, verbatim, the same claim regarding the "grave risk" aggravating

circumstance that he raises here.  Robinson-II, 877 A.2d at 438 n.1.  The Pennsylvania Supreme

Court, however, declined to address this claim on the merits, finding that it had been previously

litigated on direct appeal.  Id. at 439 n.2.  The Court will now consider Robinson's arguments in

turn.[42]

### 1.     Sufficiency of the Evidence

Robinson first contends that the evidence adduced at the sentencing hearing was

insufficient to support the application of the "grave risk" aggravating circumstance.  (Doc. No.

21 at 127-30.)  In support of this claim, Robinson relies on the Pennsylvania Supreme Court's

---

[41] The Pennsylvania Supreme Court automatically reviews a death sentence under this statutory provision.  The statute provides, in pertinent part,

> The Supreme Court shall affirm the sentence of death unless it determines that:
>     (i) the sentence of death was the product of passion, prejudice or any other arbitrary factor; or
>     (ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d).

42 Pa. Cons. Stat. § 9711(h)(3).

[42] It is not entirely clear to the Court that each of these issues are properly before the Court, nor is it clear that the de novo standard of review proposed by Robinson is appropriate. However, the Commonwealth deigned to provide the Court with only six sentences addressing "Claim Six" of the petition.  In its six sentence argument, the Commonwealth neither addresses these questions, nor provides the Court with any citation to either the law or the record. Therefore, the Court will accept Robinson's arguments regarding the procedural posture of the case.

decision in Commonwealth v. Stokes, 615 A.2d 704 (Pa. 1992). In Stokes the Pennsylvania Supreme Court advised that the application of the "grave risk" aggravating circumstance "applies to situations where the defendant in the course of killing his particular victim acts in a manner which endangers the lives of others close in proximity to the intended or actual victim." Id. at 713 (citing Commonwealth v. Rollins, 580 A.2d 744 (Pa. 1990)).

Upon a cursory review, Stokes appears to require this Court to grant Robinson's motion for a new sentencing hearing. Stokes was convicted of three counts of first degree murder and sentenced to three consecutive sentences of death. Id. at 707. The evidence adduced at trial showed that while robbing a restaurant, Stokes forced three individuals into an industrial refrigerator. Id. at 707-08. After deciding he needed to kill the witnesses of the robbery, Stokes fired a number of shots into the refrigerator, killing two individuals. Id. at 708. A third, escaped the refrigerator and ran to the front door of the restaurant. Id. However, the door was locked and Stokes shot his third victim three times, killing him. Id. At the penalty phase, the trial judge instructed the jury that "as a matter of logic" for each count of murder, the killing of the two other victims would satisfy the "grave risk" aggravating circumstance. Id. at 713. The Pennsylvania Supreme Court reversed and noted that the "grave risk" aggravating circumstance was "completely inapplicable" to the murder committed at the front door of the restaurant because there were no other individuals "in close proximity" to that victim when he was killed. Id. at 713-14.

Although initially compelling, the Court concludes that Robinson places undue weight on Stokes. To the extent that Robinson's characterization of the language in Stokes regarding the meaning of the "grave risk" aggravating circumstance is accurate, the Court rejects this

understanding as dicta[43] and as inconsistent with binding precedent of the Pennsylvania Supreme

Court.  Contrary to Robinson's suggestion, the relevant Pennsylvania precedent does not limit the

"grave risk" aggravating circumstance to a formalistic spatial inquiry.  An instructive case on the

scope of the "grave risk" aggravating circumstance is Commonwealth v. Mitchell, 599 A.3d 624

(Pa. 1991).  As recounted by the Pennsylvania Supreme Court, in Mitchell the defendant and

three minors decided to murder the resident counselor assigned to work at the Children's Home

of York, where the three minors resided.  Id. at 626-27.  The four entered the home, and the

defendant directed one of the minors to remain on the second floor and to kill any of the boys

living in the home if they woke up while the victim was being killed downstairs.  Id. at 627.  The

defendant and two other minors then proceeded downstairs, woke up the victim, and stabbed him

twenty-one times, killing him.  Id.  None of the sleeping boys woke up, and the conspirators left

the scene without harming, or attempting to harm, any of them.  Id.  The trial judge[44] found that

the defendant had placed the boys who were sleeping upstairs at grave risk of death.  Id.

The Pennsylvania Supreme Court "review[ed] the actor's conduct to determine whether

his conduct brought others into a life threatening situation."  Id. at 628.  Under Robinson's theory

of the aggravating circumstance, the boys sleeping upstairs were not put in grave risk of death by

---

[43] In Stokes, the Pennsylvania Supreme Court did not strike the jury's finding of the "grave risk" aggravating circumstances because the facts did not support such a finding.  Rather, the court struck the finding because the trial court instructed the jury that they must conclude the aggravating circumstance applied "as a matter of logic."  Id. at 713-14.  "Regardless of what would have been reasonable on the facts," the instruction prevented the jury from exercising its function as fact finder by informing the jurors that the "grave risk" aggravating circumstance applied as a matter of law.  Id.

[44] The defendant was informed that he had the right to have a jury determine his sentence, but he waived this right.

the killing – certainly they were not at risk of the defendant accidentally stabbing them while he was murdering his victim.  However, the Pennsylvania Supreme Court affirmed the trial court's conclusion that the grave risk aggravating circumstance applied to the boys who were not even on the same floor as the defendant when he was committing the crime.  Id.  The court concluded that the defendant created a grave risk of death to the sleeping boys because he set a plan in motion where if the sleeping boys had awakened the defendant's armed coconspirator was prepared to kill them.  Id.  It is clear, therefore, that the correct measure of whether the grave risk aggravating circumstance is proper is not the distance between Hodge and Bass when the latter was murdered, but rather whether there is a link between a risk of danger to Hodge and the murder of Bass.  See Commonwealth v. Paolello, 665 A.2d 439, 457 (Pa. 1995) (requiring a "nexus . . . connecting the 'other persons' to the zone of danger created by the [Petitioner's] actions in killing the victim"); see also Commonwealth v. Wharton, 607 A.2d 710, 723-24 (Pa. 1992) (concluding that the defendants created a grave risk of death to an infant, after having killed the infant's parents, by abandoning the infant in a house with the heat turned off during February).

When viewed in this light, it becomes clear that the Pennsylvania Supreme Court was correct in concluding that the evidence adduced in this matter was sufficient to support the "grave risk" aggravating circumstance.  Robinson-I, 721 A.2d at 355.  Indeed, when confronted with the proper rule of law and the evidence presented in Robinson's case, the Court is convinced that a reasonable jury could not have come to any conclusion other than that the "grave risk" aggravating circumstance applied to Robinson's action.  The evidence presented during the penalty phase of Robinson's trial establishes an unambiguous nexus between the

112

killing and the "zone of danger."  The uncontested evidence showed that Robinson was in a

bedroom with Hodge, which was attached to the bathroom in which Bass was killed.  Hodge

testified that just after she had "stood up by the bathroom door" Robinson demanded that she tell

Bass to leave.  (Doc. No. 36 at 81.)  When Hodge refused, Robinson shot her, and then

proceeded past her into the bathroom to kill Bass.  (Id. at 81, 83.)  In short, Robinson shot an

individual who was obstructing his path to the victim.  It strains the imagination to create a

hypothetical with a closer nexus between the killing and the "grave risk of death to another"

created by that killing.

Significantly, the uncontested evidence supports even Robinson's overly-narrow

understanding of the grave risk aggravating circumstance.  Here, Hodge was lying a few feet

away, just outside the open bathroom door, when Bass was killed in the shower.  (Id.)  Further,

the evidence introduced at trial demonstrated the very real danger Hodge was in while Bass was

being shot.  Thomas Day and Paul Anderson both testified that bullets and "projectiles" fired by

Robinson passed through the wall of the bathroom to the outside of the home and into the

kitchen, knocking down a pan that had been hung up on the wall and striking a number of spice

jars.  (Id. at 23, 24, 112, 113.)  To that end, Hodge was at risk of being struck by a ricochet

passing through the open door or even through the wall.  This is well within the "zone of danger"

as articulated by the Pennsylvania Supreme Court.  See, e.g., Commonwealth v. Smith, 540 A.2d

246 (Pa. 1988) (concluding that shooting the victim on the sidewalk created a grave risk of harm

to individuals sitting outside on a nearby porch because the people on the porch "could have been

struck by a ricochet, a 'pass through' bullet, or a missed shot").  Therefore, the Court concludes

there was ample evidence to support the jury's finding that the grave risk aggravating

circumstance applied in this case, even under Robinson's formulation of the grave risk analysis.

### 2.      Unconstitutionally Vague Jury Instruction

Robinson next argues that the trial court failed to properly instruct the jury as to the meaning of the grave risk aggravating circumstance.  In support of this argument, Robinson cites Gregg v. Georgia, 428 U.S. 153 (1976), wherein the United States Supreme Court noted that a similar Georgia statute "might be susceptible of an overly broad interpretation."  Id. at 202. Robinson concludes that because the trial court failed give a limiting instruction, the jury applied the grave risk aggravating circumstance arbitrarily and capriciously, rendering the jury's verdict unconstitutional.  (Doc. No. 21 at 132-33.)

An aggravating circumstance is constitutional so long as it: (1) applies only to a subclass of defendants convicted of murder; and (2) the aggravating circumstance is not unconstitutionally vague.  Tuilaepa, 512 U.S. at 972.  In determining whether an aggravating circumstance is unconstitutionally vague,[45] the Court must impose a "quite deferential" standard of review, wherein the factor will be upheld if it "has some 'common-sense core of meaning . . . that criminal juries should be capable of understanding.'"  Id. at 973-74 (quoting Jurek v. Texas, 428 U.S. 262, 279 (1976) (White, J., concurring)).  The "controlling objective" must be to ensure that a jury is not empowered to employ bias or caprice in meting out a sentence of death.  Id. at 973 (citing Gregg, 428 U.S. at 189 (joint opinion of Stewart, Powell, and Stevens, JJ.)).  To that end, the Court has tended to strike down those factors that present a jury with "pejorative adjectives" that can be applied to nearly any crime.  Arave v. Creech, 507 U.S. 463, 472-73 (1993)

---

[45] Robinson does not challenge the grave risk aggravating circumstance on the grounds that it can apply to murder defendants generally.

114

(concluding that while aggravating circumstances referring to "heinous, atrocious, or cruel" or "outrageously or wontonly vile, horrible and inhuman" crimes are unconstitutionally vague, an aggravating circumstance referring to an "utter disregard" for human life was sufficiently definite to survive constitutional challenge); see also Tuilaepa, 512 U.S. 973-74 (collecting cases).  When reviewing a jury instruction for a Due Process violation, the central question is whether "there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.  Boyde v. California, 494 U.S. 370, 380 (1990).

In the present matter, the Court is satisfied that the jury instruction, while not a model of clarity, does not run afoul of the Eighth Amendment's prohibition on instructions that permit open-ended discretion as to the sentence that may be imposed.  As other courts have concluded, the grave risk aggravating circumstance provides juries with a "common-sense core of meaning." See, e.g., United States v. Allen, 247 F.3d 741, 786 (8th Cir. 2001) (affirming a "grave risk of death" aggravating circumstance where a jury was instructed that the circumstance meant "a significant and considerable possibility under the circumstances that existed at that time that another person could be killed"); Brecheen v. Reynolds, 41 F.3d 1343, 1361 (10th Cir. 1994). The trial judge instructed the jury twice during sentencing that the grave risk aggravating circumstance only applied if the jury concluded beyond a reasonable doubt that "in the commission of the criminal homicide defendant knowingly created a grave risk of death to Tara Hodge in addition to Rashawn Bass who was the victim of the offense."  (Sentencing NT 3/14/97 380; see also id. at 375-76.)  The plain meaning of these words are sufficiently clear as to permit a jury to properly apply the law to the facts of this case, and there is no reason to believe, let alone a "reasonable likelihood," that the jury applied the instruction in such a way that violates

the Constitution.  Boyde, 494 U.S. at 380.  This is not a case where the jury was given leave to apply the grave risk aggravating circumstance with no clear direction.  Rather, the arguments by the attorneys and the instruction by the trial judge made clear that the jury was only to consider whether Robinson put Tara Hodge at grave risk of death in the course of killing Rashawn Bass.  This is a proper instruction, and in light of the overwhelming evidence, the Court is satisfied that the jury applied it in a proper way.

### 3.     Ineffective Assistance of Counsel

In addition to these substantive claims, Robinson claims counsel were ineffective for failing to properly litigate the claims.  As discussed in the preceding subsections, the substantive claims put forth by Robinson are meritless, and counsel's performance cannot be deficient based on a failure to advance meritless claims.  Strickland, 466 U.S. at 691.  Further, the Court is satisfied that even if counsel were ineffective in pursuing these claims or disputing the grave risk aggravating circumstance at trial, counsel's performance was not prejudicial and thus Robinson's Sixth Amendment rights were not violated.  Id. at 697.  The evidence supporting a jury finding that Robinson placed Tara Hodge at grave risk of death is overwhelming.  Robinson shot Hodge in the head as he advanced toward the bathroom where Bass was showering.  Moreover, in addition to shooting an individual standing in his path to his victim, Robinson fired a number of shots in the bathroom that resulted in bullets flying through the walls of the apartment, again endangering Hodge who was lying in the open doorway to the adjoining bedroom when the shots were fired.  The evidence establishes, beyond any reasonable doubt, the necessary nexus between Robinson murdering Bass and placing Hodge in grave risk of death.  No reasonable juror could have found otherwise.  Therefore, Robinson's claims of ineffective assistance of counsel must

fail.

**M.     Sentencing Phase Issue - Claim Eight - Future Dangerousness**

Robinson argues that the trial court violated his Due Process and Eighth Amendment rights when it failed to instruct the jury that a life sentence means life without parole, as is required under <u>Simmons v. South Carolina</u>, 512 U.S. 154 (1994) and its progeny, after the Commonwealth put his future dangerousness at issue during both phases of his trial.  Robinson also argues that direct appeal counsel was ineffective for failing to properly litigate this claim. For the reasons that follow, the Court finds these claims have no merit.

**1.     Future Dangerousness**

In support of his contention that the Commonwealth put his future dangerousness at issue, Robinson relies on several portions of the record from both the guilt phase and the sentencing phase.  During the guilt phase, the Commonwealth questioned a Carlisle Police detective about the search of Robinson's bedroom after his arrest.  The detective testified that he found, <u>inter alia</u>, guns, ammunition, and firearms paperwork in a safe in the bedroom.  (Sentencing NT 3/12/97 152-56.)  He also found various photographs of Robinson with guns in a closet.  (<u>Id</u>. at 162-63.)  Further, the Commonwealth questioned a detective with expertise in ballistics and firearms inspection about bullets found at the scene.  (<u>Id</u>. at 209.)  Robinson also claims that during the guilt phase the jury heard information indicating that Robinson was on parole at the time of the killing.  (<u>See</u> Doc. No. 174 at 49-50.)

During the sentencing phase, the Commonwealth cross-examined Robinson's mother about Robinson's ownership of guns and his being on parole:

[District Attorney]:     Okay.  Now, this whole time he's living with

117

you, were you aware that he had these guns and everything in your house?

[Mrs. Robinson]:   Once he told me he had a gun that belonged to Anthony.

[District Attorney]:   Now, you knew during this period of time he was not allowed to have any guns at all, right?

[Mrs. Robinson]:   I did not approve of having guns.  My husband has a gun because he is a postal police officer.

\* \* \*

[District Attorney]:   Well, you were aware that because of the problems he had before under his probation he wasn't allowed to even have a gun?

[Mrs. Robinson]:   Yes.

\* \* \*

[District Attorney]:   But his - - he was supposed to be living at your home under the regulations that had been placed on him, wasn't he?

[Mrs. Robinson]:   I didn't place any regulations on him.

[District Attorney]:   But his probation officer said where do you live, you have to tell me where you live.

\* \* \*

The point, I guess, is that two years before the police took this statement when this murder happened during the investigation was still a period of time when under the rules of his probation he wasn't supposed to have any guns at all, right?

\* \* \*

Now, were you aware that he had gotten arrested, you know, for shooting at another

118

girl?

| | |
|---|---|
| [Mrs. Robinson]: | He told me that incident was blown out of proportion.  I was totally aware of that. |
| [District Attorney]: | But he was convicted of reckless endangerment in Maryland, assault and battery, and carrying a firearm illegally? |
| [Mrs. Robinson]: | Yes. |

(Sentencing NT 3/14/97 326.)  Finally, during his closing argument, the prosecutor stated the

following:

> Now, you consider those aggravating circumstances.  I submit to you your prior verdicts have proved them beyond a reasonable doubt. There are two of them that the circumstances are that he killed in perpetration of felonies carrying that gun illegally.  Had he not done that, this would never have happened.  And then while he is killing Rashawn another person gets almost killed. That's a serious thing that we have to stop, and then in the count of creating a grave risk of death to Tara.  Those are two things.  Your verdicts have already said it beyond a reasonable doubt.

(Id. at 358.)[46]

Robinson presented this claim to the Pennsylvania Supreme Court on direct appeal,

arguing that the Commonwealth "spent 'a good deal of time in both the case-in-chief and the

penalty phase' implicating the future dangerousness of [Robinson] by references to the fact that

[Robinson] was dangerous before the murder."  Robinson-I, 721 A.2d at 354-55.  Citing

---

[46] In a sidebar discussion between counsel and the trial court, the prosecutor offered the following:

> I believe what we presented today was rebuttal to, you know, what in essence was good character.  He is a good boy.  He did this.  I think the jurors have a right to hear what his past has been.  I do not intend to argue that he will be a future danger.

(Sentencing NT 3/14/97 348.)

Simmons and Pennsylvania law, the Pennsylvania Supreme Court denied the claim for

Robinson's failure to demonstrate that his future dangerousness was expressly implicated.  Id. at

355.  The court further found that because the only references to the dangerousness of Robinson

related to his past dangerousness, a Simmons instruction was not necessary.[47]  Id.  Because the

state court properly addressed this claim on the merits, the Court will review this claim using

AEDPA's deferential standards.

In Simmons, the Supreme Court held that not informing a jury that a defendant would

never be released on parole if sentenced to life is a violation of due process requiring a new

sentencing phase.  Simmons, 512 U.S. 154.  However, that requirement is only applicable when

the prosecution argues future dangerousness.  The Court explained:

> Holding all other factors constant, it is entirely reasonable for a
> sentencing jury to view a defendant who is eligible for parole as a
> greater threat to society than a defendant who is not.  Indeed, there
> may be no greater assurance of a defendant's future
> nondangerousness to the public than the fact that he never will be
> released on parole.  The trial court's refusal to apprise the jury of
> information so crucial to its sentencing determination, particularly
> when the prosecution alluded to the defendant's future dangerousness
> in its argument to the jury, cannot be reconciled with our well-
> established precedents interpreting the Due Process Clause.

Id., 512 U.S. at 164.

Further, the Third Circuit Court of Appeals has emphasized that in reviewing the

constitutionality of the Commonwealth's conduct at sentencing, "[t]he relevant question is

---

[47] Three Pennsylvania Supreme Court Justices concurred in the majority opinion of the
court, stating, inter alia, that the trial court was correct in not giving the instruction based on
current state law precedent, but that a Simmons instruction should be given in all future capital
cases.  Robinson-I, 721 A.2d at 356 (Zappala, J., Nigro, J., Newman, J.).  One Justice dissented,
stating that he would mandate a Simmons instruction, and therefore would vacate Robinson's
sentence of death and remand for a new sentencing hearing.  Id. (Flaherty, J.)

whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting

conviction a denial of due process.'"  Thomas v. Horn, 570 F.3d 105, 120 (3d Cir. 2009)

(quoting Darden v. Wainwright, 477 U.S. 168, 181 (1986) (citation omitted)).  It has further

instructed that in evaluating a claim like the one at issue here, the habeas court must not consider

the alleged improper argument and evidence in isolation.  Thomas, 570 F.3d at 120-21.  Rather,

they must be considered in context to see if the Commonwealth urged the jury to consider future

dangerousness when contemplating the death penalty and created an unacceptable risk that the

jury believed, in error, that the defendant could be released on parole if he were not sentenced to

death.  Id.

In this case, when considered in context, the prosecutor's questioning and comments did

not convey a message that Robinson posed a threat of future dangerousness if not sentenced to

death.  Pursuing a line of questioning about the guns in Robinson's bedroom or raising the fact

that he was on parole at the time of the shootings does not expressly suggest to the jury that

Robinson would pose a danger to society if he was released from prison.  These circumstances, in

fact, speak to Robinson's past rather than his future.  Further, the prosecutor's statement during

closing argument in support of the aggravating circumstances, "[t]hat's a serious thing that we

have to stop," does not expressly suggest to the jury that it should impose the death penalty rather

than life imprisonment because of Robinson's inability to function in society in the future.

Rather, the prosecutor's use of that phrase indicates that he wanted the jury to impose the death

penalty because of Robinson's past crimes, not because he could be a threat to society in the

future.  In sum, the prosecutor's relevant questions and comments during both phases of the trial

cannot be read as an encouragement to the jury to consider any future danger Robinson may have

posed to others if he was not sentenced to death.  Nor did the questions or prosecution argument

create an unacceptable risk that the jury believed that, if it did not impose the death penalty,

Robinson could be released on parole.  Thus, the Court concludes that the state court's decision

is not contrary to, or an unreasonable application of, clearly established federal law.  28 U.S.C. §

2254(d).

### 2.      Ineffective Assistance of Counsel

In addition to the substantive claim, Robinson claims counsel were ineffective for failing

to properly litigate this claim.  As discussed in the preceding subsection, the underlying claim put

forth by Robinson is meritless, and counsel's performance cannot be deficient based on a failure

to advance meritless claims.  <u>Strickland</u>, 466 U.S. at 691.  Therefore, Robinson's claim of

ineffective assistance of counsel must fail.

### N.      Sentencing Phase Issue - Claim Eleven - Cross-Examination of Robinson's Mother at Sentencing

Robinson claims he is entitled to a new sentencing hearing because the prosecutor's

cross-examination of Robinson's mother and her testimony elicited as a result of that questioning

violated clearly established federal law that a jury cannot be precluded from giving full effect to

relevant mitigating circumstances and that a jury is precluded from considering non-statutory

aggravating factors.  He further contends that counsel was ineffective for objecting to this

testimony and for failing to properly litigate the claim on direct appeal.  For the reasons set forth

below, the Court will not disturb the jury's sentence on this ground.

Robinson raised this claim relating to the cross-examination of Mrs. Robinson in the

PCRA proceedings and the Pennsylvania Supreme Court rejected it on state law grounds.

Robinson-II, 877 A.2d at 449.  Thus, he contends that since the state supreme court did not

adjudicate his federal constitutional claim on the merits, AEDPA's standard of review does not

apply and this Court must review the claim de novo.  As the Commonwealth does not address the

question of standard of review in its answer to the petition, the Court will review this claim de

novo.

      As stated above, Robinson claims that on cross-examination of Robinson's mother, the

Commonwealth engaged in an irrelevant, prejudicial, inflammatory line of questioning that went

beyond the scope of direct examination because it failed to deal with the character traits elicited

on direct.  This improper examination, he argues, included the following prejudicial and

irrelevant questions of whether Mrs. Robinson was aware that: (1) Robinson had punched a girl

while in the military, (2) Robinson was on probation, (3) Robinson had a gun at home even

though he was not permitted to while on probation, (4) Robinson had a lock on the door to the

room in his home, (5) Robinson "spent a lot of night down at the boy[s] home, (6) two years

earlier Robinson's father had filed a report with the police alleging that Robinson had pulled a

gun on him and had assaulted him, which was why he had to leave the house, (7) Robinson was

discharged from the army reserves because he was in prison, and (8) Robinson had been arrested

for shooting at a girl and convicted of reckless endangerment, assault and battery, and carrying a

firearm illegally in Maryland.  (See Doc. 17-5 at 23-24.)  The Court notes that on direct

examination, Mrs. Robinson testified that Robinson graduated from high school and did not have

problems in school, (Sentencing NT 3/14/97 320); earned an award for excellence in playing the

piano (id. at 320-21); entered the United States Army Reserves and was honorably discharged

(id. at 321-22); was very helpful with raising his nieces and functioned as a parent somewhat (id.

at 322-23); and worked soon after leaving the Reserves (id. at 323-24).

The Pennsylvania Supreme Court addressed this claim in Robinson-II.  In denying the claim, the state court noted the following state law with respect to presenting testimony relating to mitigating circumstances and subsequent cross-examination:

> [Robinson] may present any evidence "relevant and admissible" to any mitigating circumstance, including any evidence "concerning the character and record of the defendant . . . ."  42 Pa. Cons. Stat. § 9711(a)(2) and (e)(8).  However, [Robinson] may not offer this evidence in a vacuum without challenge or rebuttal by the Commonwealth.  Commonwealth v. O'Shea, 523 Pa. 384, 567 A.2d 1023, 1032 (1989).  "[C]ross-examination is permissible within the sound discretion of the trial court."  Commonwealth v. Ogrod, 576 Pa. 412, 839 A.2d 294, 322 (2003).  On cross-examination, counsel may question the witness concerning subjects raised during direct examination, may refute inferences raised during direct testimony, and may attempt to discredit a witness through questions about acts or omissions inconsistent with his testimony.  Id.  The trial court's discretion will not be reversed unless there has been a clear abuse of discretion or an error of law.  Id.

Robinson-II, 877 A.2d at 449.  The court then concluded that the prosecutor's cross-examination of Mrs. Robinson was not irrelevant, prejudicial, or inflammatory, but rather "was an attempt to discredit the witness on [Robinson]'s character, which was offered by [Robinson] on direct examination and clearly within the scope of direct.  Id.  It also found that since the trial court did not abuse its discretion, the ineffectiveness claims were meritless.  Id.

The Court will now turn to Robinson's arguments presented in the instant petition.

**1.     The Jury's Alleged Failure to Give Full Effect to Mitigating Circumstances**

The United States Supreme Court has stated, "[i]t is beyond dispute that in a capital case the sentencer may not be precluded from considering, as a mitigating factor, any aspect of a

124

defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Mills v. Maryland, 486 U.S. 367, 374 (1988) (quotations omitted) (emphasis in original). Further, "[t]he corollary that the sentencer may not refuse to consider or be precluded from considering any relevant mitigating evidence is equally well established." Id. at 374-75 (quotations omitted) (emphasis in original).

Here, Robinson likens his claim to a Mills claim in which a petitioner is granted sentencing relief when a jury instruction prevents full consideration of mitigating evidence. However, instead of disputing the jury instruction, Robinson claims that the prosecutor's cross-examination placed improper limitations on the jury's ability to consider all the mitigating evidence. The fundamental flaw with Robinson's claim here is that the Court is not convinced that this is a federal claim. Rather, Robinson is attempting to convert a mere state law claim that allegedly irrelevant, prejudicial and inflammatory evidence was introduced by the Commonwealth, into a federal constitutional claim. The state supreme court in Robinson-II properly disposed of this claim on state law grounds, finding that the prosecutor's cross-examination was an attempt to discredit Mrs. Robinson's direct testimony on Robinson's character, and thus was clearly within the scope of direct. Robinson-II, 877 A.2d at 449. Moreover, even if there was any error here (which the Court finds Robinson has failed to establish) it did not rise to the level of a federal constitutional violation. Thus, Robinson's claim here fails.

### 2.      The Jury's Alleged Consideration of Non-Statutory Aggravating Circumstances

In a state such as Pennsylvania where the sentencer weighs aggravating and mitigating

circumstances, "there is Eighth Amendment error when the sentencer weighs an 'invalid' aggravating circumstance in reaching the ultimate decision to impose a death sentence." Sochor v. Florida, 504 U.S. 527, 532 (1992); see also Espinosa v. Florida, 505 U.S. 1079, 1081 (1992). As the Supreme Court stated in Sochor,

> Employing an invalid aggravating factor in the weighing process "creates the possibility . . . of randomness," Stringer v. Black, 503 U.S. 222, 236, 112 S. Ct. 1130, 1139, 117 L. Ed. 2d  725 (1992), by placing a "thumb [on] death's side of the scale," id., at 232, 112 S. Ct., at 1137, thus "creat[ing] the risk [of] treat[ing] the defendant as more deserving of the death penalty," id., at 235, 112 S. Ct., at 1139. Even when other valid aggravating factors exist, merely affirming a sentence reached by weighing an invalid aggravating factor deprives a defendant of "the individualized treatment that would result from actual reweighing of the mix of mitigating factors and aggravating circumstances." Clemens [v. Mississippi, 494 U.S. 738, 752, 110 S. Ct. 1441, 1450 (1990)] (citing Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L. Ed. 2d 973 (1978), and Eddings v. Oklahoma, 455 U.S. 104, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982)); see Parker v. Dugger, 498 U.S. 308, 321, 111 S. Ct. 731, 739, 112 L. Ed. 2d 812 (1991).  While federal law does not require the state appellate court to remand for resentencing, it must, short of remand, either itself reweigh without the invalid aggravating factor or determine that weighing the invalid factor was harmless error.  Id., at 320, 111 S. Ct., at 739.

Sochor, 504 U.S. at 532.

Here, Robinson argues that the prosecutor's line of questioning resulted in the introduction of evidence of inappropriate, non-statutory, non-existent aggravating circumstances. In essence, he claims that his federal constitutional rights were violated when the jury was exposed to, and allegedly considered, the above-referenced eight (8) non-statutory aggravating factors.  The Court is not persuaded by this argument.  First, Robinson does not provide evidence that the jury did consider and give weight to an invalid aggravating circumstance.  In contrast, in

126

Sochor, the trial court weighed the statutory aggravating circumstance that the killing was

"committed in a cold, calculated and premeditated manner, without any pretense of moral or

legal justification" in its sentencing deliberations.  On direct appeal, the state appellate court

determined that the evidence was insufficient to support the trial court's reliance upon that

aggravating circumstance, but upheld the defendant's sentence because, inter alia, the trial court

had found three other valid aggravating circumstances.  Sochor, 504 U.S. at 538-39.  The

Supreme Court reversed, holding that an Eighth Amendment error had occurred because the trial

court had weighted an aggravating circumstance that was invalid (since it was supported by

insufficient evidence).  Id. at 538-39.  Here, Robinson is merely speculating that the jury must

have considered the evidence elicited on cross-examination as invalid non-statutory aggravating

circumstances.

Second, Robinson's argument is unconvincing in light of the instructions given to the

jury.  The trial court specifically instructed the jury as to the two aggravating circumstances it

could consider.  (Sentencing NT 3/14/97 375-76.)  Further, the trial court instructed, "You must

determine whether one or both [of the aggravating circumstances] have been proven beyond a

reasonable doubt.  If neither has been proven beyond a reasonable doubt, there would be no

aggravating circumstances and your verdict must be life imprisonment."  (Id. at 376.)  Because

the law presumes that the jury followed the instructions given, see Kindler v. Horn, 542 F.3d 70,

89 (3d Cir. 2008), cert. granted, Beard v. Kindler, — U.S. —, 129 S. Ct. 2381 (2009), vacated

and remanded on other grounds, Beard v. Kindler, — U.S. — , 130 S. Ct. 612 (2009), the Court

cannot conclude that the jury improperly considered as a non-statutory aggravating circumstance

any of the eight factors at issue in this claim, or that it is even reasonably likely that it did.  Thus,

Robinson's claim here fails.

### 3.      Ineffective Assistance of Counsel

In addition to the substantive claim, Robinson claims counsel were ineffective for failing to properly litigate this claim.  As discussed in the preceding subsections, the underlying claim put forth by Robinson is meritless, and counsel's performance cannot be deficient based on a failure to advance meritless claims.  Strickland, 466 U.S. at 691.  Therefore, Robinson's claim of ineffective assistance of counsel must fail.

### O.      Claim Thirteen - Pennsylvania Supreme Court's Proportionality Review

At the time of Robinson's trial and appeals in state court, the Pennsylvania Supreme Court was required by statute to determine whether the death sentence imposed in his case was "excessive or disproportionate to the penalty imposed in similar cases."  42 Pa. Cons. Stat. § 9711(h)(3)(iii).[48]  Robinson argues that the Pennsylvania Supreme Court failed to provide him with that meaningful proportionality review because the database relied upon by the court was fundamentally flawed and inaccurate, thereby violating his right to due process.  He further claims that counsel was ineffective for failing to properly litigate this claim.[49]

---

[48] Although proportionality review was statutorily mandated at the time of Robinson's trial in March 1997, the state legislature deleted it from Pennsylvania's death penalty statute on June 25, 1997.  See 42 Pa. Cons. Stat. § 9711 (amended by P.L. 293, No. 28, § 1 (June 25, 1997)).

[49] Robinson exhausted this claim, as well as the derivative claim of ineffective assistance of counsel, on post-conviction review before the Pennsylvania Supreme Court.  Robinson-II, 877 A.2d at 449.  In its decision on post-conviction review, the court pointed out Robinson's acknowledgment that his claim had been previously rejected in other cases.  See id. (citing Commonwealth v. Miller, 746 A.2d 592, 604 (Pa. 2000); Commonwealth v. Albrecht, 720 A.2d 693, 708 (Pa. 1998); Commonwealth v. Gribble, 703 A.2d 426, 438-40 (1997)).  In denying the claim, the court stated only that Robinson had failed to offer a compelling reason to reexamine those decisions.  Robinson-II, 877 A.2d at 449.  While it does appear that the court considered

128

It is clear that there is no constitutional requirement that a defendant be granted comparative proportionality review of his sentence.  Pulley v. Harris, 465 U.S. 37, 50-51 (1984); Riley v. Taylor, 277 F.3d 261, 310 (3d Cir. 2001).  However, where a state creates a right to proportionality review, a defendant is constitutionally entitled to procedures which ensure that the right is not "arbitrarily denied."  Foster v. Delo, 39 F.3d 873, 882 (8th Cir. 1994) (citing Wolff v. McDonald, 418 U.S. 539, 557 (1974)).  If the state has conducted such a review and concluded that a defendant's punishment is proportionate to that imposed for similar crimes, there is no basis for constitutional relief.  Foster, 39 F.3d at 882.  Thus, a federal court may not issue a writ of habeas corpus on the basis of a perceived error in application of state law.  Pulley, 465 U.S. at 41.

In the instant case, Robinson does not deny that the Pennsylvania Supreme Court granted him proportionality review; instead, he objects to the procedure by which that review was conducted.  The Pennsylvania Supreme Court, however, has examined the procedures in place at the time of Robinson's appeal and "found nothing arbitrary or capricious" about them.  Gribble, 703 A.2d at 441.  Specifically, the court noted that in conducting a proportionality review,

> we examine not only the compiled data from the AOPC, but we also have at our disposal the verdict sheets and the review forms submitted by the President Judges.  This allows us to conduct a thorough review of cases similar to the one in question and provides additional screening for any anomalies that may be present in the AOPC database.  We have carefully reviewed these procedures and find nothing arbitrary or capricious in this scheme.  Instead, we believe that our proportionality review comports with the General Assembly's desire to afford capital defendants an additional check against the arbitrary imposition of the death penalty.

---

Robinson's arguments in support of his claim, in an abundance of caution, this Court will review the substantive claim here under a de novo standard.  See supra, Section III(B).

Id.  As the state court in this case did review Robinson's case under procedures found not to be "arbitrary or capricious," the Court finds there is no basis for federal review of this claim. Further, as previously discussed, where the substantive claim put forth by Robinson is meritless, counsel's performance cannot be deficient based on a failure to advance meritless claims. Strickland, 466 U.S. at 691.  Thus, the ineffectiveness claim is also denied.

**P.      Sentencing Phase Issue - Claim Fourteen - Prospective Jurors Excused for Cause**

Robinson challenges his death sentence on the grounds that his Due Process and Eighth Amendment rights were violated when he was tried by a jury that was improperly death qualified. He argues that four venirepersons - Virginia Francavilla, Cynthia Railing, Xuan Thieu, and Ann Barrell - were improperly excused for cause during voir dire.  In the instant petition, Robinson also claims that counsel was ineffective for failing to properly litigate this claim.  For the reasons that follow, habeas relief on both claims will be denied.

**1.      Excusing Prospective Jurors for Cause**

Robinson bases this claim on the following voir dire of four potential jurors, which he claims was insufficient to justify their excusal for cause.  In each instance, the trial court began by explaining the circumstances under which the death penalty could be imposed in this case.[50]

---

[50] By way of example, the trial court initially stated to Virginia Francavilla the following:

> Defendant, Antyane Robinson, who is representing himself and has two standby attorneys, Arla M. Waller and Ellen K. Barry, is charged with capital criminal homicide.  The Commonwealth is represented by the District Attorney, M.L. Ebert.
>
> If and only if a jury returns a verdict of murder in the first degree will the jury then determine if the penalty is death or life

As to Virginia Francavilla, Robinson challenges the following exchange:

> The Court:     Do you have any moral, philosophical, religious or
>                other beliefs or scruples in opposition to the death
>                penalty?
>
> Francavilla:   I don't know if I could do that.
>
> The Court:     If defendant is convicted of murder in the first
>                degree, is any opposition that you have to the death
>                penalty so firm and fixed that you could not after
>                hearing all additional evidence set aside your own

imprisonment.  Because of that possibility, it is necessary to ask
you some questions regarding the death penalty.

The questions have no bearing on whether or not defendant is
guilty or not guilty of any degree of criminal homicide.  At this
point he is presumed innocent, and in order to convict him of any
degree of criminal homicide, the Commonwealth must prove his
guilt beyond a reasonable doubt.

If there is a verdict of first degree murder, the District Attorney has
indicated that he will offer evidence of aggravating circumstances
under Pennsylvania law.  The defense may offer evidence of one or
more mitigating circumstances.

If the jury finds one or more aggravating circumstances and no
mitigating circumstances, the penalty must be death.  If the jury
finds no aggravating circumstance, the penalty must be life
imprisonment.  If the jury finds one or more aggravating
circumstances and one or more mitigating circumstances, the jury
must weigh all of the evidence in the case to determine if the
penalty is death or life imprisonment.

As I said, the jury will not have to make any decision regarding
penalty unless it finds defendant guilty of murder in the first
degree.  If it does, the jury will only be asked to decide if the
penalty of death should be imposed after all evidence of any
aggravating circumstances and any mitigating circumstances has
been presented in a second phase of the trial.

(Trial NT 3/11/97 173-74.)

|  |  |
|---|---|
|  | beliefs and scruples in deference to the law and if the facts and the law support the imposition of the death penalty vote for the penalty of death in this case?  Could you do that? |
| Francavilla: | Could I vote for it? |
| The Court: | Yes. |
| Francavilla: | I don't know. |
| The Court: | If the Commonwealth proves beyond a reasonable doubt that defendant is guilty of murder in the first degree, will you vote for that verdict knowing that if defendant is convicted of murder in the first degree the jury will then have to decide whether to impose a penalty of death or life imprisonment?  Could you vote for murder in the first degree knowing that you would then have to decide the issue of penalty, death or life imprisonment? |
| Francavilla: | I don't think I have that in me. |

(Trial NT 3/10/97 174-75.)

As to Cynthia Railing, Robinson challenges the following exchange:

|  |  |
|---|---|
| The Court: | Do you have any moral, philosophical, religious or other beliefs or scruples in opposition to the death penalty? |
| Railing: | I do. |
| The Court: | If the defendant is convicted of murder in the first degree, if your opposition to the death penalty so firm and fixed that you could not after hearing all additional evidence set aside your own beliefs or scruples in deference to the law and if the facts and the law support the imposition of the death penalty vote for the penalty of death in this case?  Could you vote for the penalty under those circumstances? |
| Railing: | I don't think so. |

(Id. at 183-84.)

As to Xuan Thieu, Robinson challenges the following exchange:

| | |
|---|---|
| The Court: | Do you have any moral, philosophical, religious or other beliefs or scruples in opposition to the death penalty? |
| Thieu: | That I don't know.  It depend[s].  I cannot answer that. |
| The Court: | Okay.  If a defendant is convicted of murder in the first degree, is any opposition that you may have to the death penalty so firm and fixed that you could not after hearing all additional evidence set aside your own beliefs or scruples in deference to the law and if the facts and the law support the imposition of the death penalty vote for the death penalty in this case? |
| Thieu: | No. |

(Id. at 193.)

As to Ann Barrell, Robinson challenges the following exchange:

| | |
|---|---|
| The Court: | Do you have any moral, philosophical, religious or other beliefs or scruples in opposition to the death penalty? |
| Barrell: | I really have never had it put to the test before, so I don't know. |
| The Court: | If defendant is convicted of murder in the first degree, is any opposition or concern you have to the death penalty so firm and fixed that you could not after hearing all additional evidence set aside your own beliefs or scruples in deference to the law and if the facts and the law support the imposition of the defendant [sic] penalty vote for the death penalty in this case?  Could you do that? |
| Barrell: | I really don't know. |

133

(Trial NT 3/11/97 260-61.)

After each exchange set forth above, the trial court asked Robinson, who was proceeding pro se at the time, and the prosecutor if either had additional questions on the penalty phase. (Trial NT 3/10/97 175, 184, 193; Trial NT 3/11/97 261.)  In every instance, both parties answered in the negative and the prosecutor requested a challenge for cause.  (Trial NT 3/10/97 175-76, 184, 194; Trial NT 3/11/97 261.)  The court granted every challenge and excused the prospective jurors.  (Trial NT 3/10/97 176, 184, 194; Trial NT 3/11/97 261-62.)

Robinson raised this issue related to the dismissal of prospective jurors on direct appeal. In denying this claim on the merits, the Pennsylvania Supreme Court focused on the court's rehabilitation of juror number 6, Ann Barrell.[51]  Robinson-I, 721 A.2d at 354.  The state supreme court noted that the trial court asked a follow-up question upon hearing the reservations by the prospective juror, and subsequently granted the prosecutor's challenge for cause.  Id.  In denying Robinson's claim, the court concluded:

> In the instant case, based on the above exchange it is unclear whether this juror would have been able to follow instructions on the law. Moreover, the trial court does not have a duty to rehabilitate a potential juror where it is not clear that the potential juror would be

_____

[51] Even though the Pennsylvania Supreme Court refers only to the disqualification of Ann Barrell, Robinson's claim with respect to the other venirepersons is properly before this Court because in addressing Robinson's claim regarding Barrell, the state court was afforded the opportunity to consider the same legal theory and factual basis that governs the situations surrounding the three other prospective jurors.  See Picard v. Connor, 404 U.S. 270, 277 (1971) ("Obviously there are instances in which 'the ultimate question for disposition' will be the same despite variations in the legal theory or factual allegations urged in its support.") (citations omitted).  Further, the similarity of the four accounts ensures that the "same method of legal analysis" will be applied in both state and federal court.  Landano v. Rafferty, 897 F.2d 661, 669 (3d Cir. 1990).  Moreover, Respondents do not argue that Robinson failed to exhaust his available state remedies with respect to the three other prospective jurors.  Thus, the Court will address all four prospective jurors.

able to follow the instructions on the law. [Commonwealth v. Paolello, 665 A.2d 439, 450, 451 (Pa. 1995).] Accordingly, we do not find that the trial court abused its discretion in striking this juror for cause.

Robinson-I, 721 A.2d at 354.

Before this Court Robinson argues that his constitutional rights were violated when he was tried by a jury that was improperly death qualified.  The Court will review this claim using the deferential AEDPA standard.[52]  Section 2254(d) of AEDPA requires that federal courts defer to a state court decision unless the decision was either "contrary to, or involved an unreasonable application of, clearly established federal law, . . . or . . . [was] based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  In Witherspoon v. Illinois, 391 U.S. 510, 522 (1968), the United States Supreme Court held that a sentence of death cannot be carried out if the jury that imposed it was chosen by excluding potential jurors for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its inflection.  Id.  The question of whether a venireperson is biased has traditionally been determined by the voir dire

---

[52] Robinson contends that this Court's review is de novo because the state court ruled on state grounds alone instead of adjudicating a federal constitutional claim.  (Doc. No. 15-2 at 46-47.)  We disagree.  AEDPA deference applies even if the state court does not cite to or indicate any awareness of federal cases as long as the reasoning of the state court does not contradict relevant Supreme Court precedent.  Priester v. Vaughn, 382 F.3d 394, 397-98 (3d. Cir. 2004) (citing Early v. Packer, 537 U.S. 3 (2002); Woodford v. Visciotti, 537 U.S. 19 (2002)); see also Bell v. Cone, 535 U.S. 685, 698 (2002) (applying the deferential AEDPA standard of review where the state court had relied only on its own precedent to reject the petitioner's ineffective assistance of counsel claim); Rompilla v. Horn, 355 F.3d 233 (3d Cir. 2004) (applying AEDPA deference to Pennsylvania court's determination of petitioner's allegation of ineffective assistance of counsel despite court's failure to expressly cite to the Strickland standard).  Here, the state court's reasoning does not contradict the principles established in Witherspoon and its progeny, infra, and therefore the deferential AEDPA standard of review applies to this claim.

process culminating in a conclusion by the trial judge as to the venireperson's state of mind.

Wainwright v. Witt, 469 U.S. 412, 428 (1985).  In Uttecht v. Brown, 551 U.S. 1 (2007), the

Supreme Court asserted that its precedents had established at least four principles of relevance

with respect to jury selection:

> First, a criminal defendant has the right to an impartial jury drawn
> from a venire that has not been tilted in favor of capital punishment
> by selective prosecutorial challenges for cause.  Second, the State has
> a strong interest in having jurors who are able to apply capital
> punishment within the framework state law prescribes.  Third, to
> balance these interests, a juror who is substantially impaired in his or
> her ability to impose the death penalty under the state-law framework
> can be excused for cause; but if the juror is not substantially impaired,
> removal for cause is impermissible.  Fourth, in determining whether
> the removal of a potential juror would vindicate the State's interest
> without violating the defendant's right, the trial court makes a
> judgment based in part on the demeanor of the juror, a judgment
> owed deference by reviewing courts.

Id. at 9 (citations omitted).  The Court further found that "[d]eference to the trial court is

appropriate because it is in a position to assess the demeanor of the venire, and the individuals

who compose it, a factor of critical importance in assessing the attitude and qualifications of

potential jurors."  Id. (citing Darden v. Wainwright, 477 U.S. 168, 178 (1986); Witt, 469 U.S. at

428).  A trial judge's finding that a juror is impermissibly biased is a factual finding entitled to a

presumption of correctness under 28 U.S.C. § 2254(e)(1).  See Darden, 477 U.S. at 175; Patton v.

Yount, 467 U.S. 1025 (1984).  Robinson has the burden of rebutting the presumption of

correctness by clear and convincing evidence.  See 28 U.S.C. § 2254(e)(1).

   According to Robinson, none of the responses from the four potential jurors referred to

above indicate an inability to perform the duties of a capital juror.  As a result, all were

improperly excused for cause.  The Court agrees that a literal reading of each voir dire does not

necessarily lead to the conclusion that under no circumstances could any of these potential jurors

vote for the death penalty.  However, the trial court, "aided as it undoubtedly was by the

assessment of (the potential juror's) demeanor," has the responsibility of determining whether the

views of a potential juror would prevent or substantially impair his or her performance as a juror.

Witt, 469 U.S. at 434.  In this case, prior to directly inquiring into the views on the death penalty

of each of the four potential jurors, the trial court clearly set forth the circumstances by which the

death penalty could be imposed upon Robinson.  After each potential juror expressed

reservations as to whether any of her beliefs or scruples were in opposition to the death penalty,

the trial court followed up with a further question, albeit a lengthy one.  Robinson argues that this

follow-up question was so confusing that a response to it from a potential juror could not

possibly aid in determining whether that potential juror would be able to perform her duty on a

capital jury.  The Court notes that the transcript of this lengthy question indicates no punctuation

whatsoever.  Without an audio recording of the trial court's inquiry, the Court is unable to

determine at what point, if any, the trial court paused at the end of a phrase or for emphasis in

order to make this question clearer for the potential juror.  However, as the record clearly

indicates that none of the relevant venirepersons requested clarification with respect to the

lengthy question, the Court cannot conclude that this inquiry confused potential jurors to an

extent that the principles espoused in Witherspoon and its progeny were not satisfied.  Instead,

the record reflects that the additional question assured the trial court of the venireperson's true

position.  The trial court also afforded Robinson and the prosecutor the opportunity to assure

themselves of the true positions of these potential jurors.  The Court recognizes that "[d]espite

[a] lack of clarity in the printed record, . . . there will be situations where the trial judge is left

137

with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." Witt, 469 U.S. at 425-26. Further, the question of a challenge for bias is a factual issue and, consequently, a trial court's decision is entitled to a presumption of correctness. See id., 469 U.S. at 429. Here, Robinson has not established by clear and convincing evidence that the trial court's finding is incorrect. See 28 U.S.C. § 2254(e)(1). Viewing the record of the voir dire in its entirety, the Court concludes that the Pennsylvania Supreme Court acted reasonably in finding that the trial court's decision to exclude these four venirepersons was proper. See id. § 2254(d)(2). In addition, the state supreme court's decision is not contrary to, or an unreasonable application of, clearly established federal law. Id. § 2254(d)(1).

### 2.    Ineffective Assistance of Counsel

In addition to the substantive claim, Robinson claims counsel were ineffective for failing to properly litigate this claim. As discussed in the preceding subsection, the underlying claim put forth by Robinson is meritless, and counsel's performance cannot be deficient based on a failure to advance meritless claims. Strickland, 466 U.S. at 691. Therefore, Robinson's claim of ineffective assistance of counsel must fail.

### Q.    Claim Seventeen - Overall Ineffective Assistance Claim

Robinson argues that, to the extent that trial and direct appeal counsel failed to object to and/or properly litigate and argue the issues raised in his federal habeas petition, they were ineffective in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments. Because the Court has already addressed Robinson's individual ineffective assistance arguments and found them to be without merit, the Court declines to repeat analyses here. Therefore, this claim is denied in accordance with the Court's foregoing conclusions.

**R.     Claim Eighteen - Overall Cumulative Prejudice Claim**

Robinson argues that, even if he is not entitled to relief on any particular claim, the cumulative effect of all the errors alleged in his petition denied him a fair trial.  The Third Circuit has established that "[i]ndividual errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional right to due process."  Fahy v. Horn, 516 F.3d 169, 205 (3d Cir. 2008) (quoting Albrecht v. Horn, 471 F.3d 435, 468 (3d Cir. 2006)).  See also Marshall v. Hendricks, 307 F.3d 36, 94 (3d Cir. 2002) (finding that certain errors, harmless when viewed individually, may be so prejudicial when taken cumulatively as to warrant a new trial) (citing United States ex rel. Sullivan v. Cuyler, 631 F.2d 14, 17 (3d Cir. 1980)). Cumulative errors will only be deemed not harmless where "they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish 'actual prejudice.'"  Fahy, 516 F.3d at 205 (internal citation omitted); see Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). To demonstrate actual prejudice, Robinson must show that the errors during his trial created more than a possibility of prejudice; he must show that the errors "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Murray v. Carrier, 477 U.S. 478, 494 (1986).

Here, Robinson has failed to demonstrate any such cumulative prejudicial effect.  This Court has found all of Robinson's claims relating to both the guilt phase and the sentencing phase to be meritless.  Even considering cumulatively the few instances of harmless error

139

identified by Robinson and recognized by the Court, their overall effect is not so prejudicial to the fairness of the proceedings as to warrant a new trial. See generally Marshall, 307 F.3d at 94. Therefore, this claim will be denied.

## V.    CONCLUSION

Based on the foregoing, the Court will deny Robinson's petition for writ of habeas corpus. Pursuant to Local Appellate Rule 22.2 of the Rules of the United States Court of Appeals for the Third Circuit, at the time a final order denying a petition under 28 U.S.C. § 2254, the Court must make a determination as to whether a certificate of appealability should issue. 3d Cir. L.A.R. 22.2. A certificate of appealability should issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To meet this burden a petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Slack v. McDaniel, 529 U.S. 473, 484-83 (2000) (internal citations and quotations omitted). In the present matter, the Court concludes that reasonable jurists may debate whether the Court properly resolved the issue of whether the trial court's jury instruction on the grave risk aggravating circumstance ran afoul of the Eighth Amendment and whether there was sufficient evidence to support a finding that the grave risk aggravating circumstance was applicable to Robinson. The certificate of appealability will be denied in all other respects.

An appropriate order will issue.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANTYANE ROBINSON,** | : | **Civil Action No. 1:05-CV-1603** |
| | : | |
| **Petitioner** | : | **(Chief Judge Kane)** |
| | : | |
| **v.** | : | |
| | : | |
| **JEFFREY BEARD, Commissioner,** | : | **THIS IS A CAPITAL CASE** |
| **Pennsylvania Department of Corrections,** | : | |
| **et al.,** | : | |
| | : | |
| **Respondents** | : | |

**ORDER**

AND NOW, this 30th day of September, 2011, upon consideration of the petition for writ

of habeas corpus (Doc. 21), the complete record in this case, and the reasons set forth in the

accompanying Memorandum, **IT IS HEREBY ORDERED THAT**:

1.      The petition for writ of habeas corpus (Doc. 21) is **DENIED**.

2.      A certificate of appealability shall issue only on the issue of whether the trial court's jury instruction on the grave risk aggravating circumstance ran afoul of the Eighth Amendment and whether there was sufficient evidence to support a finding that the grave risk aggravating circumstance was applicable to Robinson.  See 28 U.S.C. § 2253(c).

3.      The Clerk of Court is directed to CLOSE this case.

                        ___s/ Yvette Kane_____
                        Yvette Kane, Chief Judge
                        United States District Court
                        Middle District of Pennsylvania